UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC., and American Telephone and Telegraph Company, Defendants.

UNITED STATES of America, Plaintiff,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., Defendants.

Civ. A. No. 82–0192.
Misc. No. 82–0025 (PI).

United States District Court, District of Columbia.

July 8, 1983.

On Motion for Partial Reconsideration July 28, 1983.

On Motions for Reconsideration and Clarification Aug. 5, 1983.

---

See also, 552 F.Supp. 131.

James P. Denvir, Michael F. Altschul, Luin P. Fitch, J. Philip Sauntry, Jr., Richard Lavine, Antitrust Div. U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Howard J. Trienens, Jim G. Kilpatric, New York City, John D. Zeglis, Washington, D.C., Francine Berry, New York City, for defendants.

John Dempsey, Bruce Renard, National Ass'n of Regulatory Utilities Commissioners, Chester T. Kamin, MCI, Chicago, Ill., Lewis J. Paper, United Church of Christ, Malcolm Pfunder, Tandy Corp., Jeffrey Olson, Black Citizens for a Fair Media, Washington, D.C., for intervenors.

## OPINION

HAROLD H. GREENE, District Judge.

Section I(A) of the decree entered on August 24, 1982, provides that "[n]ot later than six months after the effective date of [the decree], defendant AT & T shall submit to the Department of Justice for its approval, and thereafter implement, a plan of reorganization," and section VIII(J) specifies that the plan of reorganization "shall not be implemented until approved by the Court as being consistent with the provisions and principles of the decree." In accordance with these provisions, AT & T has submitted its plan to the Court following approval by the Department of Justice.[1] The intervenors were thereafter given the opportunity to raise objections; a considerable number of such objections were, in fact, filed with the Court; and AT & T and the Department of Justice, in turn, filed their own responses.

Following receipt of these papers, the Court designated certain issues for more intensive briefing and for oral argument.[2] Voluminous briefs were received on these issues, and argument was had thereon on June 2, 1983.[3] At that hearing, the Court

---

1. The Department required certain modifications which AT & T accepted.

2. The Court, of course, considered all the provisions of the plan, including those which were not set down for hearing.

3. The four issues addressed by counsel were the allocation of the costs of equal access, the distribution of contingent liabilities arising from antitrust suits against AT & T, assignment of the Bell name and logo, and assignment of patents. Three opponents of the plan of reorganization focused on the first two issues: MCI Communications Corp., the Church of Christ et al., and the National Association of Regulatory and Utility Commissioners (NARUC); three opponents focused on the last two issues: Tandy Corp., Black Citizens for a Fair Media et al., and NARUC. AT & T and the Department of Justice argued in favor of the plan of reorganization on all four issues.

also heard testimony from three of the designated chief executives[4] of the seven newly-established Regional Companies.[5] Additional documents were submitted after the hearing, including one—a letter with attachments from AT & T (see p. 1067 *infra*)—as late as June 29, 1983.

The Court has considered all issues raised with respect to the plan of reorganization on the basis of the written materials, the oral hearing, the testimony, and the entire record herein, and it has concluded that the plan of reorganization will be approved[6] provided that certain inconsistencies with the provisions and principles of the decree are corrected.[7]

**4.** Zane Barnes, chief executive-designate of the Southwestern Region, testified about the costs of equal access and the assignment of switching systems. William Weiss, chief executive-designate of the Midwest Region, testified about the apportionment of contingent liabilities and the proposed Central Staff Organization. Thomas Bolger, chief executive-designate of the Mid-Atlantic Region, testified about assignment of the Bell name and logo, and assignment of patents.

**5.** The seven Regional Companies will be holding companies for the twenty-two Bell Operating Companies. The Northeast Region will include New England Telephone Co. and New York Telephone Co. The Mid-Atlantic Region will include New Jersey Bell Telephone Co., the Bell Telephone Company of Pennsylvania, the Diamond State Telephone Company, and the Chesapeake and Potomac Telephone Companies of Washington, D.C., Virginia, Maryland, and West Virginia. The Southern Region will include Southern Bell Telephone and Telegraph Co. and South Central Bell Telephone Company. The Midwest Region will include the Ohio Bell Telephone Co., Michigan Bell Telephone Co., Indiana Bell Telephone Co., Illinois Bell Telephone Co., and Wisconsin Telephone Co. The Mountain-Northwest Region will include Northwestern Bell Telephone Co., the Mountain States Telephone and Telegraph Co., and Pacific Northwest Bell Telephone Co. The Far West Region will include the Pacific Telephone and Telegraph Co. and Bell Telephone Company of Nevada. The Southwest Region will include Southwestern Bell Telephone Co. Although the Regional Companies have been identified by geographic designations throughout these proceedings, they will subsequently be adopting formal corporate names. For in-

# I

## *Equal Access*

The decree requires the Operating Companies to "provide to all interexchange carriers and information service providers exchange access, information access, and exchange services for such access . . . that is equal in type, quality, and price to that provided to AT & T and its affiliates." Section II(A).[8] As the stepping stone to increased competition in the field of intercity telecommunications, the decree's equal access requirements and the implementing provisions of the plan of reorganization have generated substantial controversy. Comments filed by Operating Company executives, interexchange carriers, regulatory

stance, the Northeast Region has announced that it will call itself NYNEX, while the Mountain-Northwest Region has chosen U.S. West. Except where the distinction appears to be significant, the Regional Companies and the Operating Companies will be referred to herein as the Operating Companies.

**6.** On April 20, 1983, the Court tentatively approved the Local Access and Transport Areas (LATAs) within which the Operating Companies' telecommunications services will be confined. See *United States v. Western Electric Co. and American Telephone & Telegraph Co.,* 569 F.Supp. 990 (D.D.C.1983). The LATA applications were technically the first phase of the plan of reorganization. The parties proposed, and the Court accepted, that review of the plan of reorganization be undertaken in two stages for the sake of speed and convenience and because the drawing of geographic boundaries naturally preceded any division of assets between AT & T and the Operating Companies. Remaining issues with respect to the LATAs are considered in Part VII *infra*.

**7.** Both AT & T and the Department have filed motions for approval of the plan of reorganization. Those motions will be acted upon after the required modifications are submitted to the Court.

**8.** The equal access obligation takes effect on September 1, 1984, and it will be phased in over a two-year period. By September 1, 1985, the Operating Companies must provide equal access to one-third of their respective access lines, and by September 1, 1986, to the remaining access lines. See Appendix B to the decree.

commissions, consumer groups, and telecommunications associations indicate that at this stage of the proceedings[9] there is a need to resolve three primary questions relating to equal access:[10] what is it, how is it to be achieved, and who will pay for it?

### A. What Does "Equal" Mean?

A number of the Operating Companies propose to connect AT & T's interexchange competitors to the homes or businesses of local telephone subscribers by using facilities built or upgraded specially for that purpose; AT & T, on the other hand, will in numerous LATAs gain access to subscriber lines through different facilities, many of which are already extant.[11] For that reason, the access provided AT & T's competitors will not be identical to that given AT & T in all places; rather, it will be technically different in certain areas and at certain times.

The Operating Companies assert that any such technical deviations will be so slight as to be imperceptible to all customers, whether of voice or of data.[12] Accordingly, they urge the Court to accept a definition of "equal access" as access whose "overall quality in a particular area is equal within a reasonable range which is applicable to all carriers,"[13] and to reject a more stringent definition which would demand access that yields identical technical quality (*i.e.,* identical values for loss, noise, and echo, and identical possibility of blocking).[14]

■ The Court accepts the Operating Companies' definition and will not insist on absolute technical equality. To do otherwise would necessitate substantial dismantling and reconstruction of local telephone networks without any real benefits either to the consuming public or to AT & T's intercity competitors. This ruling, however, is based squarely upon the Operating Companies' representations that both voice and data customers will perceive no qualitative differences between AT & T transmissions and those of its competitors—at least with respect to those portions of the transmissions carried by an Operating Company.[15] The Operating Companies are well aware, however, that the Department of Justice will be monitoring the quality of the access they will provide and that the price of falling short of their assurance of equal quality will be enforcement proceedings brought by the Department.[16]

9. Under Section II(C) of the decree, the Operating Companies are not required to file their precise plans for providing equal access until six months after divestiture. That date may be unrealistically late because much of the preparation that must be completed by September 1984 cannot be undertaken by the Operating Companies until they are told whether their initial plans are acceptable. See Response of the United States to Public Comments and Action on AT & T's Proposed Plan of Reorganization, filed March 24, 1983 (hereinafter Department of Justice Response to Comments) at 187–88.

10. These issues bear, *inter alia,* on the assignment of assets and liabilities between AT & T and the Operating Companies, and they are therefore properly considered as part of the plan of reorganization.

11. In only one of the seven telephone regions will this not occur. In the Northeast Region, which encompasses New York and New England, AT & T and its competitors will be served from the same switches in the same LATAs. Response of the Northeast Region to the Court's May 17, 1983 Memorandum at 2 n. **.

12. It is asserted that even the interexchange carriers will not be able to detect any qualitative difference.

13. Statement of the Operating Companies Supplementing their Responses to the Court's Memorandum of May 17, 1983 Regarding the No. 4ESS Switching Systems (hereinafter Operating Company Supplement) at 2.

14. The Operating Companies state that identical per call access would be impossible, even if a uniform access configuration were imposed in each LATA, because of "normal variations of electrical characteristics of facility components and installation line-up variations...." Operating Company Supplement at 3.

15. The Operating Companies are not responsible, of course, for correcting any quality deficiencies that may result from an interexchange carrier's own facilities.

16. See Department of Justice Response to Comments at 187.

The interexchange competitors, as noted, would not be disadvantaged if the Operating Companies meet the standard they have proposed. Their real complaint is that the Operating Companies will be unable to meet that standard in many of the LATAs by the means they propose [17]—a subject to which the Court now turns.

### B. Which Switches Should Be Used for Access Arrangements?

First. Since the initial comments were filed regarding the first, or LATA, phase of the plan of reorganization, a number of intervenors have expressed concern over the kinds of switches the Operating Companies will use to route traffic from an interexchange carrier's point of presence in a LATA to a local Class 5 end office.[18]

The Court initially shared this concern, primarily because so little information about equal access planning for individual LATAs had been made available. In May of 1983, it therefore requested the Regional Companies to report in detail regarding their plans for equal access and their need in this respect for the efficient, state-of-the-art No. 4ESS switches.[19] The Court asked to be apprised of any instances where an Operating Company believed that a particular switch should be assigned to it for equal access purposes even though that switch would belong to AT & T under the predominant use test.[20] The responses were extremely helpful. Their detail and the varied recommendations made with respect to each region revealed that, contrary to some speculation, the Operating Companies had carefully studied the alternatives for the provision of access within their respective territories, and that they had concluded, independent of pressure from AT & T, which arrangements would be most economical and efficient for them.

Most of the LATAs will be served by four-wire digital tandems,[21] if not in 1984,

---

**17.** The skepticism of the interexchange competitors relates largely to the kinds of switches the Operating Companies will employ to connect the competing interexchange networks with the local Operating Company networks. See 569 F.Supp. 990.

**18.** An end office is the plant into which individual subscribers' telephone access lines feed. It is typically the point of concentration of telecommunications traffic closest to the subscriber—i.e., the point of origination or termination—and it is decidedly local in character and function. In the Bell System hierarchy of functions, this is the facility which performs the Class 5 function, meaning that from the Class 5 end office a call is either routed directly to another end office through a Class 5 trunk (a "local" call) or it is routed to a Class 4 facility for interconnection with the "toll" network. In a number of sites, the Class 4 and Class 5 functions are located in the same facility. Under the plan of reorganization, all such facilities will be owned by the Operating Companies because of the local nature of the Class 5 function. Plan of reorganization at 16–17.

**19.** There are 91 such switches in the Bell System. They were first introduced in 1976 and are large, four-wire digital switches with the capacity to handle almost 700,000 call attempts per hour. Memorandum of the Midwest Regional Holding Company, May 31, 1983, at 3. The DMS–200, DMS–100/200, and the No. 5ESS switches are smaller than the No. 4ESS,

but they "provide equivalent transmission and switching characteristics as the No. 4ESS." Response of Donald E. Guinn to the Court's Memorandum of May 17, 1983, at 3 n. *. These four switches are the most advanced of all switches in use today.

**20.** Bell System assets will be distributed according to the function they perform. 552 F.Supp. 131 at 206. Those assets performing exchange and exchange access functions will be owned by the Operating Companies; those performing interexchange functions by AT & T and its affiliates. Section I(A)(1). About eighty percent of the Bell System's assets perform one function or the other and hence are classifiable with relative ease. The remaining 20 percent are multifunction assets, providing both exchange and interexchange services. The government proposed, and the Court accepted, that the predominant use test be applied to these assets, that is, the asset will be assigned to the entity whose use predominates. 552 F.Supp. at 207. The Court noted, however, that in certain cases the test would be inappropriate (552 F.Supp. at 207 n. 317) as where a facility primarily used in connection with interexchange services was necessary for the provision of equal access by an Operating Company. See 552 F.Supp. at 200–01; section VIII(G) of the decree.

**21.** These are the advanced switches of the type described in note 19 supra and are the switches most readily connected to the four-wire trunks

then within two years.[22] The Operating Companies are not planning to make as much use of the existing No. 4ESS switches, however, as might have been anticipated. The basis of that choice appears reasonable.

Because of the large capacity of the No. 4ESS switch, the cost to an Operating Company of leasing part of it would be, in most cases, greater than would be that of constructing a smaller-scale switch directly for that company. The other alternative—vesting ownership of the No. 4ESS switch in the Operating Company, in the expectation that it will be able to lease substantial capacity to AT & T—is problematic in many cases because AT & T may choose instead to build a new switch (and even if it did not, it would be required in any event under the plan to terminate the lease after eight years). In either event, the Operating Company would thus be left with the expense of stranded capacity.

■ For these reasons, the Operating Companies will instead engage in a substantial amount of new construction, and they have persuaded the Court that this is an appropriate decision. In some instances they will thereby be merely accelerating construction which would have occurred in any event, and new construction, as opposed

to leasing, will have the advantage of facilitating network separation between AT & T and the Operating Companies.

Given the care which went into the Operating Companies' studies, the Court will not second-guess them by imposing upon them an assignment of switches which they do not endorse. The Court therefore rejects the position of some [23] that all No. 4ESS switches should be divested from AT & T and assigned instead to the Operating Companies.

Second. The New England Telephone Co. (NET) has suggested that it could provide access more economically if the Court were to override the predominant use test in its territory with respect to three advanced switching systems. NET wishes to make extensive use of No. 4ESS switches—which apparently would be more appropriate in its region than elsewhere because of existing population densities—and it states that it could benefit from the allocation of three existing No. 4ESS switches (in Manchester, New Hampshire; Springfield, Massachusetts; and Cambridge, Massachusetts).[24] NET has further informed the Court that if it were to receive the existing switches in these locations, the net present value advantage to it would range from $20 to $25 million with respect to the Cambridge switch and from zero to $8 million

---

which the interexchange carriers primarily use in their own networks. Pacific and Nevada Bell will use "state of the art digital, four-wire tandems for more than 99 percent of [their] requirements." Response of Donald E. Guinn at 8 n. *. This appears to be true for New York and New England as well. In the remaining five regions, it appears that all switches to be constructed will be four-wire digital tandems. Only in a relatively small number of LATAs do the companies propose to provide access via two-wire switches. This, and the fact that the Department of Justice will continue to study whether two-wire switches can provide suitable access, largely moots the concerns of Satellite Business Systems, Southern Pacific Communications Corp., and MCI Communications Corp. that the Operating Companies would make larger scale use of two-wire switches, necessitating the use of adapters to connect them to the four-wire trunks of the interexchange competitors.

**22.** AT & T has consistently maintained that requiring interexchange competitors to hook into two-wire switches via adaptors would not impair the quality of the transmissions, a point which AT & T's competitors have just as consistently challenged. Since the Operating Companies have decided to offer mainly four-wire connections, this dispute is largely moot. See note 21 supra.

**23.** E.g., Black Citizens for a Fair Media, et al.

**24.** NET states that owning the switches, and presumably leasing space to AT & T, would in these instances be the cheapest alternative. The next best option would be for NET to build its own 4ESS switches, with the most costly alternative being to lease space from AT & T. Response of the Northeast Region, May 31, 1983, at 5–6.

per switch with respect to the Manchester and Springfield facilities.[25]

■ Although it accepted the predominant use test, the Court has stated that this test would be waived where particular equipment was needed by an Operating Company for the provision of equal access. See note 20 *supra*. Clearly that need is present with respect to the Cambridge switch,[26] and the Court will therefore require that AT & T assign that switch to NET. The matter is not as clear with regard to the Manchester and Springfield switches. If NET wishes to make a formal proposal for the transfer of these switches, it should submit a motion explaining under what circumstances the savings would amount to zero and under what circumstances they would amount to $8 million,[27] and AT & T and the Department of Justice may respond to the motion. The Court will order no other changes in the assignment of switches.[28]

C. *How Should the Operating Companies Recover the Costs of Becoming Equal Access Providers and of Reconfiguring Local Networks to Conform to LATA Boundaries?*

AT & T estimates that it will cost the Operating Companies $73 million to reconfigure their networks [29] and $2.47 billion to provide equal access.[30] The plan of reorganization does not directly address the issue of who should pay these costs but seems to proceed on the premise that equal access is exclusively an Operating Company responsibility with which the plan, and AT & T, need not be concerned. That approach is improperly simplistic.

Section I(A)(1) of the decree states that AT & T shall

transfer from AT & T and its affiliates to the BOCs ... sufficient facilities [and] systems ... to permit the BOCs to perform, independently of AT & T, exchange telecommunications and exchange access functions ... and [which are] *sufficient to enable the BOCs to meet the equal exchange access requirements* of Appendix B (emphasis added).

There can be no doubt, then, that AT & T has a significant responsibility [31] to see to it

25. Different values are achieved depending upon the assumptions used.

26. The expenditure of $20 to $25 million required for the construction of a new switch is not an acceptable alternative.

27. NET should also indicate whether assignment to it of the Cambridge switch would alter its analysis of the impact of a separate Worcester LATA. Specifically, if NET owns the Cambridge switch would it also want to build a Framingham No. 4ESS switch?

28. The Court notes that Bell of Pennsylvania has supplanted its proposal to use a 1AESS switch to offer access in Harrisburg (the "Capital" LATA) with a plan to build a DMS–200, 4ESS or comparable four-wire switch by September 1985. Response of the Mid-Atlantic Bell Telephone Companies, May 31, 1983, at 6 n. 6. Bell of Pennsylvania also intends to offer access to the Philadelphia LATA through the existing 4ESS until its own digital switch is in place, assuming that "billing software develops satisfactorily." *Id.* These plans are hereby approved. The Court accepts Pacific Northwest Bell's proposal to build its own digital switch in Seattle and use direct trunking to provide access pending completion of the switch. See Appendix A to Response of Operating Companies in Mountain-Northwest Region to Court's Memorandum of May 17, 1983.

The suggestion of the Department of Justice that the date for the Operating Companies' formal equal access filings be advanced is a sound one. The Department should consult with the Operating Companies with regard to the timing of an accelerated schedule.

29. It is obvious that this figure is somewhat low, as is indicated, for example, by the claim of the Mid-Atlantic Region that the estimate of $30 million does not include any of the $30 million it expects to spend on network reconfiguration. *Response of the Mid-Atlantic Bell Telephone Companies,* May 31, 1983, at 9 n. 10.

30. AT & T Memorandum, May 23, 1983, at 4 n. **, 5 n. *. This includes putting in place access tandems for interconnection between interexchange carriers' points of presence and the local loops, plus any direct trunks from points of presence to end offices where this is considered more efficient than using access tandems. The exact amount will depend on many factors, including any waivers of the equal access requirements pursuant to Appendix B of the decree.

31. The primary responsibility lies with the Operating Companies since as part of the divesti-

that the Operating Companies are left in a position, as of divestiture, that will enable them to offer equal access to AT & T's competitors.[32] The only question is what obligations attach to this responsibility.

The intervenors have proposed various ways to assign the costs of network configuration and equal access directly to AT & T, from requiring AT & T to give the Operating Companies more switches to requiring it to finance all equal access projects. The former has the disadvantage of imposing switch assignments on the Operating Companies which they do not want; the latter is problematic in that it will perpetuate a liaison between AT & T and the Operating Companies where none should exist. AT & T, for its part, while it rejects any suggestion that it should have to pay these costs, in effect concedes that it bears some share of the responsibility since it asserts that the access charges paid by interexchange carriers will reimburse the Operating Companies, and that it, as the dominant interexchange carrier, will pay the lion's share of such charges.

All the parties have agreed that these costs are properly to be recovered from the interexchange carriers, rather than through access charges levied on local ratepayers, because the expenditures represent improvements to the long distance network. AT & T's assurances to the contrary notwithstanding, it is unsettled at present by what methodology the interexchange carriers could be made to bear the costs of equal access and network reconfiguration through interstate access charges. Under existing procedures for allocating property costs, revenues, expenses, and reserves between intrastate and interstate jurisdictions for rate making purposes (see 47 C.F.R. § 67.1), a disproportionately small amount of equal access and network reconfiguration costs would be designated for recoupment through interstate tariffs; most of these costs would be designated for recovery through intrastate tariffs even though, at least initially, most of the benefits of equal access connections will flow to users of interstate, not intrastate, telecommunications services. See Correspondence between Howard J. Trienens and A. Gary Collins, filed June 29, 1983; Response of Mid-Atlantic Bell Telephone Companies, May 31, 1983, at 8–10.[33] In fact, only after it was pointed out by others did AT & T acknowledge that all equal access and network configuration costs would not be recovered through interexchange carrier charges under the current jurisdictional separations procedures.

---

ture process they will receive the Bell System's local exchange facilities by which equal access will be provided.

**32.** It has been clear at least since the decision of the Court of Appeals in *MCI Telecommunications Corp. v. FCC,* 580 F.2d 590 (D.C.Cir. 1978) (*Execunet II*)) that AT & T was under an obligation to furnish equal or substantially equal access to its intercity competitors. See also, *United States v. Am. Tel. & Tel. Co.,* 524 F.Supp. 1336, 1356, 1360 (D.D.C.1981).

**33.** Indeed, the Mid-Atlantic Region expects to spend $200 million for equal access through 1986, but anticipates that, under the existing separations procedures, about 60 percent of these costs would be allocated to intrastate, not interstate, ratemaking. As the Mid-Atlantic region states:

It may be possible, if regulators agree, to apportion these costs more equitably between the interstate and intrastate jurisdictions. If this does not occur, there is no assurance that state regulators will be able to fix intrastate access rates high enough to recover these costs. If rates are fixed at such level, [interexchange carriers] will have a strong incentive to 'forum shop' between interstate and intrastate tariffs and to bypass the BOCs for intrastate access. Even if the bulk of the costs become properly assigned as between interstate and intrastate access, the possibility of by-pass becomes more threatening with each increase in access costs.

Response of the Mid-Atlantic Bell Telephone Companies, May 31, 1983, at 9–10.

AT & T and the Operating Company personnel apparently are working on a proposal to treat equal access and reconfiguration costs as if they were costs of "Special Services Switching Equipment" which, it is asserted, "will avoid the misallocation of costs to the intrastate jurisdiction" and will allocate investment and related expenses on the basis of relative toll minutes, *i.e.,* on the basis of carriers actually using access services. Letter from A. Gray Collins to Howard J. Trienens, filed June 29, 1983, at 2. The FCC would have to approve any such proposal.

Another, equally serious problem is created by the ability of AT & T to make use of the so-called bypass technology (552 F.Supp. at 175–76) which would allow that company, at its choice, and given the availability of the necessary technology, to bypass the Operating Company circuits altogether and to reach ultimate telephone subscribers directly. To the extent that bypass is a serious threat to the Operating Companies,[34] AT & T, because of its size and its well-developed telecommunications technology, is by far the most likely origin of that threat. Use of that bypass technology by AT & T would, of course, permit it to escape the payment of access charges to the Operating Companies, and this, in turn, would jeopardize the recovery of the funds which will be expended by the Operating Companies for the equal access and reconfiguration construction program.

It is thus not certain that the Operating Companies will be fully reimbursed through carrier access charges for their equal access and network reconfiguration expenditures. Yet because the decree anticipated that AT & T would transfer sufficient facilities to the Operating Companies to ensure equal access; because it now appears that the Operating Companies will instead have to undertake substantial new construction of their own; and because AT & T has throughout this proceeding assured the Court that access charges paid by interexchange carriers would be the instrument which would prevent divestiture from causing increases in local rates, it is appropriate that AT & T should bear the ultimate risk if it turns out that its assurances are overly optimistic.[35] That risk will accordingly be assigned to AT & T in the following manner.

■ According to the plan of reorganization, the equal access construction program will be completed in five years. Within five years thereafter, that is by January 1, 1994, if the Operating Companies have not recovered the costs of equal access and network reconfiguration, inclusive of financing costs, through their collection of access charges from the interexchange carriers,[36] AT & T will be responsible for reimbursing the Operating Companies in the amount of any remaining deficit.[37] A preliminary accounting will take place at the close of the construction program on by January 1, 1989, whichever is earlier.

If the Operating Companies and AT & T are able to report to the Court on or before January 1, 1994, of their agreement that all costs have been recovered, AT & T will be discharged from any further obligation with respect to the cost of equal access and network reconfiguration. If there is a dispute, the Court will decide, if necessary with the assistance of the Department of Justice and the Federal Communications Commission, whether all costs have been recovered.[38]

34. The Court, unlike the Federal Communications Commission, does not consider bypass to be an immediate large-scale problem. See transcript June 2, 1983 hearing at 25466.

35. However, for the reasons stated in note 31 *supra,* there is no basis for requiring AT & T to pay all of these costs, in addition to the contribution it will make by way of the access charges and the costs of the risks assigned to it herein.

36. AT & T is entitled, in equity, to count toward reimbursement of these costs all carrier access charges, not only the charges collected from it. If only AT & T's contributions were counted, the Operating Companies, AT & T's interexchange competitors, or both, would reap a windfall.

37. The Operating Companies shall keep records to isolate those expenses incurred solely for equal access and network reconfiguration as mandated by the decree from expenses they would have incurred in any event. AT & T and the Regional Companies shall, jointly or severally, submit to the Court prior to January 1, 1984, the accounting method that will be appropriate for isolating these expenses and for determining whether and when the costs of equal access and of network configuring have been recovered.

38. This mechanism has several advantages: it avoids any direct financing partnership between AT & T and the Operating Companies; it requires relatively little monitoring; it gives effect to the access charge tool; it encourages AT & T to work for suitable separations procedures; and it minimizes interference with regulatory commissions.

## II

### Contingent Liabilities

Under the plan of reorganization, the contingent liabilities of the Bell System are apportioned among AT & T and the Operating Companies on the basis of their relative net investment[39] as of the date of divestiture.[40] Section VIII(H) of the decree allocates to each Operating Company a proportionate share of the System's consolidated debt and equity; and the plan of reorganization provides that the post-divestiture entities will share in the contingent liabilities on the same basis.[41]

The intervenors acquiesce in most aspects of the plan's allocation of contingent liabilities,[42] and they limit their objections in the main to the allocation of contingent antitrust liabilities. Several intervenors assert broadly that because the Operating Companies were not responsible for AT & T's alleged conduct in violation of the antitrust laws and reaped no benefits from such violations, they should not have to share in the liabilities resulting from any antitrust claims. Others make similar arguments more narrowly with respect only to certain types of antitrust violations, such as those relating to the provision of interexchange services or of customer premises equipment (CPE).[43]

The contingent liability provisions of the plan assume (1) that prior to divestiture the Bell System operated as a single unit, and (2) that the residual risks of the System's predivestiture operations should be shared by all entities which receive a part of the System's assets. Several intervenors challenge these assumptions.

### A. Principle of the Division of the Contingent Liabilities

It is argued by a number of opponents of the plan that for many purposes the Bell System did not operate as a single enterprise. Thus, it is claimed that various Operating Companies charged different rates, operated under different tariffs, were directed by different personnel, and engaged in other practices which differed from company to company. One consequence of this diverse pattern, according to the plan's opponents, is that some Operating Companies were charged with violations of the antitrust laws along with AT & T while others were not. Further, since under the law a corporation is not automatically liable for the antitrust violations of its affiliates,[44] there is no basis, it is said, for imposing liability upon entities (*i.e.*, the Operating Companies) which have not been or may not be found to have been at fault. Finally, citing *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), several intervenors argue that the plan violates the "rule"

---

**39.** Contingent liabilities are liabilities which are attributable to pre-divestiture events but do not become certain, and are therefore not booked, until after divestiture. The plan of reorganization defines "net investment" as total assets less reserves for depreciation. AT & T states that it will receive 25 percent of the net investment of the Bell System, and the remaining 75 percent will be assigned to the Operating Companies. AT & T Memorandum, May 23, 1983, at 13 n. *.

**40.** The plan provides special allocation rules for contingent liabilities relating exclusively to interstate or intrastate operations or to tax liabilities. See Plan of Reorganization at 188–89. These special rules have either not been specifically challenged by the intervenors, or they have been opposed for the same reasons discussed *infra* for challenging the general rule for allocating contingent liabilities. See, *e.g.*, NASUCA Memorandum, May 25, 1983, at 10.

**41.** Under the plan, AT & T and the Operating Companies will be responsible for the payment of judgments and determinations of liability, regardless whether or not an entity was dismissed from the proceeding by virtue of settlement or otherwise. Plan of Reorganization at 190.

**42.** No objections were raised with respect to the contingent liabilities having to do with the Bell System's rates, contracts, torts, or taxes.

**43.** CPE is used on subscribers' premises to originate, route, or terminate telecommunications (*e.g.*, telephone sets, answering machines). Section IV(E) of the decree.

**44.** See, *e.g.*, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

against contribution for antitrust damages.[45]

All of these arguments miss the mark. Until the time the reorganization takes effect, the Bell System is legally a single enterprise, with a single claim to the System's assets and a single responsibility for the System's liabilities. It is erroneous, therefore, to pose the problem in terms of imposing liability upon parts of the enterprise based upon fault or lack of fault; at the time the acts complained of occurred there was only one entity (the Bell System), and should there be a judgment in any particular case, that entity will have been found to be at fault.

The evidence at the trial of this case did not isolate specifically whether the fault for particular activities which allegedly violated the antitrust laws lay with personnel assigned to AT & T headquarters or with personnel working for an Operating Company; and, of course, there was no adjudicated final judgment by which such fault could have been parceled out. In view of the commingling and transfers of personnel between AT & T's central divisions (e.g., Western Electric) and the Operating Companies, it may be that no such decision could ever have been made.[46]

This basic problem with the theory advanced by the intervenors is not cured by the circumstance that some Operating Companies are defendants in some of the pending private antitrust lawsuits while others are not. The decisions of antitrust plaintiffs as to which Operating Companies, if any, should be named as defendants in the private suits appear to have most often been dictated by such non-substantive matters as jurisdiction, venue, and ease of discovery.[47] Such choices were available to the plaintiffs in the various actions because they knew that the cost of any judgment would be shared by AT & T and all Operating Companies[48] regardless whether or not a particular Operating Company was a party to the proceeding in which liability was determined. In short, the identity of the particular Bell defendants played no real substantive part in pre-divestiture lawsuits or judgments, and it would make no sense to regard it as the determinative factor with respect to the payment of judgments based on pre-divestiture conduct which are entered or become final after divestiture actually occurs.

More broadly, it is incorrect to view the plan's allocation of contingent liabilities as an attempt to impose upon this Court the responsibility for making findings concerning fault or for imposing liability with respect to lawsuits pending in other forums.[49] The plan of reorganization does not purport to assign fault; all that is involved here is that, as part of its review of the decree and of the plan of reorganization of the Bell System, the Court has been presented with a proposed contractual arrangement[50]

---

**45.** See, e.g., Comments of Southern Pacific Communications Co., May 23, 1983, at 15; Comments of MCI Communications Corp., May 23, 1983, at 9.

**46.** Because of the integrated nature of the Bell System, it is unlikely that the result would be any different in the private cases brought against that System or its components. In any event, as developed below, it is appropriate to assign the responsibility for the payment of possible judgments now, rather than to leave the issue for resolution for later, on a case-by-case basis. Recognizing this reality, few of the intervenors suggest that the matter be left open until judgments are entered; they argue instead for a fixing of liability now, albeit on a basis different than that assigned by the plan. See pp. 1071–72 infra.

**47.** AT & T Reply Memorandum, May 31, 1983, at 18 n. *.

**48.** Such sharing would have occurred through the division of revenues process and a general contribution to the expenses of AT & T's General Department, and it is that Department which would have paid any antitrust judgment irrespective of the Bell entity upon which it might have been imposed. Id.; AT & T Response to Objections at 333.

**49.** See, e.g., Satellite Business Systems Memorandum, May 23, 1983, at 4.

**50.** The plan provides that in December 1983, the Operating Companies and AT & T will enter into an agreement which will identify all then-pending litigation or other proceedings in which a judgment could result in liability to be allocated under the plan. This agreement will

whereby the Operating Companies and AT & T will share in the payment of liabilities arising from pre-divestiture operations regardless of fault—in effect a form of self-insurance. See p. 1073 *infra.*

The intervenors' reliance upon *Texas Industries, Inc. v. Radcliff Materials, Inc., supra,* as an obstacle to this procedure is misplaced. In that case the Supreme Court held merely that there is no *right* to contribution in antitrust cases;[51] it did not decide, nor was its decision based on the premise, that contribution is contrary to the policies underlying the antitrust laws.[52] *Texas Instruments* thus does not invalidate either the liability sharing arrangement which presently exists (and has long existed) among the Bell System's components for that System's liabilities or the contractual arrangement proposed for the future by the plan of reorganization.[53]

### B. *Method of Apportionment*

The plan of reorganization proceeds on the basis that the residual risks of the Bell System's pre-divestiture operations should be shared by the entities of the System on the same basis as their receipt of the System's assets and equity.[54] This method of apportionment is challenged by several intervenors who suggest a division of contingent liabilities based on a "benefit" or "line of business" approach rather than the "relative net investment" approach provided for by the plan.[55] While this suggestion appears abstractly to have some merit, it is faulty if only because it suffers from serious, indeed insuperable, difficulties in administration.

It may well be doubtful that the Operating Companies benefitted quite as much from the activities challenged in the various pending antitrust suits as AT & T now claims; but it would also surely be incorrect to say that the Operating Companies' past and future lines of business received no benefits. For example, activities which adversely affected competitors of AT & T in the CPE business probably benefitted not only AT & T "headquarters" but also the Operating Companies' own CPE business, and the effects of these activities may even

identify whether each contingent liability will be shared by AT & T and the Operating Companies under the net-investment formula or whether it will be treated under one of the special allocation rules. Within one month of the institution of any other action or proceeding against AT & T or an Operating Company based on pre-divestiture events, notice must be given to each entity which may be responsible for payments under the plan. Plan of Reorganization at 189–90, 470.

**51.** In that case, the defendant corporation had attempted to file a third-party complaint against other companies seeking contribution should it be held liable under the initial complaint. The Supreme Court upheld the lower court's dismissal of the third-party complaint.

**52.** To the contrary, the Court concluded that it was for the Congress, not the courts, to decide whether there should be a statutory right to contribution in antitrust cases and how such contribution should be structured. 451 U.S. at 646, 101 S.Ct. at 2069.

**53.** Arguing that the agreement between the Operating Companies and AT & T to share contingent liabilities should be deemed void as contrary to public policy, one intervenor cites *St. Paul Insurance Companies v. Talledega Nursing Home, Inc.,* 606 F.2d 631 (5th Cir.1979).

See Southern Pacific Memorandum of May 23, 1983, at 16. The *St. Paul* decision stands only for the proposition that under Alabama law insurance contracts protecting against intentional wrongs are invalid. Not only are such contracts not universally considered void, but any public policy problems from such contracts are avoided here because the agreement among the Bell companies does not relate to future conduct but applies only to liabilities from pre-divestiture events.

*Zenith* (note 44 *supra*) is likewise inapplicable because the jurisdictional problems there involved are not present here and because of the contractual agreements discussed *infra.*

**54.** On this basis, since AT & T will receive 25 percent of the net investment of the Bell System, it will be responsible for 25 percent of the contingent liabilities. See note 39 *supra.*

**55.** These intervenors assert (1) that AT & T's future lines of business, not those of the Operating Companies, benefitted from whatever anticompetitive conduct occurred, (2) that the potential liability from alleged anticompetitive conduct bears no necessary relationship to the assets being divided, and (3) that the method prescribed by the plan, coincidentally or otherwise, favors AT & T's interest as against that of the Operating Companies.

linger so as to continue to provide the local companies with a benefit after divestiture. Further, evidence at the trial of this case indicated significant involvement of the Operating Company personnel in the so-called "procurement" portion of the case, *i.e.*, that dealing, among other things, with CPE.

Likewise, because the Operating Companies received a substantial portion of revenues from interexchange services through the division of revenues process, and because it appears that they stood to lose revenues to the extent that long distance traffic was handled by one of AT & T's competitors, it is difficult to say that they did not benefit from Bell System activities claimed to be unlawful which affected the interexchange market.

For these reasons, several intervenors candidly acknowledge that it is not possible, at least not without lengthy proceedings, to conclude that the Operating Companies received no benefit from the conduct challenged in pending antitrust actions[56] or precisely how such benefits might be allocated between them and AT & T.[57] The Court will go further. In its view, to attempt to trace benefits from conduct challenged in lawsuits not yet decided to lines of business[58] which will be engaged in at a later time by entities which do not yet exist would involve the Court in an impossible, almost metaphysical task, and it is one which, for that reason, it will not undertake.

More affirmatively, the assumption underlying the plan's allocation of contingent liabilities that, as a matter of equity, the contingent liabilities should be shared proportionately by all entities which "succeed" to the assets of the Bell System, is not unreasonable. Under the current division of revenues and costs within the Bell System, antitrust liabilities are liabilities of the entire System. Contingent antitrust liabilities—just as the other contingent liabilities not challenged by the intervenors—do not encumber particular assets or particular lines of business; they encumber all of the System's assets and equity. Because the decree provides that the Operating Companies and AT & T will each receive a portion of the consolidated debt and equity of the Bell System,[59] it is reasonable for each of the post-divestiture entities also to receive a corresponding portion of the System's pre-divestiture business risks which encumber the equity.[60]

**56.** See United Church of Christ Reply, May 31, 1983, at 8 (not possible to determine the extent to which Operating Companies and their ratepayers benefitted from AT & T's policies); General Dynamics Telephone System Center, Inc. Response, May 20, 1983, at 8 (alleged antitrust violations did not necessarily inure to the benefit of the Operating Companies "to the same degree" as they did to AT & T).

**57.** Because of this problem, California suggests that the test for allocating contingent liabilities should be: which line of business "primarily" stood to benefit from the antitrust violation? State of California Memorandum, May 25, 1983, at 19. New Mexico advocates that where ultimately there remains a dispute about which entity receives the post-divestiture benefit, the matter should be submitted to arbitration. State of New Mexico Reply Comments, April 13, 1983, at 5.

**58.** The break-up of the Bell System does not, in a number of respects, involve a neat division of operations and lines of business. For example, the Operating Companies will handle some intercity toll calls—especially in some of the larger LATAs—and they will also be able to market CPE.

**59.** The decree provides that AT & T is to divest the Operating Companies with 45 percent debt ratios (55 percent equity). This ratio represents the 1981 (year end) consolidated debt ratio of the Bell System and was also the System's target debt ratio for the end of 1983. See AT & T Reply Comments, June 29, 1982, at 95–96.

**60.** The equity portion of the Bell System's capital structure represents, in effect, the shareholders' reserve against business risks, including contingent liabilities. The possibility that certain contingent liabilities may not become certain or may not be turned into debt does not mean that these contingent liabilities are not business risks which currently encumber equity.

One intervenor (Washington Utilities and Transportation Commission Memorandum, May 25, 1983, at 5) argues that, if the Operating Companies were not assigned any contingent liabilities, they could be considered as receiving too much equity only if all other busi-

The proof of that proposition lies in an examination of the alternatives. If AT & T had decided to settle, insure, or self-insure all contingent liabilities prior to divestiture, the costs of these liabilities would have been reflected now in the Bell System's debt and equity accounts,[61] and there would have been no need for making provision in the plan of reorganization for the allocation of contingent liabilities. These other options were apparently considered by AT & T and the Operating Companies,[62] and the choice was made that each Operating Company would take on a portion of the System's consolidated equity as well as all associated business risks. In furtherance of that decision, all Bell System Companies are, in essence, insuring one another against the possibility that the contingent liabilities will become certain after divestiture. The chief executives of the Regional Companies have informed the Court that, with but one exception, they agree with the choice made in the plan for allocating the contingent liabilities.[63]

■ For these reasons, the Court rejects the objections to the treatment accorded in

---

ness risks in the overall Bell System capital structure were equal, and it goes on to state that there is good reason to believe that the Operating Companies will face higher risks because they are removed from certain lines of business by the decree. This argument is too speculative. Even though AT & T will retain some of what have been the more lucrative lines of business in the past, these are the competitive lines of business, and there are some who regard them as riskier than the Operating Companies' monopoly exchange functions. See Fortune, *Breaking Up The Phone Company,* June 27, 1983, at 81–91.

**61.** AT & T could have decided to handle the contingent liabilities problem by one of the following methods, all of which would have led to results similar to the apportionment provided for by the plan of reorganization:

(1) The Bell System could have chosen to pay these liabilities through settlement of the litigation before the decree was entered (or before divestiture occurred), such payment to be funded by debt. The Operating Companies would then be divested with higher debt ratios (perhaps 50 percent) to reflect the higher debt ratio of the Bell System. There would then, of course, be no residual risks to divide.

(2) The Bell System could have purchased insurance, with the premiums funded by debt. Again, this would have pushed the System's debt ratio closer to 50 percent, and the allocation of contingent liabilities would then have become irrelevant since any judgment would have been paid by the insurer.

(3) The Bell System could have self-insured the contingent liabilities with a funded reserve of some $25 billion, which would have been borrowed and held in a separate account. The System's debt ratio would again have risen closer to 50 percent, and whichever entity would have been assigned the contingent liabilities would have received this separate reserve account.

(4) The Bell System could have self-insured by booking the contingent liabilities through transfer of a portion of its equity to an appropriate liability account. The choice then would have been either for AT & T to take all the contingent liabilities and the liability account, or AT & T and the Operating Companies each could have taken a share of both the contingent liabilities and the corresponding liability account.

In essence, AT & T and the Operating Companies decided to select the last option—each will receive a share of the contingent liabilities and each will receive more equity than it would have had if one of the other three options had been selected. The only substantive difference between that option and the proposed plan is that the shareholders' equity reserve is not being segregated into a separate liability account. By accepting a share of the contingent liabilities and a higher equity ratio, the Operating Companies are all simply participating in underwriting the System's contingent liabilities. In this way, they are insuring each other, and they will retain any profit which otherwise would have gone to an insurer.

**62.** AT & T Memorandum, May 23, 1983, at 11–12.

**63.** See testimony of Thomas Bolger, June 2, 1983, transcript at 25603–04; testimony of William Weiss, June 2, 1983, transcript at 25493–94; but see testimony of Zane Barnes, June 2, 1983, transcript at 25487.

The Court notes that it is entirely unlikely that the contingent liabilities could realistically threaten the viability of the Operating Companies. AT & T has suggested that $25 billion in additional liabilities might become certain after divestiture, but it has since hastened to concede that this possibility is extremely remote. Even if this outside contingency came to pass, the Operating Companies could finance their shares with debt, and their debt ratios would then increase from 45 percent to the 50 percent range—still the typical debt ratio of independent telephone companies and electrical utilities.

the plan of reorganization to the contingent liabilities,[64] and it will approve that portion of the plan as part of its overall disposition of the parties' motions.

## III

### Bell Name and Logo

[6] The plan of reorganization originally submitted by AT & T provided that upon the divestiture both AT & T and the Operating Companies could continue to use the "Bell" name.[65] Complex provisions were made with respect to the Bell trademarks,[66] and the plan further provided that if, in light of the Justice Department's opposition to the AT & T approach, the Court were to disapprove it, AT & T "*will adopt* the alternative . . . [to] retain all uses of the Bell name, including all Bell trademarks, the Bell logo or seal, the blue and ochre stripes, and other graphics and all uses of Bell in

corporate names" (emphasis added).[67] The Department of Justice did not oppose the second alternative,[68] but with respect to the first it proposed an amendment which AT & T accepted. It is this Department of Justice version (Amendment No. 15), described in more detail below, which is now before the Court.

Under Amendment No. 15, although the Operating Companies would have exclusive rights to the Bell logo in the United States,[69] they could use it only in connection with the provision of exchange telecommunications services, exchange access services, and printed directory advertising. The Operating Companies would be prohibited from using the Bell logo in connection with the marketing of any customer premises equipment (even that supplied by AT & T and its affiliates). As concerns the "Bell" name, the Operating Companies would be permitted to use it only in connection with

64. The Court has also considered the various provisions made in the plan of reorganization with respect to other liabilities, reserves, and equity, including tax reserves, depreciation reserves, and long term debt, and finds the treatment of these matters in the plan to be reasonable.

It is appropriate briefly to mention the debt of Pacific Telephone and Telegraph Co., which has been the subject of several submissions both by the Operating Company and by the State of California. Upon consideration of all the documents, the Court has concluded that it will not require a modification of the plan of reorganization with regard to this issue because the plan is not the appropriate vehicle for determining the extent to which the local company's debt problems may have been created by the California regulators—as was previously assumed by this Court (552 F.Supp. at 208) as well as by the FCC staff (Staff Analysis of February 11, 1983, at 27–28) and various financial rating services—or by AT & T.

The debt equalization scheme which is proposed by California would inappropriately result in inter-regional subsidies and create complex problems leading to new and continuing AT & T entanglements with the Operating Companies. In any event, neither the decree nor the plan of reorganization adversely affects Pacific's financial condition; if anything, they improve it. See Second Supplemental Statement of Donald Guinn, April 7, 1983, at 1. Pacific's interest coverage ratio will be above the level necessary to maintain a Standard & Poor's "A-" rating. Supplemental Statement of Donald Guinn, January 13, 1983, at 2; AT & T

Response to Objections at 300–01. While future developments and perceptions cannot be vouchsafed, it appears that Pacific will be divested in as financially a sound condition as its prior history permits.

65. AT & T and the Operating Companies could not use "common corporate names," however.

66. The Central Staff Organization to be established by the Operating Companies (see Part VIII *infra*) was to receive the rights to the existing Bell trademarks for use in connection with lawful Operating Company business except for the marketing of "equipment not supplied by AT & T and its affiliates." The trademarks include not only the encircled bell logo but also the blue and ochre stripes, and other trademarks and service marks used on vehicles, telephone directories, and the like. They will generally be collectively referred to as the Bell "logo."

67. If only because of the explicit representations made by AT & T's counsel to the Court during the first Tunney Act hearing in June 1982 (see pp. 1080–81 *infra*), this alternative cannot be seriously entertained.

68. It stipulated, however, that compensation had to be paid to the Operating Companies for the direct costs of revamping their trademarks and trade names.

69. AT & T would retain its present rights to trade names and trademarks for use outside the United States.

services other than the sale of equipment and only when explicitly modified by a geographic designation of an area less than national in scope (*e.g.,* Southwestern Bell); AT & T, on the other hand, could use the name "Bell" on a national basis for all these purposes if preceded by the word "American." [70]

## A. Use of the "Bell" Name by both AT & T and the Operating Companies Would Be Confusing

The Department of Justice apparently considered that the original AT & T plan was unacceptable because it could lead to consumer confusion and mutual promotion (*i.e.,* cross subsidization). The proposal presently before the Court is as flawed in those respects as the first plan—if not more so—and it therefore cannot be approved.

There is no question but that the proposal, if implemented, would be confusing as to the relationship between AT & T and the Operating Companies: contrary to fact, it would lead consumers to believe that there is a continuing close connection between these entities or, worse, that they are all still components of the same company. The proposed system—AT & T's use of the "Bell" name preceded by the word "American" and the Operating Companies' use of the "Bell" name preceded by the designation of some smaller geographic area—inevitably suggests that each of the Operating Companies provides service in a particular region of the country while AT & T provides the national service which ties all of the components together into one integrated Bell System. As one of the intervenors correctly points out,

for AT & T to suggest that consumers will not likely think that "Illinois Bell" is part of "American Bell" is as preposterous as it is that consumers would not think Illinois to be part of America.[71]

This implication, that there is a continuing link between AT & T and the Operating Companies, would have several significant anticompetitive effects: in the market for intercity telecommunications services it would imply that AT & T is the natural or "official" long distance company to be used in conjunction with the local services provided by the several Bell Operating Companies; in the market for consumer premises equipment it would lead consumers to believe that the local system maintained by a "Bell" Operating Company calls for "American Bell" (*i.e.,* AT & T) equipment, or at a minimum, that American Bell equipment is made for and works better than the equipment of other manufacturers when hooked up to the local Bell network;[72] and it would suggest that the local Bell Operating Companies will warrant, service, and repair the equipment of the national Bell company (*i.e.,* AT & T).

It is only to belabor the obvious to record that with respect to each of these areas, AT & T's competitors would, in terms of consumer perception, come off distinctly second best. None of them could claim a similarly close relationship with the local Operating Companies. Sprint and MCI would inevitably be regarded as not as well suited as AT & T to render long distance service in partnership with the local circuits of the Bell Operating Companies; and Tandy and ITT would constantly have to strive to overcome the perception that, even if their equipment could be connected at all to the local Bell Operating Company loops, it

---

**70.** AT & T could continue to use the name "Bell Laboratories" without modification. AT & T could also continue to use the descriptive phrase "Bell System," albeit with the modifier "American." The amendment further provides that AT & T would conduct an extensive advertising campaign to distinguish its products, names, and trademarks from those of the Operating Companies.

**71.** Reply of Tandy Corporation at 8.

**72.** This confusion would exist regardless whether the Operating Companies would market CPE under the Bell label. Even if there were no such marketing, customers would still be led to believe that the providers of local exchange, exchange access, and directory advertising services are intimately connected with American Bell, and that AT & T's equipment— the only equipment that would be marked "Bell"—would be the most adaptable to the local system.

would not operate as smoothly and naturally with them as would AT & T's, and that, again unlike AT & T's equipment, it would not be locally serviced.

The implication of a continuing relationship between AT & T and the Operating Companies is thus inconsistent with the bedrock principles underlying the decree. The principal purpose of the decree was to introduce fair and equitable competition in the telecommunications markets. This was to be achieved by separating the Operating Companies from AT & T so as to ensure that purchasing decisions regarding AT & T's competitive services and equipment would be unaffected by the position of the Operating Companies as the providers of local monopoly exchange and exchange access services.[73] It was, in brief, the decree's purpose to give AT & T's competitors the opportunity to compete with AT & T on equal terms without artificial impediments. The proposal for joint use of the "Bell" name substantially, if not fatally, undercuts these objectives.[74]

Moreover, as long as AT & T and the Operating Companies both used the "Bell" name, there would also be subsidization between them to the detriment of the other existing and potential competitors. Any promotional efforts by either AT & T or an individual Operating Company would accrue to the benefit of the other, transmitting overtly or subliminally the message that Bell is a single, dominant supplier of telecommunications services and equipment. When an Operating Company advertised under the "Bell" name, it would necessarily also promote the products and services of AT & T marketed under the "American Bell" label, and vice versa. The long-standing consumer association of the "Bell" name with all aspects of the Bell System's local, long distance, and equipment operations would not only persist; it would actually be reinforced.[75]

The decree is designed to effect a radical separation of the Operating Companies from AT & T;[76] it will hardly do to contin-

**73.** It is on a similar rationale that the Court required modification of the decree to dispel customer confusion arising from joint billing. 552 F.Supp. at 199.

**74.** One of the intervenors provided the apt example of a newspaper advertisement proclaiming "NOW YOU CAN BUY GENUINE AMERICAN BELL EQUIPMENT THROUGH THE RETAIL OUTLETS OPERATED BY YOUR LOCAL BELL TELEPHONE COMPANY." Reply of Tandy Corporation at 5. There can be no doubt that consumers would be led to conclude by such an advertisement that these various "Bell" entities are all part of one giant company, and that their equipment was so designed that it would all mesh better than would some other, "foreign" equipment. This would be so if the Bell System had not become fixed in the national consciousness for a hundred years as a single corporation; it is even more true because of that historical fact.

**75.** AT & T argues, citing several trademark decisions (*e.g., Gould Engineering Co. v. Goebel,* 320 Mass. 200, 68 N.E.2d 702 (1946); *Gemeinde Bran, Inc. v. Amana Society,* 557 F.2d 638 (8th Cir.1977)) that different businesses which "share a common heritage" may use the same mark in separable parts of the business. See Response to Comments at 480–90. That argument lacks merit. Trademark law as it has developed in the context of claims of unfair competition between competing concerns is of

dubious applicability to a situation—divestiture under antitrust principles—where the interests of outside competitors and the public are implicated. Cf. *Ford Motor Co. v. United States,* 405 U.S. 562, 576 & n. 11, 92 S.Ct. 1142, 1151 & n. 11, 31 L.Ed.2d 492 (1971). In any event, the lines of businesses of AT & T and the Operating Companies are not separable but related and, in the equipment market, they will be direct competitors. The customer confusion this would foster would delay achievement of a truly competitive CPE industry.

It was for similar reasons that the various oil companies which emerged from the 1911 break-up of Standard Oil have generally been prohibited from doing business under a Standard Oil name or trademark in a territory where Standard Oil denoted another product. See, *e.g., Standard Oil Co. (Kentucky) v. Humble Oil & Refining Co.,* 363 F.2d 945, 951 (5th Cir.1966) ("we think long cumbersome records are no longer necessary to prove the public believes that all of the pseudonyms for Standard Oil belong to the same or related companies").

**76.** The various components of the Bell System will, to be sure, be separated from each other in a legal, ownership, and financial sense. But if they were all to support each other in their marketing and promotional efforts, not a great deal will have been gained. Together they

ue to have the various divested entities of the Bell System [77] hold themselves out as if they were all still part of the same complex.[78] The plan proposed by AT & T would create the impression to the consuming public that the divestiture had never taken place. The Court did not approve a decree breaking up the Bell System to have that system rise again, phoenix-like, in the plan of reorganization.

For these reasons, the "Bell" name and the Bell logo must belong either to AT & T or to the Operating Companies—but not to both.

### B. AT & T Is Not Entitled to the "Bell" Name and Logo as a Matter of Right

Since the concurrent use by AT & T and the Operating Companies of the name "Bell" cannot be approved, it remains to be decided which entity or entities should inherit that name—and along with it the logo—as part of the divestiture. Before proceeding to determine whether AT & T or the Operating Companies should, consistently with the decree's principles, be assigned the Bell tradename and trademark, consideration must be given to several preliminary arguments made by AT & T.

First. AT & T contends that it owns the "Bell" name,[79] from which it would presumably follow that it cannot be deprived thereof without its acquiescence. That argument is not well taken.

All of the assets of the combined Bell System are the property of AT & T [80] yet some—indeed the majority—of these assets are being assigned by the decree to the Operating Companies. If AT & T had a veto power stemming from general principles of property law with respect to the "Bell" name, it would have the same kind of power with regard to all other Bell System assets. Obviously that is not so, in the context of a distribution of assets and liabilities stemming from a break-up of the corporation under a court-approved decree.[81] The question actually is a much more simple and direct one: how should the assets represented by the "Bell" name and logo be distributed in order to effectuate the provisions and principles of the decree—an issue which is considered in Part C below.

Second. AT & T next claims that the "Bell" name is part of the heritage of AT & T,[82] and that customers who have purchased Bell telephones and services and who may want to patronize Bell System companies in

---

would still crowd out all others; together they would still be the colossus of telecommunications.

**77.** Use by AT & T of the terms "Bell System" or "American Bell System" is particularly troublesome, for it implies that the system that will be broken up on January 1, 1984 actually survives in the form of AT & T.

**78.** It is worth noting also that this confusion is actually being encouraged by AT & T's current advertising which features such phrases as "Bell System" and "Genuine Bell." Indeed, AT & T announced its decision to name its equipment marketing subsidiary "American Bell, Inc." after it had learned of the Department of Justice's objection to the use by AT & T of the word "Bell" in any way which could imply a continuing "endorsement or relationship between the BOCs' monopoly local exchange service and the products and services of AT & T and its affiliates" (letter of September 23, 1982, from William F. Baxter to Howard J. Trienens (Exhibit D to Objections of Tandy Corp., filed February 18, 1983)) and after at least one intervenor in the public interest proceeding before this Court (Tandy Corp.) had similarly complained about such use. AT & T advertising

focusing on the word "Bell" has proceeded at a crescendo since the divestiture decision was made.

Because of this history, not much faith can be placed in AT & T's promise to undertake an advertising campaign to educate consumers as to the differences between the new entities. An effective campaign along these lines would be directly contrary to AT & T's interests.

**79.** Plan of Reorganization at 415.

**80.** See 552 F.Supp. at 201–04.

**81.** See *Ford Motor Co. v. United States, supra,* 405 U.S. at 576 and n. 11, 92 S.Ct. at 1151 and n. 11. AT & T also "owns" a sizable magnitude of liabilities, including the contingent liabilities the responsibility for which will pass in large part to the Operating Companies (see Part II *supra*), yet it has never taken the position with respect to these liabilities that they constitute its obligation as distinguished from that of the Operating Companies.

**82.** The reference to a "common heritage" is puzzling for another reason as well. It is because that common heritage was allegedly used

the future are entitled to know, post-divestiture, which companies "are historically related to those products and services they have enjoyed for a hundred years."

But not only is that name as much a part of the heritage of the Bell Operating Companies as that of AT & T, but, in the public mind, "Bell" may well be said to stand primarily for the local companies, for that is where the public has traditionally obtained its telephones and its service.[83] It was the Operating Company to which one turned with a malfunction, a complaint, a request for new or altered service, a billing inquiry, and the like. The function of a trademark or tradename is to indicate the party which "puts the goods on the market and accepts the responsibility or plaudits for their acceptability or quality." E. Vandenburgh, Trademark Law and Procedure at 34 (2d ed. & 1979 Supplement).[84] In this instance, that means, more than any other entity, the Operating Companies.

Third. AT & T contends that the name "Bell" is assigned to it by the plan of reorganization and that this assignment should not be disturbed because it allegedly is not

inconsistent with the provisions of the decree. It is true that the Department of Justice has capitulated to this argument, stating that it could find no basis for overturning the AT & T decision. But the provisions of the plan drawn by AT & T are entitled to much less weight here than in other circumstances, since it is clear from the submissions of the designated chief executives of the Regional Companies that a number of them oppose the proposed disposition of the Bell name and logo.[85] Beyond that, as the Court has had occasion to explain a number of times, the plan of reorganization, to be approved, must be consistent not only with the provisions of the decree but also with the underlying principles. For the substantive reasons discussed below, an assignment of the "Bell" name and logo, or either, to AT & T would not be consistent with these principles.

### C. Use of the Bell Name and Logo Are More Appropriately Assigned to the Operating Companies than to AT & T

Both the original plan and the proposed Department of Justice amendment would

---

to violate the antitrust laws, and it is presumably because the "common heritage" was so intrinsically anticompetitive, defying less drastic remedies such as injunctions, that this lawsuit was filed and this divestiture agreement was made and approved.

83. Response to Objections at 486–87.

84. AT & T also claims that the trademark and the tradename Bell belongs to the party which manufactured Bell equipment, i.e., Western Electric Co. However, as one commentator put it,

> When one says that a trademark must indicate origin of the goods to which it is applied, it is not intended to [imply] that a trademark can only be used by a manufacturer of the goods. . . . The origin to which reference is made is the party that introduces the goods on which the mark is used into commerce with the trademark on them and who primarily stands to gain or lose by the acceptable qualities of the goods. It is not even necessary that the public. or purchasers know who is the manufacturer of the goods. . . .

E. Vandenburgh, Trademark Law and Procedure at 35 (2d ed).

Moreover, it is undisputed that AT & T has not supplied to the Operating Companies and hence held out to the public only products

made by it or its affiliates. See Amended Certification of Thomas E. Bolger, April 6, 1983, at 4.

While certainly a survey of the public would indicate that the name "Bell" and the Bell logo do not connote the same thing to every single person—an individual who has written checks monthly to one of the Operating Companies which does not use the name "Bell" in its corporate name may be more likely to think of "Ma Bell" than of a local Operating Company, for instance—it cannot be gainsaid that the primary connection between the individual and the Bell System occurred between telephone subscriber and local Operating Company. Assignment of Bell name and logo to the Operating Companies is thus consistent with trademark law.

85. See, e.g., Statement of Wallace R. Bunn, May 23, 1983; Reply Memorandum of the Midwest Regional Holding Co., May 31, 1983; Supplemental Statement of Zane E. Barnes, April 12, 1983. Here, again, AT & T cannot have it both ways: it cannot relegate the largest share of the Bell System obligations to the Operating Companies yet purport to speak conclusively on behalf of the entire System with regard to the plan of reorganization even where there is a sharp dispute among the various components. See note 81 supra.

deny to the Operating Companies the use of the Bell name and logo in marketing customer premises equipment (CPE).[86] The former would have severely limited this use; the latter would preclude it altogether. It is this aspect which has drawn the widest criticism—from the States, the interexchange carriers, the manufacturers of CPE, and the Operating Companies themselves. In the view of the Court, the critics are entirely correct.

The decree as ultimately entered expressly authorized the Operating Companies to market customer premises equipment. The Court fully explained why it required this modification as a condition of its approval of the decree:

> As against [the] relatively slight risks to competition from Operating Company involvement in the marketing of CPE must be weighed the very substantial contribution these companies could make to vigorous competition in the customer premises equipment market.... The Operating Companies, with their existing relationship to telephone users, are more likely than any other competitive entity to provide an effective counter-balance to AT & T's market strength and thereby to promote a genuinely competitive market.

552 F.Supp. at 192 (footnotes omitted).[87]

To deprive the Operating Companies of the use of the Bell logo and the Bell name in the CPE area would effectively cripple their efforts to become viable competitors in this market. The Court approved the decree in the expectation that the Operating Companies would be able to use their "existing relationship to telephone subscribers" in marketing equipment as a counter to AT & T's market strength.[88]

The various Operating Company officials who provided comments to the Court[89] on this aspect of the plan of reorganization attested to the fact that their

> principal strength in the marketplace for customer premises equipment (and other potential services which may be approved by the Court) [is their] long and solid reputation for quality products and excellent service. Our ability to trade on that hard earned reputation is important and should not be compromised by denying us the ability to use the Bell logo and marks as legitimate reminders of who we are.[90]

Several executives of the new Regional Companies have stated that they might have to stay out of the equipment market entirely (or limit themselves to the sale of large-scale equipment) if they were prevented from using the Bell name and logo in connection with equipment marketing. See testimony of Thomas Bolger, June 2, 1983, transcript at 25601–02; see also, Wall Street Journal, *Some Bell Companies May Stop Supplying Residential Phones as Competition Grows*, June 17, 1983.

It would not be similarly inimical to the purposes and principles of the decree to preclude AT & T from the use of the Bell name and logo. One principle underlying the decree is that both AT & T and the

---

**86.** See note 43 *supra*.

**87.** The Court repeated this reasoning in its Memorandum of August 23, 1982, denying the Justice Department's motion for reconsideration (at p. 5):

> Balanced against the remote contingency that the Operating Companies would engage in anticompetitive conduct is the certainty that they would provide healthy competition for AT & T.... Allowing the Operating Companies to engage in providing CPE will serve as a useful competitive check on AT & T, not only deterring the possibility of anticompetitive behavior but also benefiting consumers by increasing the number of equipment providers in the market place.

**88.** August 23, 1982, Memorandum Opinion at 4 n. 7. Since the provision allowing the marketing of CPE was added to the decree at the Court's insistence, it would not be unreasonable to regard the Court's expectations in that regard as the most accurate expression of the decree's "intent."

**89.** A substantial amount of testimony at the June 2, 1983, hearing was devoted to this issue.

**90.** Letter dated April 13, 1983, from Raymond F. Burke, Vice President and General Counsel-designate of the Northeast region; see also, *e.g.*, Supplement to Sworn Statement of Wallace R. Bunn, chief executive officer-designate of Southeast region; Statement of Thomas Bolger at 2–3.

Operating Companies shall be in a position to be vigorous competitors with each other and with others in the marketing of customer premises equipment. To that end, the decree sets up a carefully balanced structure, as follows. AT & T will retain all embedded CPE; it will retain the Bell System retail outlets; and it will retain the ability both to manufacture and to market CPE. The decree further takes into account in this regard that, by comparison with the individual Operating Companies, AT & T will be a giant, with financial and other resources far overshadowing those of the local entities.

The Operating Companies, on the other hand, will come out of the divestiture with relatively limited CPE-related resources and functions. They will be prohibited from manufacturing CPE; they will be deprived in part of their existing customer base by the assignment of existing CPE to AT & T; they will lack the ready-made outlet of existing retail stores; and they will not have the benefit of Bell personnel experienced in the marketing of CPE. Insofar as such marketing is concerned, these companies will essentially be limited to their proximity to the local customer base in addition to the goodwill inherent in the "Bell" name and logo (if these are assigned to them). In short, in competitive terms, the assignment of the Bell name and logo to the Operating Companies rather than to AT & T can hardly be characterized as unfair to the latter.[91] The true situation is that, without the name and logo the local companies' right, under the decree, to market CPE would be defeated, while AT & T's

right to do so would only be minimally affected.[92]

It is appropriate, finally, to quote from the representations which were made to the Court by AT & T's counsel at last year's public interest hearing. On June 29, 1982, counsel stated in response to comments made by an attorney representing a competitor that

> ... The problem is not the logo, the yellow and blue stripes and that sort of thing .... We do not want to get into that fight and we have already agreed ... that the Bell that you know, the stripes that you have come to know they will go to the BOCs. Trucks that get repainted will be the Long Lines trucks, [not?] the BOC trucks.
> The only thing left then is the names. I think Tandy's counsel was very appropriate in saying that after all, you're breaking up the Bell System.... What he objected to was concurrent use of the same corporate names. I stand before you and say there will be no such concurrent use of the same corporate name after the split.

When the Court suggested that this understanding had best be incorporated in the decree, AT & T's counsel replied that this was not necessary because

> [t]he question has been raised about these common names, the Court Reporter is recording this and there is a record of this hearing that should well outlast all of us, I suppose.

Transcript at 25214–15.

To be sure, it could be argued that these statements are not without some ambiguity.[93] Yet the overwhelming sense of the

---

**91.** There is some merit to AT & T's point that its employees have an emotional attachment to the Bell name, and that to them the name's passing may mean the loss of an emblem of pride and perhaps life-long association. The same could be said about employees of the Operating Companies, however.

**92.** It is significant also, in antitrust terms, that transfer of the Bell name and logo to the Operating Companies will not eliminate AT & T as a competitor but will yield two competitors where otherwise there might only be one. Cf.

*United States v. Lever Brothers Co.,* 216 F.Supp. 887 (S.D.N.Y.1963).

**93.** AT & T suggests that it is not, even now, proposing "common corporate names." When the promise was made that there would be no "common corporate names," it would have been difficult to visualize that AT & T promised only that a modifier would be added to the word "Bell" but that otherwise that name would still be used by all of the successor entities of the Bell System. Had not AT & T's counsel hastened to assure the Court that no amendment of the proposed decree was neces-

representation, particularly when juxtaposed against the arguments made by counsel for one of AT & T's competitors and that of the Department of Justice, was that AT & T was content to have the Operating Companies inherit the Bell logo and name.[94]

For the reasons stated, the Court will refuse to approve the plan of reorganization unless it is amended to provide for use of the "Bell" name and logo by the Operating Companies (except as provided in Part D *infra*) and for a prohibition on AT & T's use after January 1, 1984,[95] of the "Bell" name or the word "Bell" in any existing or new corporate name or in connection with the manufacture or marketing of any product or service, or for any other purpose.[96]

### D. Limitations on the Operating Companies

The use which the Operating Companies may make of the Bell name and logo requires additional discussion.

First. Under the current version of the plan of reorganization, the "Bell" trademarks are to be assigned to the Central Staff Organization.[97] However, if the CSO were to receive the assignment of the name and logo, it might also have to administer centrally a program of quality control, for lack of reasonable "quality control" could be regarded as working an abandonment of the licensor's registration of its trademark.

See Lanham Act, 15 U.S.C. § 1051 *et seq.; Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 367 (2d Cir.1959). Such monitoring of the Operating Companies by the CSO would run counter to the notion that it is the Operating Companies which control the CSO, not vice versa. Moreover, each Regional Company must have individual responsibility for giving meaning to the products or services it offers under the name Bell, consistent with trademark and antitrust law. Accordingly, the Court will require that the tradename and trademarks shall pass directly to the Regional Companies, without intervention of the CSO.

Second. With respect to exchange telecommunications, exchange access, and directory advertising, the Operating Companies and the Regional Companies will, by definition, be limited to clearly defined geographic areas, and they will therefore use the name "Bell" only in conjunction with a geographic designation indicating the relevant territory. Likewise, in their corporate names, the Operating and Regional Companies will use "Bell" only in conjunction with a geographic prefix. In the marketing of equipment, however, these companies may wish to compete in places beyond their service territories, particularly with respect to the sale of large-scale telecommunications equipment to business customers. There is no reason why such competition should be

---

sary, the Court would have, then and there, insisted upon language which is not susceptible of the current "fine print" argument.

**94.** The assignment of the Bell name and logo to the Operating Companies rather than to AT & T is further consistent with those provisions of the decree which distribute assets on the basis of predominant use. As the Department of Justice points out,

[a]ssignment of the Bell logo and marks to AT & T would create relatively more transitional costs, due to the relatively greater number of BOC assets upon which the marks and logo appear, in comparison to those retained by AT & T, *e.g.,* on buildings, trucks, phone booths.

Department of Justice Response to Comments at 155.

**95.** The Court will consider postponing the effective date of the prohibition for an additional six months upon a showing by AT & T made by

November 1, 1983, that it needs more time to continue a promotional campaign with respect to whatever name it desires to adopt in place of "American Bell." Although to some extent AT & T has created this problem by its recent intensive advertising campaign (see note 78 *supra*), it is nevertheless appropriate to allow it a reasonable period within which to extricate itself from this situation.

**96.** AT & T may, however, continue to use the "Bell" name with respect to its Bell Laboratories and its foreign operations. The Laboratories and the foreign operations will not be in competition with the Operating Companies, and use of the "Bell" name in these contexts will not otherwise be confusing.

**97.** See Part VIII *infra.*

precluded by the imposition of territorial restrictions.[98]

To the extent that an Operating Company sold CPE within its own geographic area, there might be no problem. Confusion would result, however, if hypothetically, Southern Bell, Northwestern Bell, and Pennsylvania Bell all marketed equipment in, say, Chicago, simply as "Bell" products, or if they stamped only the Bell logo on the equipment they sold there. The name "Bell" would in that case have little meaning; both it and the logo might be of dubious legitimacy under trademark law; and each company would run the risk of being sued by Illinois Bell for unfair competition. Accordingly, an Operating Company wishing to trade in another's territory shall not use the name "Bell" without a trade modifier, nor may it use the logo standing alone. See, *e.g., Standard Oil Company v. Standard Oil Company,* 252 F.2d 65 (10th Cir. 1958); *Mister Donut of America, Inc. v. Mr. Donut, Inc.,* 418 F.2d 838 (9th Cir.1969).[99]

## IV

### Patents

The issue before the Court is not, as it is with regard to the Bell name and logo, whether the Bell system patents should be assigned to AT & T or to the Operating Companies. AT & T will, in any event, retain ownership of all the patents. The question to be decided is the extent to which the Operating Companies will share in the patents by being granted licenses thereto, and what right these companies should have to grant sublicenses to others.

### A. *Meaning of the Decree*

The plan of reorganization provides that the Operating Companies will be granted royalty-free licenses to use patents [100] now owned by AT & T or to be issued to AT & T within five years after divestiture, to the extent that they relate to exchange, exchange access, and printed directory advertising services.[101] Under the plan, the Operating Companies will not, however, be granted licenses to patents relating (1) to any services which the decree prohibits them from offering (such as inter-LATA service) and (2) to the provision of customer premises equipment. To justify these limitations, AT & T and the Department of Justice rely upon section I(A)(1) of the decree, which provides, *inter alia,* for the

> transfer from AT & T . . . to the BOCs . . . of sufficient . . . rights to technical information to permit the BOCs to perform, independently of AT & T, exchange telecommunications and exchange access functions

and on section VIII(B) which provides that

> all facilities, personnel, systems, and rights to technical information owned by

**98.** Such restrictions have in other contexts been found to violate the antitrust laws. See, *e.g., Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.,* 585 F.2d 821 (7th Cir.1978).

**99.** Whether use of the word "Bell" with an appropriate prefix could pass muster under the law of trademarks and unfair competition outside a particular Regional Company's territory may be expected to depend upon the particular facts of each use (*e.g.,* the precise configuration of the name and logo, the results of customer surveys, and the like). Any decision now on that issue would therefore not only be entirely speculative and premature but it might also be beyond the Court's jurisdiction, and it will accordingly be left to another day and another forum.

**100.** "Patents" as used in this Opinion includes non-patented technical information. The parties have agreed that the Operating Companies would be granted rights not only to patents but

also to all technical information funded by the license contracts. 552 F.Supp. at 177. The plan as proposed applies only to United States patents; the Operating Companies would receive no rights to foreign patents. Objections to this aspect of the plan are discussed at note 116 *infra.*

**101.** AT & T's original proposal, which was modified at the request of the Department of Justice, would not have permitted the Operating Companies to engage in sublicensing on their own at all but would have required them to request AT & T to perform all sublicensing for them. The parties have since agreed to a modification of this part of the plan, and each Operating Company will now have the right directly to sublicense patents to any firm for use in supplying goods or services to that company, regardless whether the sublicensee is then a party to a license agreement with AT & T. See Department of Justice Response to Comments at 141.

AT & T . . . which are necessary for the production, publication, and distribution of printed advertising directories shall be transferred to the separated BOCs.

In the view of these parties, no patent rights need to be granted to the Operating Companies on any basis other than these explicit provisions contained within the "four corners" of the decree. This is erroneous.

When the Court approved the proposed decree on August 11, 1982, it made the approval contingent upon the adoption by the parties of a number of modifications. These modifications, it was made clear at the time, were required only for the most substantial changes or clarifications; with respect to other subjects, the Court stated that it was content to rely upon the parties' representations and promises and its own authority to give them effect during the implementation proceedings, including by its authority to approve or disapprove of the plan of reorganization. Thus, the August 11, 1982 Opinion explained

With respect to a number of subjects, the proposed decree establishes merely general principles and objectives, leaving the specific implementing details for subsequent action, principally by the plan of reorganization. . . . *The parties have also made informal promises,* either to each other or to the Court, *as to how they intend to interpret or implement various provisions.* The Court has decided that its public interest responsibilities require that it establish a process for determining *whether the plan of reorganization and other, subsequent actions by AT & T actually implement these principles and promises* in keeping with the objectives of the judgment. . . .

For that reason, the Court is requiring that the judgment be modified . . . to provide for a proceeding . . . in which *the Court will determine whether the plan of reorganization is consistent with the decree's general principles and promises* (emphasis added).

552 F.Supp. at 224–25.

One of these promises concerned patents. In its August 11, 1982 Opinion, the Court took note of the fact that

AT & T has proposed granting to the Operating Companies, on a royalty-free basis, *all* existing patents and all patents issued for a period of five years following approval of the proposed decree.

552 F.Supp. at 177 (emphasis added).[102] This statement was not conjured up by the Court; it reflects repeated representations made to it both by AT & T and by the Department of Justice. For example, the Department stated in its Response to Public Comments of May 20, 1982 at 132 that

the reorganization plan will require AT & T to grant royalty-free licenses to the BOCs for *all* of its existing patents, and for *all* patents issued for a period of five years following entry of the proposed modification (emphasis added).

See also Department of Justice Response to Public Comments, May 20, 1982, at 38; AT & T Reply to Comments, May 21, 1982, at 123; and see note 105 *infra.*

These various representations, said the Court in its August 11, 1982 Opinion,

are adequate to support the conclusion that the Operating Companies will possess the necessary patent and technical information resources.[103]

The arguments now made by AT & T and the Department of Justice in support of their claim that the word "all" in their several representations to the Court did not really mean "all," and that in context they meant something else, are disingenuous to say the least.[104]

Both parties base their narrow interpretations on the circumstance that the representations were made at a time when the

---

**102.** The Court further relied on the fact that "the parties have assured the Court that the Operating Companies will have the right to sublicense the AT & T patents and technical information to those providing them with goods and services." 552 F.Supp. at 177.

**103.** 552 F.Supp. at 177. Neither AT & T nor the Department of Justice thereafter contradicted the Court's understanding, whether by a motion for reconsideration or otherwise.

**104.** Indeed, the Court is disturbed that representations made by both parties in so clear and unequivocal a fashion are now claimed, after

proposed decree would have limited the Operating Companies to exchange telecommunications and exchange access services.[105] While this is an accurate depiction of their timing, it does not in the least support the conclusion that the promises were or reasonably should have been regarded as limited to patents which related to these lines of business.

These promises, whatever their timing, were relevant not only to the question of what resources were required to be transferred to the Operating Companies to implement the exchange telecommunications and access service provisions of section I(A)(1), but also to two other issues—whether the Operating Companies should receive licenses to patents which they had in substantial part financed, and whether AT & T should be relieved of the obligation, imposed by the 1956 decree, to license its patents to all applicants on a nondiscriminatory basis.

First. There were numerous references throughout the Tunney Act proceedings to the fact that the Operating Companies, by means of the licensing contracts, had contributed substantial amounts to the cost of the research which led to the patents, and this was always regarded by all as at least a possible basis for awarding licenses to the patents to these companies. See, *e.g.,* De-

partment of Justice Response to Public Comments, May 20, 1982, at 38.

Second. The Department of Justice took the position during the Tunney Act proceedings that it was reasonable and in the public interest to relieve AT & T of the patent provisions of the 1956 decree which required it to grant licenses to all comers, foreign and domestic. One basic argument made to buttress the claim of reasonableness was that the fruits of the Bell system research would not simply be lost to the world because the reorganization plan would still require AT & T to grant royalty-free licenses to the Operating Companies for all of its existing patents and for all patents issued for a period of five years following entry of the decree.[106] The Department explained that the effect of such a grant would be that

the BOCs will have the right to sublicense these patents for their own use, including the manufacture of equipment for the BOCs' purchase. Thus, as a practical matter, many AT & T patents issued within the next several years must also be licensed to AT & T's competitors notwithstanding entry of the proposed modification.

. . . . .

Because of the existence of requirements that AT & T license patents heretofore

---

the decree has been entered, to be encumbered by gaping loopholes.

**105.** See AT & T May 31, 1983 Memorandum at 24; Department of Justice Memorandum, June 10, 1983, at 3.

The Department of Justice points out that AT & T made the following statement during the Tunney Act proceedings:

[T]he Decree requires that AT & T afford the BOCs sufficient technical information to independently provide exchange telecommunications service and exchange access functions (Decree, § I(A)(I)). In compliance with that provision, AT & T will continue to license to the BOCs on a royalty-free basis existing patents and patents issuing within five years after entry of the Decree. AT & T Reply Comments, May 21, 1982, at 123.

The Department further referred to its May 20, 1982 Response to Public Comments at 38, where it stated:

In addition, AT & T has made a commitment to the Department that it will continue to license to the BOCs, on a royalty-free basis,

all existing patents and patents issued within five years of the date of entry of the modification. Such licenses will be for the life of the patent and will include the right to grant sublicensee to others to provide the BOCs with goods and services *for the BOCs' own use* (emphasis added). Department of Justice June 10, 1983 Memorandum at 3.

The Department argues that the "own use" limitation is not consistent with an interpretation that these companies would be granted the right to sublicense patents to manufacturers who provided them with products for resale. But the decree grants to the Operating Companies the right to provide CPE, and these companies obviously need to be supplied with products to use in selling CPE to the general public. See *infra.*

**106.** Department of Justice Response to Public Comments, May 20, 1982, at 132.

issued or issued during the next five years, and in view of the BOCs' sublicensing rights, it is apparent that a significant portion, if not all, of such 'work in progress' patents will be licensed. . . . [T]here is no reason to believe that entry of the proposed modification will result in the removal of 'work in progress' patents from the pool of AT & T patents generally available to industry.[107]

This expansive description of the proposed distribution of patent rights was not in any way limited, explicitly or implicitly, to section I(A)(1) of the decree or to intra-LATA services. The Justice Department's reference was to the effect of the proposed decree on the mandatory licensing provisions of the 1956 decree—and these provisions clearly applied to all Bell System patents (including, of course, the CPE patents).

There is, in view of that history, no reasonable basis for the conclusion that the various references by AT & T and the Department of Justice to "all" patents did not mean just that, or that CPE patents in particular were meant to be withheld from the Operating Companies. Thus, when the decree was modified to authorize the Operating Companies to provide CPE, there was no need again to specify the patent rights incidental to this modification [108]—rights which were already guaranteed to the Operating Companies by the parties' represen-

tations and by the Court's retention of jurisdiction to give effect thereto. As the Court said with reference to patents and technical information,

> When [the plan of reorganization] is submitted . . . the Court will evaluate [that plan] to make certain that [the appropriate details] conform to the general principles implied by these assurances.

552 F.Supp. at 177.

■ AT & T next contends that, if it were required to license all the Bell System patents to the Operating Companies which would then have the right to sublicense these patents to others, it would be required to "give away *its* technology" (emphasis added).[109] That formulation misstates the issue. Because of their financing of much Bell System research through the licensing contracts, what the Operating Companies will be receiving cannot fairly be described as AT & T's technology; [110] that technology is as much theirs as it is AT & T's. See 552 F.Supp. at 177.[111] Also, as the Court has already noted (see Part II above) all of the assets and all of the liabilities of the Bell System are being distributed between AT & T and the Operating Companies. AT & T cannot assert that, in the context of that distribution, the patents are "its" technology unless it is also prepared to live with the proposition that the liabilities of the Bell System are "its" liabilities. In short, it is entirely appropriate under the decree for

---

**107.** *Id.* at 132–33.

**108.** The Department of Justice and AT & T also point out that section VIII(B)—which authorizes the Operating Companies to provide printed directory advertising services (*i.e.,* Yellow Pages)—specifically provides that the technical information necessary to provide such services should be transferred to the Operating Companies. From this premise they argue that since section VIII(A)—which authorizes the Operating Companies to provide CPE—is silent with regard to the transfer of technical information, the conclusion may be drawn that no transfer of CPE patents to the Operating Companies was intended.

This argument is likewise unpersuasive, since there is another, more plausible explanation for the variation between sections VIII(A) and VIII(B). The language in section VIII(B) concerning technical information is part of a larger provision, similar to section I(A)(1), which was

intended to result in the transfer to the Operating Companies of all Bell System assets used in the production of printed directories. See 552 F.Supp. at 194 n. 263. If this provision had been used in the CPE context, it would have effectively assigned to the Operating Companies the embedded CPE and the existing network of retail outlets, contrary to the Court's intent. See 552 F.Supp. at 192 n. 248.

**109.** AT & T Response to Objections at 462.

**110.** That is, "central" AT & T, as distinguished from the Bell System as a whole.

**111.** This is so even if it is assumed, as AT & T asserts, that no expenses have been billed to the Operating Companies for new CPE patents since May 1980. See testimony of Thomas Bolger, designated chief executive of Mid-Atlantic Region, June 2, 1983, transcript at 25594, 25597–98.

the Operating Companies to receive licenses to the existing patents and to those which will be issued within the next five years.[112]

AT & T and the Department of Justice finally argue that under this rule, the Operating Companies would receive licenses to patents for services which the decree currently prohibits them from offering,[113] and that there could be no justification for such an action. It is not true, however, that even with respect to such subjects as inter-LATA services, the Operating Companies will be entirely barred from entry; they will be in these lines of business as of the very date of divestiture, albeit on a limited scale,[114] and they will therefore be able legitimately to make use of the pertinent patents [115] and the technology they represent.[116] Additionally, the line of business restrictions which will initially apply might in the future be lifted by the Court pursuant to section VIII(C) of the decree, and the patents would be useful to the Operating Companies at that time.[117]

B. *Sublicensing by the Operating Companies*

It is thus clear that, in view of the representations made by the parties and accepted by the Court as part of the decree, as well as in view of the various supporting considerations (*e.g.,* that the Operating Companies in significant part financed the research which produced the patents), the local companies are entitled to licenses to all the patents secured during the course of their association with AT & T and for five years after the association is dissolved.[118] This does not mean, however, as AT & T assumes and as some of the intervenors strenuously urge, that the Operating Companies may make direct use of the patents with respect to services which are otherwise forbidden to them by the decree. What must be firmly kept in mind is that, since the Operating Companies will not be allowed to enter manufacturing, they will be able to make effective use of the patent licenses only to the extent that they will have the power to grant sublicenses to manufacturers. As explained below, that power will exist with respect to some subjects immediately upon divestiture; with respect to others it is inchoate and its actual exercise will depend upon the removal of the line of business restrictions under section VIII(C).

112. With regard to all patents, AT & T will retain ownership and the right to use them in any lawful way it sees fit. None of the licensing requirements in the decree or in the plan of reorganization as required to be modified by the Court changes that fact in any way.

113. *E.g.,* patents applicable directly to inter-LATA services or to foreign operations.

114. *E.g.,* in the so-called "corridors" and the Official Services (see pp. 1097 and 1107 *infra*).

115. See, *e.g.,* testimony of Thomas Bolger, June 2, 1983, transcript at 25595.

116. With regard to foreign patents, AT & T argues that since the Operating Companies' exchange operations are confined to this country, the rights to AT & T's domestic patents provide all the patent rights the Operating Companies require to conduct exchange and directory advertising operations. AT & T Memorandum, May 31, 1983, at 24 n. **. However, in the CPE area, at least, foreign patents could be helpful to the Operating Companies even though they will not be operating overseas, for rights to foreign patents will enable them to purchase CPE which is manufactured entirely or in part by foreign companies. See testimony of Thomas Bolger, June 2, 1983, transcript at 25600; Memorandum of Mid-West Regional Holding Company, May 23, 1983, at 19; Memorandum of Mid-West Regional Holding Company, May 31, 1983, at 8.

117. The Operating Companies would benefit from these rights if any of the line of business restrictions should be lifted *at any time during the life of the particular patent,* not simply during the five years after divestiture. A lifting of the restrictions, or some of them, during that extended period is certainly conceivable.

118. It may be noted that requests to modify the proposed plan of reorganization so as to broaden the scope of patent rights granted to the Operating Companies were made by the Midwest Regional Holding Company (see Reply Memorandum of May 31, 1983); Thomas Bolger, designated chief executive of the Mid-Atlantic Region (see Second Amended Certificate of June 10, 1983); and Wallace R. Bunn, designated chief executive of the Southeast Region (see Statement of May 23, 1983).

The Operating Companies may grant sublicenses consistently with the decree to the extent that they will use the technology covered by the particular patents in their provision of products and services which they are authorized to sell or render.[119] They may not, however, grant sublicenses with respect to any other patents, for two reasons: first, because they may not, absent special permission, engage in new lines of business (sections II(D), VIII(C)), e.g., the sale of patent rights simply as a business venture unrelated to their own use of the technology; and second, because AT & T's manufacturing competitors are not entitled, as such, to the fruits of the Bell System research (552 F.Supp. at 176–77).[120]

On the basis of these principles, it is convenient to consider the sublicensing issue with respect to two distinct categories of products or services—those which the Operating Companies will be allowed to market immediately upon divestiture, and those which they will not be permitted to market at that time.

The first of these categories includes, of course, customer premises equipment.[121] In

an effort, accordingly, to resolve whether the grant of sublicenses to CPE patents by the Operating Companies to manufacturers of CPE would be used by the local companies in their provision of CPE—and whether therefore these companies may sublicense Bell System patents to such manufacturers—the Court has received and considered evidence (in both oral and affidavit form) from the chief executives of the Regional Companies. This evidence indicates that the Operating Companies will use the end products of the sublicenses in several respects.

First. The Operating Companies must have the right to sublicense CPE patents to manufacturers of their choice if they are to develop a CPE product line distinct from that of AT & T. As Thomas Bolger, designated chief executive officer of the Mid-Atlantic Region, has pointed out, if the Operating Companies were not granted rights to CPE patents, "the selection of the vendor to use Bell technology to supply a BOC would be taken from the BOCs and left to AT & T [which] might, or might not, cross-license the vendor with whom BOCs wish to deal." [122] Under such circumstances, the re-

---

119. See 552 F.Supp. at 177 (Operating Companies may grant sublicenses "to those providing them with goods and services"). Likewise, the Plan of Reorganization at 411–12, as modified by Amendment 34, provides that
AT & T will grant to each BOC the right—which no BOC currently has—to sublicense such AT & T patents to competing manufacturers for use only in providing the BOCs with goods or services embodying the inventions of the patents, provided that such sublicense does not prejudice AT & T's existing cross license agreements.

120. Several intervenors have suggested that the plan be modified to allow the Operating Companies to sublicense patents to manufacturers for the provision of goods and services not only to the Operating Companies but also to other purchasers, arguing that such broader sublicensing rights would result in increased royalty payments to the Operating Companies and, due to greater economies of scale, to the reduction in cost of·all goods produced by independent manufacturers. See, e.g., Reply of Wang Laboratories, April 13, 1983. The Court will not order such a modification, however, since it would, in effect, permit the Operating Companies to enter the patent licensing business.

121. AT & T contends that the Operating Companies need not be granted rights to CPE patents in view of the Court's observation that the Operating Companies will enter the CPE market "from a zero base." AT & T Response to Objections at 465 n. * (citing 552 F.Supp. at 192 & n. 248). There is nothing in the Court's language to support AT & T's conclusion; it merely justified the assignment to AT & T of the embedded CPE and the retail outlets.

122. Second Amended Certificate of Thomas Bolger, June 10, 1983, at 6. When questioned by the Court at the June 2, 1983 hearing as to whether the Operating Companies would use the CPE patents other than merely as a source of revenue, Bolger responded:
I would use them in order to allow me the freedom to make arrangements with suppliers, if I wanted to and if I found that it would be valuable for me to do so, so that I would have additional flexibility to procure CPE for my requirements.... I'm not going to sell the technology. I want to use it to help me enter the CPE market.
Transcript at 25596.

# 1088

liance of the Operating Companies upon Western Electric equipment would be perpetuated, thus impeding competition in the telecommunications equipment markets. It follows, of course, that without CPE patent rights and the ability to market a distinctive product line, the Operating Companies would not be able to provide the "effective counterbalance to AT & T's market strength" in CPE marketing, which the Court sought to establish in modifying the decree. 552 F.Supp. at 192.[123]

Second. If the Operating Companies are able to sublicense CPE patents, they will probably be able to negotiate lower equipment purchase prices and thus to share in the benefits from the Bell System research which they supported for so long.[124] This, in turn, will facilitate greater CPE sales and higher Operating Company revenues, and contribute in the long run to the financial viability of the Operating Companies (and indirectly to stable local telephone rates).[125]

Third. The sublicensing of patents will permit the Operating Companies to benefit from increased competition among their suppliers—another development which would tend to reduce the price of CPE purchased by the Operating Companies for resale. To the extent that greater competi-

tion among CPE manufacturers[126] and lower wholesale prices paid by the Operating Companies will result in lower retail prices for consumers, the public will benefit as well.

For these reasons, the Court concludes that the sublicensing of CPE patents to manufacturers of CPE would be a legitimate part of the Operating Companies' CPE marketing business.

In contrast to the substantive benefits which would inure to the Operating Companies from the ability to license CPE patents, only one possible adverse effect has been suggested.[127] The Department of Justice contends that Operating Company sublicensing of such patents would be a "step into the manufacturing area," contrary to section VIII(A) of the decree. Such sublicensing, according to the Department, would give the Operating Companies an interest in the success of their manufacturer-sublicensees, and this, coupled with the proprietary interest in the particular technology covered by the sublicense, would create an incentive for anticompetitive acts.[128]

In substance, this argument is but a variation of the claims made by the Department when it opposed the Court's decision

---

**123.** The logic underlying the licensing of all patents to the Operating Companies was to assure their independence from AT & T by providing alternative sources of supply for goods and services which they would use in the businesses which they were authorized to conduct. These companies had long been a captive market for Western Electric, both for telecommunications equipment and for CPE. Operating Company independence from AT & T is therefore crucial to CPE marketing, just as it is with respect to exchange and exchange access functions. With regard to both businesses the Operating Companies will be free to purchase equipment (or services) from suppliers which do not require licenses under AT & T patents; with regard to both businesses it is important, however, that they be able to purchase from alternative sources equipment (or services) which would not be available without sublicenses under AT & T patents.

**124.** As indicated, the Operating Companies will be permitted to sublicense CPE patents only in order to enable a manufacturer to provide goods for resale by the Operating Companies.

See *infra.* Thus, any royalty received by the Operating Companies under such sublicenses will, in all probability, be in the form of a reduced wholesale price paid by the Operating Companies to the manufacturer.

**125.** See Statement of Wallace Bunn of May 23, 1983 at 5–7; Testimony of Thomas Bolger, June 2, 1983, transcript at 25596.

**126.** There is no reason why an Operating Company would sublicense a particular CPE patent to only one manufacturer. See testimony of Thomas Bolger, June 2, 1983, transcript at 25597.

**127.** To be sure, another consequence would be that AT & T would acquire additional competitors in the CPE business, but this could hardly be regarded as an "adverse" effect in the context of this antitrust decree designed, in part at least, to open the CPE market to competition.

**128.** Department of Justice Response to Comments at 143–44.

to permit the Operating Companies to enter the CPE market. The Court then rejected the Department's assertion [129] that Operating Company marketing of CPE would result in anticompetitive conduct,[130] because it concluded that the subsidization by the Operating Companies of their retail CPE operations with monopoly-derived revenues was entirely improbable.

There is no good reason—and the Department has offered none [131]—why the Operating Companies would have a greater incentive or opportunity to engage in such subsi-

dization merely because they will be able to sublicense CPE patents to independent manufacturers.[132] Such an ability would no more facilitate coordination between separate corporations likely to lead to cross-subsidization than the purchasing contracts themselves, nor would the sublicensing of patents make anti-competitive activities any less detectable.[133] See 552 F.Supp. at 191–92.[134]

Finally, it is surely not without significance that the manufacturers of CPE—

---

**129.** At the same time, as the Court made clear, there are abundant reasons why the marketing of CPE by the Operating Companies is in the public interest (552 F.Supp. at 191–92).

**130.** See 552 F.Supp. at 192; Memorandum of August 23, 1982.

**131.** The Department has not attempted to explain how the grant to the Operating Companies of the right to sublicense CPE patents would increase the potential for cross-subsidization. The Department has, however, given three reasons why in its view discrimination among manufacturers could occur: (1) the sublicensing of patents would increase the Operating Companies' incentive to discriminate against certain vendors because the companies would have an incentive to market only the products of manufacturers operating under the sublicenses; (2) the Operating Companies would have the ability to extract concessions from manufacturers, thus undermining the potential for variety and merit purchasing; and (3) a financial interest in the success of a particular technology would enhance the incentives of the Operating Companies to develop standards through the CSO, which they own and control, to favor such technology. Department of Justice Memorandum, May 31, 1983, at 12–13.

The principal difficulty with these arguments is that there will be no reason for the Operating Companies to sublicense to only one particular manufacturer (and thus to favor that manufacturer's products) and a number of reasons why sublicenses will be granted to a number of manufacturers. See notes 126 *supra* and 134 *infra*. Additionally, the type of "concessions" the Operating Companies would extract from their sublicensing rights would be lower wholesale prices, which is hardly anticompetitive or contrary to the selection of vendors based on merit. Finally, if the Operating Companies were able to sublicense Bell System technology, more manufacturers would have access to this technology than if it were tightly controlled by AT & T, and it would be less likely rather than more so that the CSO would set standards

that favored only AT & T and Western Electric products. See Independent Data Communications Manufacturers Assoc., Inc. Reply Memorandum, May 31, 1983, at 9 n. 19.

**132.** Irrespective whether a sublicense is involved, the Operating Companies will share no common facilities with manufacturers. Further, sublicensing of CPE patents by the Operating Companies is no more a step into manufacturing than is the sublicensing of exchange and exchange access patents designed to provide goods and services to the Operating Companies for their exchange operations—yet the Department of Justice does not object to the latter. If Operating Company sublicensing of CPE patents were considered a form of manufacturing violative of the decree, then so presumably would the sublicensing of *any* patent by an Operating Company to a manufacturer—and the promises of AT & T and the Department of Justice made during the Tunney Act proceeding would be reduced to a nullity.

**133.** See Memorandum of Midwest Regional Holding Co., May 23, 1983, at 20 n. 20. It is difficult to see how sublicensing of patents would be a "step into manufacturing" likely to produce anticompetitive conduct also because the Operating Companies will, by necessity, have to negotiate with independent equipment manufacturers over a variety of contractual terms (*e.g.*, specification and design terms, volume contracts, trademark licenses) in order to obtain a distinctive line of products for resale.

**134.** The Operating Companies will have no economic incentive to engage in discriminatory conduct merely because they will have the ability to sublicense. As they enter the CPE market with a zero market share, their overriding incentive will be to enter into arrangements with as many vendors as is necessary to produce the highest quality, lowest priced products for resale to the general public. And the Operating Company executives have given every indication to the Court that this is precisely what they intend to do.

whom the Department of Justice is ostensibly attempting to protect—uniformly support the grant of sublicensing rights to the Operating Companies.

The Court concludes that the Operating Companies may sublicense their Bell System patent rights to manufacturers of CPE where the equipment produced under the sublicenses will be sold to the Operating Companies.

The same rule applies to the services which the Operating Companies will be authorized to perform. Clearly, they may sublicense patents for the manufacture of products which will assist them in providing intra-LATA service. Further, although prohibited from providing inter-LATA service generally, they will be in two relatively small areas of that market: corridor services [135] and Official Services.[136] Under the rationale applied to CPE, sublicenses may therefore be granted to manufacturers for the provision of equipment for the Operating Companies' own use in these two authorized inter-LATA services.[137]

Finally, section VIII(C) of the decree provides that the Court may, in the future, allow the Operating Companies to enter lines of business presently prohibited to them.[138] While, of course, the Operating Companies could not, immediately upon divestiture, sublicense patents useful with respect to such lines of business (see note 120 *supra*), the patent licenses assigned to them at the time of divestiture will become valuable through the automatic availability of the right to sublicense to the extent that

section VIII(C) is successfully invoked in the future.[139]

### C. *General Considerations*

Two additional considerations applicable both to the patent issue and the "Bell" name and logo questions deserve brief mention.

First. The Department of Justice [140] has been opposed to the marketing of CPE by the Operating Companies from the very outset. It was the Department which insisted on a provision in the proposed decree prohibiting such marketing. See, *e.g.,* Brief of the United States, June 14, 1982, at 30. When the Court on August 11, 1982, informed the parties that it would not approve the proposed decree unless that prohibition was eliminated, the Department sought reconsideration—the only issue with respect to which it made such an effort. See Memorandum, August 23, 1982. Finally, when the Court denied reconsideration, the Department, on the very date of filing the modified decree, submitted a memorandum in which it expressed "substantial doubts" that the modification allowing the Operating Companies to market CPE was "properly within the Court's authority under the public interest standard or [was] supported by the antitrust theory and the record in these cases."

The decree entered in this case allows the Operating Companies to market CPE. That decree was signed by the two parties, and it was entered as a judgment of this

---

**135.** See p. 1107 *infra.*

**136.** See pp. 1097–1101 *infra.*

**137.** The Operating Companies will be responsible for ensuring that those to whom sublicenses are granted do not exceed the scope of the activities allowed hereunder.

**138.** This may be done under that section, if it is demonstrated that "there is no substantial possibility that [an Operating Company] could use its monopoly power to impede competition in the market it seeks to enter."

**139.** Until the occurrence of such an event, if ever, the particular patent licenses in the possession of the Operating Companies will simply lie dormant. AT & T will not be injured by the

grant to the Operating Companies of licenses to patents which, ultimately, these companies may never utilize. There is also no need, therefore, to fear that the Operating Companies will use their patent rights to "peddle" AT & T technology. AT & T Memorandum May 23, 1982, at 23.

**140.** Whether or not AT & T sought the Bell name and patent restrictions or was required or persuaded by the Department of Justice to agree to them, there can be no doubt that they are advantageous to AT & T, for they would, as a practical matter, eliminate competition from the Operating Companies or significantly curtail the effectiveness of such competition.

Court. Whatever may be the views of the Department of Justice or some of its officials regarding the wisdom of the CPE provision, it will be enforced. And the Court will not allow this provision to be stripped of its vitality by artificial restraints which would undermine the competitive position of the Operating Companies in the CPE business vis-a-vis AT & T.[141]

Second. The Court has previously taken note of the recent decision of the Federal Communications Commission concerning access charges. See 1983–1 Trade Cas. ¶ 65,-333 at 66,973–75 (April 20, 1983). Briefly, the Court was advised prior to the entry of the decree that whatever subsidy from long distance rates might in the past have been inherent in the local rate structure could and would be preserved by means of access charges levied on interexchange carriers.[142] However, in December of last year, the FCC decided to levy such charges also on individual subscribers.[143]

This access charge decision undermines one of the assumptions underlying the Court's approval of the decree [144]—that there would be no impairment of the principle of universal service [145]—that is, that everyone, regardless of income, would have access at least to a minimum of telephone service, in recognition of the fact that this service is a necessity rather than a luxury.[146] The FCC's decision unnecessarily [147] jeopardizes this objective.

Whatever its authority or lack of it with regard to this development,[148] the Court may certainly take it into account, as further support for conclusions which are sound for other reasons. In passing upon the tradename, trademark, and patent issues, as well as on various other questions, the Court has done just that (see p. 1121 *infra*). In each instance, the Court's decision is fully justified by other, specific considerations cited in the text, but in each such instance the Court also found that its decision was buttressed by the need to cope with the threat posed to universal, low-cost, local telephone service.

## V

### *Employees*

A. *Pension Plan*

Two challenges are made to the employee pension provisions of the plan of reorganization.

---

**141.** *I.e.,* restraints which would unnecessarily and improperly deprive the local companies of the necessary and appropriate patent and trademark rights.

**142.** That is, charges levied upon the carriers as a prerequisite to their obtaining access to the local loops and hence to the local subscribers.

**143.** See *In the Matter of MTS and WATS Market Structure,* CC Docket No. 78–72 Phase I (adopted December 22, 1982). The FCC also decided to begin this program on January 1, 1984, the date of the reorganization of the Bell System. This effective date makes it appear that the imposition of this burden on consumers is related to the decree herein—which clearly it is not (see note 292 *infra*).

**144.** See 552 F.Supp. at 169, 224 n. 376.

**145.** Universal service has been mandated by the Congress, and until December of last year it had been a principal policy goal of the Federal Communications Commission.

**146.** One might consider, for example, such uses as the ability to reach fire, police, and other emergency services; the need of the elderly to reach physicians, close relatives, or others who might give them aid; and the desire of those in isolated areas of the country for contact with others.

**147.** That decision, at bottom, rests upon the proposition that novel bypass technologies may erode the financial health of the Operating Companies, and that increased support from the residential ratepayers will allow these companies to remain competitive. There is no reason to believe that bypass on a large scale is imminent. Further, evolving technology may be expected to result overall in reduced costs. Rather than to serve as a basis for imposing a new burden on local ratepayers, such technology and such reduced costs would better be channelled to benefit all segments of the public, including the local subscribers.

**148.** See p. 1122 *infra*.

### 1. *Union Challenge*

The Communications Workers of America (Union) [149] claims that the plan's proposal to divide the Bell System Pension Plan (BSPP) into nine separate plans will materially alter the terms and conditions of employment within the Bell System, and that the plan therefore impermissibly interferes with the Union's right to bargain over pension benefits.

The two current pension plans, the BSPP covering nonmanagement employees and the Bell System Management Pension Plan (BSMPP) covering management employees, have existed in their present form only since 1980. Prior to that time, the many separate companies which constitute the Bell System administered separate pension plans. In October 1980 the plans were aggregated, [150] and even though a formal separation between management and non-management personnel was maintained, the assets of both the BSPP and BSMPP have since 1980 been pooled for investment purposes into one Bell System Trust. The plan of reorganization would divide each integrated plan into nine plans to correspond to the nine entities which inherit AT & T's assets and functions after January 1, 1984. [151]

The Union, which is concerned specifically with the BSPP, offers eight changes it believes this division would cause, but upon examination they reduce to three general categories. First, the Union complains that the plan would phase out the "interchange" provisions in the BSPP governing the portability of service credit from one Bell System company to another. Second, it speculates that each of the nine plans will be financially more risky than the existing central plan, [152] with the result that an employee's benefits may be reduced. Third, the Union maintains that the post-divestiture plans—as described in the plan of reorganization—would treat former employees who are rehired differently from the way they now are treated for pension purposes. [153]

In approving the divestiture and rejecting the Union's request that the decree be modified to provide that it would not preclude continued national bargaining in telecommunications, the Court stated last August:

> [T]here is no need for such a modification. There is nothing in the proposed decree or in general principles of law which would preclude or interfere with such bargaining, and there accordingly is no reason whatever why, following the entry of the decree and the reorganization, such bargaining cannot continue as in the past.

> [T]he settlement of the lawsuits ... do[es] not involve AT & T's labor relations and, more particularly, [it has] nothing to do with the Communications Workers of America or its relationship with the Bell System. [citations omitted]. It follows that the union, on the one hand, and AT & T, and the divested Operating Companies, on the other, will be entirely free to arrange their mutual labor relationships as the Bell System and the union did in the past, irrespective of the struc-

---

149. Other labor unions are also involved, but they did not submit comments to the Court.

150. The Union states that the decision to merge the various plans was a subject of collective bargaining, but AT & T disputes this assertion. AT & T Response to Objections at 399.

151. For pension purposes, these nine entities are AT & T, the Central Staff Organization, and the seven Regional Companies.

152. For example, the union posits that gains in one Operating Company's assets would no longer be available to compensate for losses in another Company's assets.

153. A fourth criticism—that the distribution of the Trust's assets may be out of synchronization with the distribution of its liabilities, *i.e.,* the accrued benefits of employees—is plainly without merit. Elaborate actuarial studies will be performed after employee assignments have been finalized to ensure that pension assets in the appropriate amounts follow each employee. A company would therefore not receive a disproportionate number of employees near retirement without also receiving a proportionately greater amount of pension assets.

tural changes that may be brought about by the decree

552 F.Supp. at 210.

The Union cites this language, the labor exception to the Sherman Act, federal labor policy, and the lack of relation between the Bell System Pension Plan and AT & T's alleged anticompetitive conduct as reasons why the Court should not approve the plan's proposed treatment of the BSPP but should commit the future of the BSPP to the results of collective bargaining.

First. The Court observes that the plan of reorganization does acknowledge the role of collective bargaining over pension benefits. AT & T states that

> [t]he provisions of this section [regarding pensions] are based on the Bell System's plans and trusts as they currently exist. These plans and trusts may be modified during 1983 or thereafter as a result of collective bargaining or other requirements.[154]

Thus, it does not appear that AT & T is attempting to ride roughshod over the bargaining rights of its employees.

■ Second. Although AT & T could not materially alter pension benefits unilaterally (see *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), *Bastian-Blessing, Division of Golconda Corp. v. NLRB*, 474 F.2d 49 (6th Cir.1973)), this principle and the cases which support it are inapplicable here.[155] We are not dealing here with unilateral employer action in the sense in which it is condemned by the labor laws, but with a break-up of the employer company as part of a comprehensive settlement of a complex antitrust action. See *Newspaper Guild of Greater Philadelphia, Local 10 v. NLRB*, 636 F.2d 550, 560 (D.C.Cir.1980).

Furthermore, contrary to the Union's assumption, the decree in this case requires far more than a separation of AT & T's telecommunications functions; it requires the complete economic separation of the various components of the Bell System. See, *e.g.*, sections I(A)(1); I(A)(3). It would be entirely inconsistent with the decree to perpetuate a unified pension plan, with the result that employees of the independently owned and functioning Operating Companies would continue to look to AT & T for their pension benefits. As it is, equipment manufacturers are concerned that they may not receive equitable treatment from Central Staff Organization employees due to their alleged emotional ties to their former parent company. Such claims would acquire considerable plausibility if CSO and Operating Company employees believed that they had a continued economic stake in AT & T in the form of their retirement benefits.

At a minimum, the decree requires that the pension assets of employees follow them to their new assignments, and that the Regional Companies develop, as soon as possible, self-sufficient pension plans.[156] Union-

---

154. Plan of Reorganization at 281 n. 317. Moreover, AT & T and the Union have already bargained over certain effects of divestiture on employees' pension and health benefits, and the results of this bargaining are reflected in the Amended New Entities Arguments dated March 26, 1982, March 30, 1982, and April 5, 1982. See AT & T Response to Objections at 397.

155. In *Katz*, the Supreme Court held unlawful an employer's unilateral establishment of new systems of wage increases, sick leave provisions, and merit raises at a time when it was negotiating with the union regarding the same subjects. *Bastian-Blessing* likewise involved the unilateral termination by the employer of a health insurance plan which had been the subject of collective bargaining. Neither case even remotely resembles the facts of the instant situation.

156. AT & T proposes to continue to administer the pension plan of any Regional Company that requests such "full service" assistance for a transition period during which the Company would acquire the skills and resources to manage its own pension plan. Regional Companies that request this option would receive their share of pension assets no later than 1987. Plan of Reorganization at 297. The Court approves of AT & T's continued management of a Regional Company's pension plan with the expectations that the Regional Companies choosing this option will have as much authority over their respective plans while they are technically under AT & T's administration as they desire, and that the transition periods will be kept to a minimum. It would be impractical to insist that assets be immediately transferred to a company that does not believe it can prudently manage them. At the same time, continued

employer bargaining for a continued, unified pension plan is thus not a viable option. This is a structural matter covered by the decree that is not inconsistent with federal labor policy, for there will be no "changes in coverage, levels, or administration of the plan." *Connecticut Light & Power Co. v. NLRB,* 476 F.2d 1079, 1082 (2d Cir.1973).[157]

■ The phasing out of unlimited portability [158] is likewise a natural consequence of divestiture, for it would surely be inconsistent with the independence of the Operating Companies from AT & T and from one another to allow employees to rotate among them as freely as if these companies were related entities.[159] The Court therefore approves AT & T's proposals which would divide the two existing plans into nine separate plans, and the provisions governing the division of pension assets through actuarial studies—both before and after divestiture—to ensure that the assets will be equitably distributed.

Third. There is merit in the Union's position that the Court need not and should not involve itself in the specific terms of the post-divestiture pension plans beyond their structure. Unlike the threshold issues of the pension plans' division and the elimination of unlimited portability, the precise terms of the pension plans admit of several resolutions each of which would be consistent with the decree.[160] However such non-structural aspects of the pension plans may have been resolved in the past, their resolution is not cast in concrete. Accordingly, they are open for further decision, whether by collective bargaining when the contract governing the current pension plan expires in August 1983, or otherwise as AT & T and the Union see fit. The Court's approval of the plan of reorganization is therefore not to be regarded as an endorsement of whatever AT & T may be planning with respect to post-divestiture pension benefits. To put it another way, there is nothing in the Court's approval of the plan of reorganization (other than the structural and portability matters discussed above) which would in any way impair the obligation of AT & T to bargain in good faith with the Union.

linkage between AT & T and the Regional Companies is not to be encouraged. In this regard, AT & T proposes to continue managing the Bell System Trust's real estate investments, which amount to approximately $3.1 billion. The Court approves this aspect of the plan, although reluctantly, in view of the nonliquid nature of these assets and the allowance for a Regional Company or AT & T to buy out of the arrangement.

**157.** AT & T and the Department of Justice represent that this will be the case: benefit amounts and entitlement and eligibility requirements will not change. The financial performance of the individual plans may vary but the Union has offered nothing but speculation that any such variation would have an actual effect on the level of benefits, particularly since the fair market value of the BSPP and BSMPP trusts exceeds the present value of accrued benefits. Plan of Reorganization at 295 n. 332.

**158.** Under the plan, unlimited portability would remain in effect for one year after divestiture, except that employees in certain specified job categories who work on facilities shared by the Operating Companies and AT & T would be granted longer portability entitlements. See *infra* at 1096. Portability would continue after the one-year "true-up" period among the Oper-

ating Companies controlled by each Regional Company.

The Union objects to the elimination of unlimited portability insofar as it overrides a benefit secured previously through collective bargaining. AT & T agrees with the Union that "many of the employee protections to be provided during the true-up period are subject to collective bargaining" (AT & T Response to Objections at 382 n. *) but argues that the decree requires the parties and the Court to set a definite time limit for the true-up period. The Court agrees that the decree's separation between AT & T and the Operating Companies requires the establishment of a fixed true-up period for employee transfers, and it finds that the one year proposed in the plan is reasonable. To the extent that it might be thought that this provision affects collective bargaining rights, such rights are superseded by the Court's power to enforce its decree. Cf. *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

**159.** See, *e.g.,* Comments of Satellite Business Systems, filed Feb. 15, 1983, at 65.

**160.** There is nothing in the provisions of the decree governing, for example, the treatment by the post-divestiture plans of former employees who are rehired, or what rules ought to determine when an employee's pension rights become vested.

## 2. State Objections

The State of Maine and the Maine Public Utilities Commission argue that the plan of reorganization improperly allocates certain pension assets to AT & T. Under the plan, the assets of BSPP and BSMPP would be divided and allocated among the nine post-divestiture entities so that the accrual rates [161] for each of the new plans after divestiture would be approximately the same as will be the rates under the AT & T plans immediately prior to divestiture.

The allocation would be accomplished in two steps: first, there would be coverage of an amount equal to the present value of accrued benefits for each participant; second, all remaining assets—the difference between the present value of assets and liabilities—would be allocated so that the accrual rates for the post-divestiture pension plans would be approximately the same as the accrual rates in effect for the AT & T plans immediately prior to divestiture. Maine does not quarrel with the first step which, in any event, is required by the Employee Retirement Income Security Act (ERISA) and section 414(a) of the Internal Revenue Code. However, in its view, the assets in excess of those needed to cover accrued benefits [162] should be allocated in proportion to the contributions which produced the excess rather than on the basis proposed by AT & T.

Maine claims that because some 10 to 20 percent of present Operating Company employees will be transferred to AT & T,[163] it is likely that excess assets originally contributed to the pension plans by the Operating Companies will improperly be transferred to the AT & T plan (thus reducing proportionately its pension liabilities).[164]

It may well be true, as Maine contends [165] that the law does not affirmatively require that excess assets must follow the transferred employees from the Operating Companies to AT & T since there is no requirement that employees receive the benefit of excess assets.[166] What is flawed, however, is the State's argument that it is improper for the plan of reorganization to allocate the excess funds in accordance with future payment obligations and contribution levels, and that these funds must be allocated instead in accordance with the contributions made in the past. What this argument overlooks is that while the Operating Companies would be losing excess assets associated with the transferred employees, they would also be losing liabilities, i.e., the benefits the employee will accrue in the future. Under Maine's proposal, entities with higher liabilities after divestiture than before would have fewer pension fund assets to meet their future obligations, requiring a higher funding rate. Conversely, those companies which will have lower pension liabilities after divestiture than before would enjoy a windfall. The most important consideration is the interest of the participants and beneficiaries,[167] and they are best served by the proposed plan.[168]

---

**161.** An accrual rate is the percentage of total payroll that must be contributed to a plan periodically in order to meet future pension liabilities.

**162.** According to AT & T's 1982 Annual Report (p. 38), the fair market value of the pension assets exceeded the present value of accrued benefits by more than $11.5 billion.

**163.** This is due to the separation of interexchange and CPE operations from the Operating Companies. Plan of Reorganization at 456 n. 430.

**164.** To the extent that some entities (either AT & T or an Operating Company) had proportionately more excess than others, the plan would equalize the extent of any such excess regard-less of which Operating Company was the source of the overfunding.

**165.** Reply of Maine and Maine PUC, April 13, 1983, at 19.

**166.** See, e.g., Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Co., 555 F.Supp. 257 (D.D.C.1982); Rev.Rul. 83–52, 1983–13 I.R.B. 7; see also ERISA § 4044(d)(1).

**167.** See ERISA, § 404(a)(1); Donovan v. Bierwirth, 680 F.2d 263 (2d Cir.1982).

**168.** There is also no evidence to support the assumption that the Operating Companies will have contributed to excess funds in greater proportion than has AT & T.

## B. *Employee Transfers*

In addition to the one-year true-up period [169] immediately following divestiture during which any employee may be transferred between AT & T and an Operating Company [170] without loss of seniority rights or other benefits,[171] the plan further provides that employees in four specific job categories [172] may be transferred without loss of benefits after the one-year period.[173]

Section I(A)(2) of the decree provides that AT & T and the Operating Companies may continue to share certain facilities, and the plan implements that provision by specifying that the entities "intend to cease sharing network facilities as promptly as is reasonably feasible." Plan of Reorganization at 56. The plan's employee transfer provisions are justified by AT & T on the basis that the job functions of these employees will begin with one entity but will need to be transferred to another as transitory arrangements for the sharing of multifunction facilities are phased out. Response to Objections at 382–83.

The principal objections raised to the plan's grant of transfer rights to the employees are that this may result in fraternization between AT & T and Operating Company personnel, the disclosure of equal access network information to AT & T employees, the perpetuation of loyalty to the Bell System, and the provision by Operating Company personnel of certain inter-exchange services to AT & T but not to other interexchange carriers. See, *e.g.,* Comments of Satellite Business Systems, February 15, 1983, at 65–66, 91.

The intervenors' concerns are not frivolous; however, given the necessity for some sharing of multifunction facilities, the solution adopted in the plan is, in general, a reasonable one. The basic alternative to the provisions for transfers without loss of benefits is a lay-off of the affected employees by one entity to be followed by a (possible) rehire by the other. The Court has no intention whatever of unnecessarily imposing such a hardship on these employees.

**169.** See note 158 *supra.*

**170.** It may be noted that all the transfers during the true-up period will be the result of arm's length negotiations between AT & T and the Operating Companies, and there is thus no occasion for either a "post-divestiture re-evaluation plan," judicial involvement, or the appointment of special Operating Company representation, as some have suggested. *E.g.,* Comments of the State of Michigan and Michigan Public Service Commission, Feb. 11, 1983, at 30; Comments on AT & T's Plan of Reorganization of the Public Service Commission of the State of Missouri, February 15, 1983, at 14. It is unclear what representation could be provided by the Court for companies which, after divestiture, will be independent entities. If the true-up process is not being conducted in accordance with the decree and the plan, ample means will be available for corrective action.

**171.** The Court expects, as AT & T represents, that the one-year true-up period will not be used for frequent personnel transfers but as a "time for correcting mistakes that are bound to occur in a reorganization of this magnitude." AT & T Response to Objections at 378.

**172.** These categories are (1) Operating Company service center employees who will write inter-LATA orders for AT & T under a sharing contract until such time as the contract ends

and they are reassigned to AT & T, but no later than 5½ years after divestiture; (2) AT & T operators who will provide intra-LATA Call Completion and Assistance services until Operating Companies establish such systems and they are reassigned to the Operating Companies, but no later than 10½ years after divestiture; (3) Operating Company personnel who will provide circuit provisioning functions for AT & T until AT & T assumes this responsibility, but no later than 5½ years after divestiture; and (4) employees providing installation and maintenance services for "special services" both by AT & T for Operating Companies and vice versa, until the companies provide their own services, but no later than 5½ years after divestiture. AT & T claims that, for various reasons, it would be inefficient for AT & T and the Operating Companies to provide these functions independently immediately upon divestiture. See AT & T Response to Objections at 388 n. *.

**173.** Under the plan, the duration of the transfer is limited to the period necessary to accomplish the change of multifunction facilities to exclusively AT & T or Operating Company facilities. This will occur not later than five years and six months after divestiture, except for operator services personnel who may be transferred up to ten years and six months after divestiture. Plan of Reorganization at 287–88. See note 172 *supra.*

Moreover, the entire matter must be kept in perspective: the individuals involved will not be managers or other policy makers but relatively low level employees. It is thus unlikely that manipulation or the disclosure of sensitive information to AT & T will occur. The loss of employment security and the unusual and unnecessary inefficiencies which would be the consequence of a rejection of most of the transfer provisions can therefore not be justified.

There is, however, one exception to this principle. AT & T has not demonstrated why Operating Company personnel should write inter-LATA orders for AT & T for up to 5½ years after divestiture. Such order-writing is purely an interexchange function; it is performed by persons, not "facilities" as that word is used in section I(A)(2); and this service would not be available to any interexchange carrier other than AT & T. Indeed, such order-writing by Operating Company personnel for AT & T could provide the latter with a significant competitive advantage. The Court will not permit sharing of this function, and it will require the deletion of references to such sharing from the plan of reorganization (at pp. 253, 254, 279–80, and 287), unless the benefits are made available to all interexchange carriers.

The Union, unlike the other intervenors,[174] suggests that the Court require modification of the plan to permit unlimited transfers of employees among the post-divestiture Bell System entities. As noted *supra*, such a provision would be flatly inconsistent with section I(A) of the decree and with the underlying rationale of the judgment—that the economic integration among the various Bell System entities must cease. That proposal, too, will therefore be rejected.

## VI

### *Official Services and Other Facilities*

 With one major exception, the division of network facilities and other assets is reasonable and fully consistent with the decree.

### A. *Official Services*

The Court will not approve the decision made in the plan of reorganization with regard to so-called Official Services. These services represent communications between personnel or equipment of an Operating company located in various areas and communications between Operating Companies and their customers.[175] The plan of reorganization provides that Bell System facilities used in whole or in part for Official Services will be assigned according to the same rules applicable to other transmission facilities; meaning that, if facilities are used solely or predominantly to perform inter-LATA functions, they will be assigned to

---

174. However, the State of New York would permit all employees in shared services to have and exercise transfer rights, as distinguished merely from the four categories of employees listed in the plan.

175. There is some dispute as to whether Official Services are limited to Operating Company internal communications or whether they include communications between an Operating Company and its customers. See AT & T Response to Objections at 95–96 n. *; Supplemental Affidavit of William Weiss, April 12, 1983, at 9; letter from Raymond Burke, April 13, 1983, at 2 n. *.

The Court concludes that for purposes of the discussion and decision herein "Official Services" must properly include customer communications. As Raymond Burke points out (April 13, 1983 letter at 3 n. *),

no charges apply to communications which AT & T classifies as 'official' service . . . [and] even where there is a charge for such services as directory assistance, any inter-LATA administrative facilities involved are not 'for hire.'

Similarly, Thomas Bolger notes (Amended Certification of April 6, 1983, at 5–6),

a customer in Salisbury, Maryland actually speaks to a directory assistance operator in Baltimore, but that is done solely to facilitate the conduct of these exchange operations in efficient work groups. The customer does not care where his call is answered and he pays no charge for the referral of his call from a local central office to a distant company location for this purpose.

AT & T even if the functions constitute Official Services.[176] Additionally, the Department of Justice has indicated to one or more Operating Companies [177] that it would object if they constructed and operated their own inter-LATA facilities to administer Official Services.[178] In the view of the Court, neither the plan's treatment of Official Service facilities nor the position of the Department of Justice is consistent with the principles underlying the decree.

Each Operating Company conducts its authorized operations in several LATAs. In order to achieve operational efficiencies, the four basic categories of Official Service systems [179] have been designed to serve geographical areas which are usually larger than individual LATAs. For example, the

so-called "Operational Support System Networks" (see note 179 *supra*) typically cover an entire state or major portion of a state, permitting the monitoring and controlling of trunks and switches and the routing of traffic from a centralized location. Directory assistance, repair service offices, and business offices likewise serve geographical areas which are larger than individual LATAs.[180]

For the reasons stated below, it makes no sense to prohibit the Operating Companies from using, constructing, and operating on their own the facilities they need to conduct Official Services, whether they be intra-LATA or inter-LATA in character, and to require them instead to lease such facilities from AT & T.[181]

---

**176.** See AT & T Response to Objections at 95–96.

**177.** The several communications from the Department of Justice to the Operating Companies may not be entirely consistent with regard to this subject, however.

**178.** See Amended Certification of Thomas Bolger, April 6, 1983, at 5; letter from Raymond Burke, April 13, 1983, at 1.

**179.** The Operating Companies manage their business through the following complex networks for the transmission of voice and data communications:

(1) The Operational Support System Network is a network of dedicated voice and data private lines used by the Operating Company to monitor and control trunks and switches. These communications links are vital to the proper operation of the network since, for example, they enable Operating Company personnel to measure the maintenance status of trunks and switches and instantly to control equipment and reroute traffic.

(2) The Information Processing Network is a network of dedicated data lines linking the Operating Companies' information system computer. It is used to transmit data relating to customer trouble reports, service orders, trunk orders from interexchange carriers, and other information necessary for carrying out the Operating Companies' business.

(3) Service Circuits comprise a network of largely dedicated voice lines used to receive repair calls and directory assistance calls from Operating Company customers. These communications ensure the maintenance of

telephone service and they provide directory assistance to Operating Company customers.

(4) Voice communications are used by the Operating Companies for hundreds of thousands of calls relating to their internal businesses.

Supplemental Affidavit of William Weiss, April 12, 1983, at 11–12.

**180.** As Thomas Bolger, designated chief executive of the Mid-Atlantic Regional Company, has pointed out:

In order to reduce costs and maximize efficiency, the BOCs have computer processing centers which receive billing and other data from company locations in a number of LATAs. Similarly, calls from Operating Company customers seeking such services as directory assistance are currently routed between BOC offices to centralized locations in other LATAs.

Amended Certification of Thomas Bolger, April 6, 1983, at 5.

**181.** The Department of Justice suggests that where Operating Company facilities are transferred to AT & T under the assignment process, it would be appropriate for AT & T to lease back to the Operating Company those circuits currently dedicated to Official use. However, an Operating Company's ability to lease existing Official Service facilities from AT & T would be limited to the duration specified in the plan of reorganization for shared facilities—that is, eight years. See Department of Justice Response to Comments at 35; AT & T Response to Comments at 115; Amended Certification of Thomas Bolger, April 6, 1983, at 5. After this eight-year period, the Operating Companies would have to hire the services of AT & T or other interexchange carriers to meet all their inter-LATA Official Service needs.

The Department of Justice recognizes "that the BOCs may have constructed their internal data processing and operational support systems on the assumption that communications links between their facilities would be over BOC-owned facilities," [182] and further that to require such communications to be "placed on commercial facilities might abruptly increase the BOCs' cost of providing service." [183] Yet, relying solely on the curt rationale that such traffic is correctly classified as inter-LATA, the Department supports the assignment of all existing inter-LATA Official Service facilities to AT & T. This solution is both unwise and unnecessary.

Only two alternatives would be available to the Operating Companies under the current plan, both of them undesirable. One option would be for the companies to redesign their Official Service systems so that none of their internal communications crosses LATA boundaries. This would result in a loss of the operational and cost efficiencies produced by the centralization which currently exists in the local phone system.[184] In effect, a separate, self-contained Operating Company would be created for each LATA—a result clearly not contemplated by the decree.

The other option would be to have the Operating Companies' Official Service communications carried by AT & T or another interexchange carrier. See note 181 *supra*. This alternative would not only be very costly [185] but it suffers from a number of other infirmities. As William Weiss, chief executive-designate of the Midwest Region, points out:

> Speed and reliability are critically important with respect to the BOCs' monitoring and controlling of their switches and trunks. BOC operating personnel and computers must have continuous, instantaneous information regarding traffic loads and the operating status of equipment. When traffic overloads or equipment malfunctions occur, they must have the capability to immediately control equipment and reroute traffic. Forcing the BOCs to rely on third parties for official service communications . . . could seriously jeopardize the BOCs' fulfillment of their responsibilities to provide intra-LATA communications and exchange access. . . .

> Moreover . . . [i]n many instances, the BOCs could more efficiently conduct these communications over inter-LATA facilities constructed and owned by the BOCs. The BOCs' ability to deploy new transmission technologies is at least as good and probably better than that of third parties who might provide us with inter-LATA services. The cost of building facilities utilizing those new technologies might be far less than the cost of leasing facilities employing older, and thus higher-priced technologies.

> . . . The critical point is that the BOCs should be free to conduct their official services communications in the optimal

---

**182.** Department of Justice Response to Comments at 35. Indeed, ironically, in spite of the fact that most Operating Company Official Service communications are presently conducted over facilities "owned" by these companies themselves, many such facilities would now, under the plan, be assigned to AT & T. Supplemental Affidavit of William Weiss, April 12, 1983, at 10.

**183.** Department of Justice Response to Comments at 35. However, that is precisely what will happen in eight years under the Department's scheme. See note 181 *supra*. Even during this eight-year period, any Official Service demands which cannot be satisfied by existing circuits leased from AT & T would have to be "placed on" commercial facilities of an interexchange carrier.

**184.** In recent years, many of the Operating Companies have achieved significant cost savings through the modernization of their internal management processes. Supplement to Sworn Statement of Wallace Bunn, April 7, 1983, at 5 (47,000 internal computer terminals in operation throughout Southeast region alone).

**185.** It has been estimated that for the Mid-Atlantic region alone, the total expenditures for all types of inter-LATA Official Services would be approximately $125 million annually. Amended Certification of Thomas Bolger, April 6, 1983, at 6.

manner, selecting whichever option is the most reliable and cost-efficient.[186]

Such significant burdens should not be imposed on the Operating Companies unless this is clearly required by the decree. An examination of the decree's provisions shows, however, that a prohibition on the maintenance of inter-LATA Official Service facilities by the Operating Companies is required neither by its spirit nor by its letter.

The Operating Companies are prohibited from engaging in intercity, inter-LATA services in order to prevent a recurrence of the alleged anticompetitive practices of AT & T, which was claimed by the government to have used its local monopolies to disadvantage its intercity competitors in a variety of ways. That rationale is wholly inapplicable to the provision of inter-LATA service by each Operating Company for its own internal, official purposes.[187] Only by a highly abstract distinction between services that are once and for all labelled "competitive" or "monopolistic" could that prohibition be applied to the Operating Companies' Official Services. Moreover, it is ironic that a prohibition which grew out of AT & T's dominant competitive position and its alleged misuse of that position is now sought to be applied in such a way as to afford AT & T a substantial financial benefit by giving it the opportunity to carry, for a profit, the Operating Companies' own internal, official communications which these companies are perfectly able to carry themselves and have, indeed, carried themselves in the past.[188]

Nor is so illogical a result required by the strict terms of the decree. While the Operating Companies are prohibited by section II(D)(1) from providing "interexchange telecommunications services," section IV(P) defines "telecommunications services" as "offering *for hire* of telecommunications facilities" (emphasis added). Obviously, the Official Services are not "for hire." Similarly, the decree prohibits the Operating Companies from engaging in "information services," but it expressly permits them to engage in such services "for the management, control, or operation of a telecommunications system or the management of a telecommunications service." Section IV(J). Further, section I(A)(1) mandates

> [t]he transfer from AT & T and its affiliates to the BOCs ... of sufficient facilities [to permit them] to perform, independently of AT & T, exchange telecommunications and exchange access functions, including the procurement for, and engi-

---

186. Supplemental Affidavit of William Weiss, April 12, 1983, at 13–14. An increasing number of private corporations with operations dispersed over large geographic areas, such as oil companies and electric power utilities, have opted to construct and operate their own circuits by which their administrative communications are transmitted. Letter from Raymond Burke, April 13, 1983, at 2; see also, Amended Certification of Thomas Bolger, April 6, 1983, at 6; Supplement to Sworn Statement of Wallace Bunn, April 7, 1983, at 6.

187. The Operating Companies are prohibited from providing inter-LATA telecommunications services under the decree for two reasons: the possibility of discriminatory interconnection practices and the possibility of subsidization of interexchange services with revenues from local exchange services. See 552 F.Supp. at 188–89. Neither of these reasons is implicated by the ownership and operation by an Operating Company of its own inter-LATA Official Service network.

188. There is also a distinct possibility that AT & T might be able to gain competitive advantages from its control over Operating Company official circuits. Compare 552 F.Supp. at 181 (possible advantage to AT & T from control of electronic publishing business).

In arguing that the Operating Companies should be able to construct and operate their own inter-LATA Official Service facilities, Raymond Burke wrote on April 13, 1983, at 4: Indeed, to the extent that the BOCs would need to purchase materials from facilities vendors in order to construct microwave, fibre, and other facilities for their administrative use, it would appear that competition in such markets would be enhanced. In contrast, the Department's interpretation may create a situation in which the BOCs may, practically speaking, be able to obtain their administrative facilities from only one interexchange carrier—AT & T.

neering, marketing and *management* of, those functions. (emphasis added).[189]

In light of these provisions, it is thus not surprising that, contrary to its present position, the Department of Justice stated in its competitive impact statement filed with the Court on February 10, 1982, that the Operating Companies will continue to perform those functions which are "inherent" in exchange communications and exchange access, such as "the ability to engage in the ... management of retained functions." Competitive Impact Statement at 29. Because each Operating Company will perform its authorized services in several LATAs, an inherent part of the management of those services includes official communications which cross LATA boundaries.

For these reasons, the Court rules that an Operating Company shall receive inter-LATA facilities which are used solely or predominantly for the performance of its own Official Service functions. If the use made by an Operating Company of a multifunction facility for the provision of exchange telecommunications, exchange access, and Official Services, predominates in the aggregate (including all such functions) over that made of such facility by AT & T, the multifunction facility is required under section VIII(G) of the decree to be assigned to the Operating Company.[190] The Court further confirms that the decree does not prohibit the Operating Companies from providing their own Official Services, including, if necessary, by the construction of the appropriate inter-LATA facilities.[191]

**B.** *Other*

The network assets are being assigned on the basis of whether they provide an ex-change function (in which event they are assigned to the Operating Company) or an interexchange function (in which event they go to AT & T); where an asset performs both functions, the assignment depends essentially upon predominant use. Sections I(A)(2), VIII(G); see note 20 *supra.*

A number of intervenors have objected to one aspect or another of the division of assets provided for under the plan (or to the failure to complete such division in advance of the approval of the plan of reorganization) but the Court finds all such objections (other than those related to Official Services allocations discussed *supra* ) to lack merit.

1. Several intervenors claim that the plan improperly disregards the predominant use test required by the decree. To be sure, the decisive role of that test can most clearly be discerned in the assignment of switching systems, and its role is not as apparent where less complex equipment is involved. That result, however, is not surprising: it would be technically and administratively impossible to assign ownership of each of the thousands of relatively small items in the central offices on the basis of predominant use. What AT & T has proposed instead is to assign equipment bays containing related items of equipment to work areas which, in turn, are assigned to AT & T or the Operating Companies on the basis of predominant use. In the absence of a showing that the assignment of the general work areas as such is not being made on this basis—which has not been forthcom-

---

189. AT & T argues to the contrary that section VIII(G) calls for the assignment to it of facilities which perform both intra-LATA and inter-LATA functions *if the use for inter-LATA func-tions predominates.* AT & T Response to Objections at 97. However, that section does not speak at all of inter-LATA and intra-LATA functions but states more simply that

> facilities ... which serve both AT & T and one or more BOCs shall be transferred to the separated BOCs if the *use* made by such BOC or BOCs predominates over that of AT & T (emphasis added).

190. It may be that this provision will not have a significant effect on the assignment of assets because Official Services use may not often tip the scales as between inter-LATA and intra-LATA use. See AT & T Response to Objections at 99.

191. The Court reaches this question now, rather than after divestiture, so that the Operating Companies may be able to continue their essential network and operational planning.

ing—the Court will accept these provisions of the AT & T plan.[192]

2. The assignment of the private line facilities and other specialized functions (*e.g.,* call completion and local directory assistance) proposed in the plan is likewise consistent with the decree and otherwise appropriate, and it will therefore also be approved.[193]

3. One type of facility about which there has been particular controversy is 800 Service Directory Assistance which several of AT & T's competitors claim properly to belong to the Operating Companies. It is abundantly clear, however, that this particular directory assistance is an interexchange, inter-LATA service which is appropriately assigned to AT & T. If this enhanced service were assigned to the Operating Companies in spite of the fact that it performs interexchange functions, it could be done only on the basis that AT & T's competitors should be afforded the ability, through the medium of the Operating Companies, to offer this service without having to pay for it.[194] If the other interexchange carriers wish to offer long distance directo-

ry assistance, they will have to construct the necessary facilities. It is not the purpose of the Court's review of the plan of reorganization to "punish" AT & T or to provide advantages to its interexchange competitors to which they are not legitimately entitled.[195]

The assignment of the network facilities and other assets provided for in the plan of reorganization will accordingly be approved.

## VII

### LATA Issues

In its April 20, 1983 Opinion on the proposed LATAs (see note 6 *supra*) the Court requested further information with regard to certain specified LATAs as well as assurances with regard to intra-LATA equal access. Also to be resolved at this time are issues which have been separately briefed respecting traffic between the LATAs and areas served by non-Bell, or independent telephone companies.

**192.** The Court likewise finds not unreasonable AT & T's decision to consider predominant use as of January 1, 1984, rather than as of some earlier date, as several intervenors have suggested. Network changes are, of necessity, occurring all the time, and most of them appear to have been planned, and partially implemented, for some time, in some instances for years. The suggestion that the January 1, 1984 date gives AT & T an undue opportunity for manipulation is unrealistic and unwarranted.

**193.** Several intervenors had originally objected to the plan's assignment of Digital Dataphone Service (DDS) facilities to AT & T. Subsequently AT & T accepted the Department of Justice's position with respect to such facilities, and it now appears that all DDS hubs, which were the focus of the intervenor's objections, will be assigned to the Operating Companies. See Department of Justice Supplemental Response, June 1, 1983, at 7. Additionally, the Department has made a commitment to review the contracts for the sharing of DDS facilities to ensure that the Operating Companies will have the ability to afford equal access to these facilities to all interexchange carriers. *Id.* at 8 n. *. The Court, therefore, finds the assignment of DDS facilities to be consistent with the decree.

**194.** Unlike with respect to some other subjects (*e.g.,* the Cambridge switch discussed at pp.

1065–66 *supra*) there is no reasonable basis for departing from the predominant use rule.

**195.** It should also be noted that the plan of reorganization initially assigned "Charge-A-Call" public telephones to AT & T on the ground that they are used predominantly for inter-LATA communications. However, a number of intervenors, along with several designated chief executives of the Regional Companies, objected to this assignment, arguing that despite the inter-LATA nature of the calls placed over these telephones, they are exchange facilities, having been installed by the Operating Companies as part of the service they provide to the public. The Department of Justice concurred with these objections, and required the plan to be modified to assign Charge-A-Call public telephones to the Operating Companies. See Department of Justice Response to Comments at 82–83. This modification was agreed to by AT & T and has been incorporated into the plan of reorganization. The Court concurs with this modification. Pursuant to the plan as so modified, the Operating Companies will be able to provide users with access to several interexchange carriers, while under the original plan AT & T would have limited access through these public telephones to its own long distance network.

## A. *Individual LATAs*

### 1. *Vermont, Maine, New Hampshire*

The Court in its April 20, 1983, Opinion declined to approve New England Telephone's proposed departure of the Maine, Vermont, and New Hampshire LATAs from state boundaries because some 26 border communities would otherwise have been placed in "out-of-state" LATAs.[196] The regulators in these states had expressed concern that these stateline crossings could result in discriminatory treatment of telephone users in these communities, and they requested that these areas be redrawn so that each LATA would correspond precisely to the borders of the particular state. NET has since informed the Court that it withdraws its request for stateline crossings and proposes instead LATA boundaries which conform to state borders. These new LATAs are approved.[197]

NET requests additionally that it be allowed to phase in the new LATA boundaries, so that, in order to minimize costs, the necessary network modifications may be undertaken in conjunction with other system improvements.[198] That request is likewise approved.[199]

### 2. *Worcester*

NET has drawn a separate Central Massachusetts LATA in conformity with the Court's April 20, 1983, Opinion, separating Worcester and its surrounding communities from the Boston area and creating a total of three LATAs in Massachusetts, but at the same time it has asked the Court to reconsider whether this third Massachusetts LATA is in the public interest. NET contends that the establishment of a third LATA will prove costly to local ratepayers; will disrupt service in nine towns divided by the new LATA boundary;[200] will decrease the viability of various optional intrastate billing plans which depend upon volume and distance;[201] and may preclude use of a No. 4ESS switch as an access tandem to the possible detriment of AT & T's interexchange competitors. The Massachusetts Department of Public Utilities also urges the Court to reconsider the division of the Eastern Massachusetts LATA into an Eastern and a Central LATA, arguing additionally that the growth of the high technology industry beyond suburban Boston westward toward Worcester has created a single community of interest in central and eastern Massachusetts. The Department of Justice, on the other hand, continues to maintain that the contribution three LATAs would make to a competitive telecommunications environment in Massachusetts outweighs the inconvenience and cost involved in the creation of a third LATA.

The Court has carefully reviewed the filings addressed to eastern Massachu-

---

**196.** These communities are presently served by NET facilities located outside the particular state, and NET requested the stateline crossings in order to continue these serving arrangements.

**197.** The network reconfiguration costs and other network considerations are not so significant as to outweigh the discriminatory treatment of and the inconvenience to residents in these communities.

**198.** The regulatory commissions support this request. Additionally, Vermont wishes the Court to declare that these costs ought to be recovered through carrier access charges rather than through local rates. This is, of course, a matter for the regulatory commissions to execute, but the Court's views ought to be apparent from Part I *supra*.

**199.** NET maintains that all necessary modifications could be completed within five years, but Maine's observation that some localities may require less time and others more is sound. NET should submit a detailed request for exemptions to the state regulators and to the Department of Justice.

**200.** A larger number of municipalities would be divided, but in all but nine communities EAS routes would enable NET to continue to carry traffic across the border from one side of town to the other.

**201.** This factor alone is not significant since it may be expected that interexchange competitors will respond to consumer demand for special billing plans, *e.g.*, for reduced rates on frequently called routes, in substitution or in addition to those offered by the local monopolist.

setts, and it has decided to grant the request of NET for a single LATA for that area. Although NET continues to overestimate the cost to ratepayers of separating the LATA,[202] the other grounds it advances are persuasive. In its most recent filing, NET describes in considerable detail the impact on subscribers whose towns would be split by the new border between the Eastern and Central LATAs. The Court has also been persuaded by the NET and the PUC submissions that the population of this area is sufficiently concentrated and the local telephone network sufficiently integrated that the expense, effort, and customer inconvenience associated with dividing the network would be very substantial, even if NET's estimate of the expense is somewhat exaggerated.[203]

The detail provided by New England Telephone in its May 5 and May 23, 1983, submissions stands in stark contrast to the paucity of supporting documentation in the Department of Justice's filing. The Department offers only its bare conclusion that "the competitive benefits of separating Worcester from Boston outweigh the costs of separation." The Department does indicate that it would consider exceptions to the new boundary to allow NET to continue to serve the divided communities, but NET persuasively counters that since calls within these municipalities are carried by the toll network—but billed as if the calls were local—"it is not clear what exemption could solve [the] problem."

The Court concludes that the palpable expense and inconvenience of separating the LATA outweigh the Department's speculation about benefits to competition,[204] and it will therefore approve the consolidation of Boston and Worcester in a single LATA.

### 3. New York

■ The Court accepts the Operating Company's proposal to consolidate Glens Falls and Albany into a single LATA and also to consolidate Utica and Syracuse into a single LATA.[205] To be sure, New York Telephone Co. failed to provide the Court with new information except the revised, lower count of telephones in Glens Falls,[206] but the Department of Justice has advised the Court that it does not believe that the competitive purposes of the decree would be significantly advanced by creating four LATAs rather than two. In view of the Department's general tendency to err on the side of separation in close cases—as evidenced, for example, by its position on the proposed Eastern Massachusetts LATA—its

---

**202.** Most of these costs will be reflected in interexchange carrier access charges, not in the local rate base. Moreover, these costs could be spread over a number of years.

**203.** Moreover, one of the factors cutting in favor of separating the LATA—the benefit to interexchange carriers of not having to compete with the Operating Company for calls between the Worcester area and the Boston/New Bedford region—is undermined somewhat by technical access considerations which previously were not entirely clear. If Worcester is in the same LATA as Boston and New Bedford, NET will offer access to interexchange carriers by means of a No. 4ESS switch to be constructed in Framingham. If Worcester is placed in a separate Central Massachusetts LATA, two smaller switches will be built in Framingham and Worcester. NET insists that the existing cross bar switch in Worcester could not be upgraded to serve as an access tandem, and although this assertion is challenged by Southern Pacific Communications Corp., the Court is not prepared to override the Operating Company on so technical a point.

**204.** Supporting the Department's position is the fact that the access provided for calls within a single LATA would not include a presubscription option while calls between Worcester and Boston, were each city in a separate LATA, would include such an option. The choice is thus between access via a No. 4ESS switch (see note 203 supra) and a larger area in which presubscription will not be available, on the one hand, and access via an inferior switch and greater availability of presubscription, on the other. Based on the comments the Court has received, it is reasonable to expect that the former would do more for competition than would the latter.

**205.** The various requests for exceptions contained in the October 4, 1982 applications also are granted, except that New York Telephone will not be serving Wells, Vermont. See pp. 1102–03 supra.

**206.** The revised count is 97,000, as opposed to 200,000.

failure to advocate such separation here, and the relatively small size of Utica [207] and Glens Falls, the Court is reluctant to impose on New York Telephone Co. total estimated costs of $8.6 million in network reconfiguration.[208]

### 4. *Pennsylvania*

 Pennsylvania Bell pledges (1) to build a No. 4ESS switch in the Philadelphia LATA and lease access capacity from AT & T in the meantime, (2) to offer access in the Pittsburgh LATA through a DMS–200 switch,[209] and (3) to construct a DMS–200 switch in Harrisburg. Based upon these assurances, the Court will approve the Pennsylvania LATAs.

### 5. *Baltimore*

 Chesapeake & Potomac Telephone Co. and the Department of Justice ask the Court to make explicit its approval of exceptions requested by C & P to allow eight exchanges in the Baltimore LATA to continue using "Metro FX" service. This service allows telephone subscribers in these exchanges to pay rates for calls to and from Washington, D.C. as if the exchanges were located in the Washington LATA. The exceptions are approved.

Some of the affected exchanges are located in Calvert County, Maryland, whose Chamber of Commerce wrote the Court in late April 1983, concerned that the County's inclusion in the Baltimore LATA would mean disruption of economically necessary discount calling into Washington. The express approval of all FX exceptions requested by C & P should alleviate the County's

concerns, for in view of that approval the placement of Calvert County in the Baltimore LATA will not affect its subscribers' rates.

The Court finds, however, that the County's placement in the Baltimore LATA, as initially proposed by C & P and accepted by the Court on April 20, 1983, is reasonable in light of C & P's representation that it would cost over $3 million to reconfigure the County's local network to render it suitable for inclusion in the Washington LATA. According to C & P, this also would "leave idle about $500,000 in facility capacity between these exchanges and Annapolis," Annapolis being the location of the toll center which connects Calvert County exchanges to the long distance network.

### 6. *Winchester*

For the reasons stated in the Department of Justice's filing,[210] the Court reconsiders the consolidation of the proposed Winchester and Louisville LATAs; approves the Louisville LATA as originally proposed; and approves the association of the Winchester LATA with the independent area around Lexington served by GTE.

### 7. *Birmingham/Huntsville*

South Central Bell's division of the Birmingham LATA into two separate LATAs, as required by the Court's April 20, 1983, Opinion, is approved.

**207.** The Utica area contains 110,000 phones, according to New York Telephone, down from the 120,000 the Company previously reported.

**208.** The Court also approves the boundaries of the new Poughkeepsie LATA as proposed by New York Telephone Co.

**209.** A small portion of the Pittsburgh LATA, the Greensburg area, will be accessed by a 1AESS, 2-wire machine. This is satisfactory since AT & T and its competitors will all be served by means of this switch, so that there will be no quality differences among them.

**210.** The Department informs the Court that South Central Bell and GTE agree to an association of GTE's Lexington 264,864 main stations and South Central Bell's 165,000 Winchester stations. This association will ensure that the Winchester area will be attractive to interexchange carriers—the primary concern that prompted the Court to require the consolidation of the Winchester and Louisville LATAs. The Louisville LATA has more than enough stations—430,000—to enable it to stand on its own.

#### 8. Midwest

The Court approves the inclusion of Kankakee in the Chicago LATA;[211] the Detroit LATA as proposed;[212] the Grand Rapids LATA;[213] the inclusion of Sikestown and Cape Girardeau in the St. Louis LATA;[214] the borders between the Cleveland and Akron-Canton LATAs;[215] the Southeast, Wisconsin LATA as proposed;[216] and the division of the Davenport LATA.[217]

#### 9. Minnesota

Northwestern Bell and the Minnesota Public Utilities Commission request the Court to consolidate the Fargo (North Dakota) and Brainerd (Minnesota) LATAs. The LATAs are now separated by the North Dakota/Minnesota border. Previously the Commission and the Operating Company had been at odds over five communities on the Minnesota side of the border which Northwestern Bell desired to place in the Fargo LATA rather than the Brainerd LATA.

■ The requested consolidation will be approved. Although it requires an exception to the decree's presumption against LATAs that cross state lines, it will accomplish the Minnesota Public Utilities Commission's objective of ensuring a LATA of adequate population to be attractive to interexchange carriers without requiring

Northwestern Bell to incur $9 million in network reconfiguration costs, as would the previous proposal of the Minnesota regulators.[218] The resulting LATA would be of moderate size—216,000 subscribers not including those of Independent companies— and it would be consistent with the community of interest that spans the Minnesota/North Dakota border.

#### 10. Seattle

■ The Court approves the inclusion of Bellingham in the Seattle LATA for the reasons stated in the May 5, 1983, filing of Pacific Northwest Bell,[219] and since leasing space on AT & T's No. 4ESS switch would cost the Operating Company approximately $1.2 million more than installing a switch of its own, the Court approves Pacific Northwest Bell's request to provide access in the Seattle LATA through a new 4-wire digital switch.

#### 11. Oregon

■ Pacific Northwest Bell requests the Court to reconsider its decision to require the establishment of the two LATAs initially proposed for Oregon, and to allow instead a single LATA for the entire state. The State, through its Governor, endorses the request, as does the Oregon Public Utility Commission. Pacific Northwest Bell ex-

---

**211.** The Court accepts the reasons for this action provided by Illinois Bell, the Illinois Commerce Commission, and the Department of Justice.

**212.** The Court agrees in this regard with the reasoning of the Michigan Telephone Company, the Michigan Public Service Commission, the State of Michigan, and the Department of Justice.

**213.** This approval is granted for the reasons stated in the Court's April 20 Opinion and the filing of the Department of Justice. The approval is conditioned, however, upon Michigan's undertaking to implement its plans to have certain Michigan Bell exchanges home on the new GTE Three Rivers switch.

**214.** This approval is in accordance with the recommendations of Southwestern Bell and the Department of Justice.

**215.** This division was required by the Court's April 20 Opinion.

**216.** The Court accepts the reasoning of the Wisconsin Telephone Company.

**217.** This division was likewise required by the April 20 Opinion.

**218.** Northwestern Bell currently serves the five Minnesota border communities from facilities located in North Dakota. Under the previous proposal of the Minnesota Public Utilities Commission, the communities would have been included in the Brainerd LATA, obliging Northwestern Bell to rewire the communities to facilities on the Minnesota side of the border.

**219.** The Department of Justice has withdrawn the reservations it initially expressed over inclusion of the Bellingham area in the Seattle LATA, noting that although the independently served expanse between Bellingham and Seattle is large geographically, it contains only about 20,000 subscribers.

plains its change of position as having resulted from a realization that it had proposed two LATAs based on a "conservative" reading of the decree's requirements. The Department of Justice maintains that a single LATA in Oregon would be unreasonable, and the Court agrees. Because of the distance between Eugene and Portland, the two major cities in Oregon, two LATAs configured around these cities are clearly warranted under the general standards applicable to the entire country, and the Court will not reverse its earlier determination.

### 12. *California*

The Court approves a tenth LATA in California composed of San Luis Obispo County as a reasonable response to its order of April 20, 1983 that the County's exchanges not be included in the Los Angeles LATA.

### 13. *Pennsylvania-New York-New Jersey Corridors*

The Court gave tentative approval to two unique serving arrangements for metropolitan regions which cross state lines—the "limited corridors" running from New York City into five northern New Jersey counties and from Philadelphia into three southern New Jersey counties.

In response to questions posed by the Court, the Operating Companies and the Department of Justice provided additional information about the setting of access charges and customer rates with respect to corridor traffic. Some of the potential competitors of the Operating Companies object to the local companies' plans not to pass on to their end user customers the costs of facilities they do not use in serving them, that is, the costs of the circuits used to connect competitors' points of presence to the local loops. In the case of the corridors, which were sanctioned specifically to preserve for interstate callers in these areas the advantages of the existing local networks, the Operating Companies' policy is

reasonable. As New Jersey and Pennsylvania Bell observed, "[t]o do otherwise would require the Operating Companies to compete on the basis of their competitors' costs rather than their own."

The International Communications Association registers a different complaint about the corridors. Rather than to ask for more competition within the corridors, it wants to ensure that the Operating Companies' efficiencies will be passed on to consumers in the lowest rates possible, and it argues that this would more assuredly be accomplished if the corridor areas became LATAs (so that all traffic within a corridor would be intra-LATA). It is difficult to understand what difference this would make since the area would still be interstate and the rates would therefore still be subject to the jurisdiction of the Federal Communications Commission.[220] Furthermore, if the corridor areas were configured into separate LATAs, this would force a reassessment of a number of other LATA boundaries, such as those between Long Island and New York City and New York City and Westchester, or else huge New York-New Jersey and Philadelphia-New Jersey-Delaware LATAs would have to be established—both undesirable developments.

For these reasons, the Court approves the two proposed corridors subject to the equal access provisions discussed *infra*.

### B. *Intra-LATA Equal Access*

With the exception of the New York and Pennsylvania corridors, the Court accepts as reasonable the commitments made by all of the Operating Companies as required by the April 20, 1983, Opinion (1983–1 Trade Cas. ¶ 65,333 at 69,980) to provide equal access for intra-LATA service.

First. Pursuant to the Operating Company commitments, the access offered to interexchange carriers for intra-LATA toll

---

**220.** Moreover, to the extent that the rates are set above cost, the presence of competitors in the corridors will exert pressure on the Operating Companies and the FCC to reduce the price of corridor service.

calls[221] will be equal in technical quality to the access provided to these carriers for inter-LATA calls, meaning that both types of access connections will be performed by the same exchange access facilities (be they access tandems or direct trunks between end offices and interexchange carrier points of presence). The access will be equal also in another respect: subscribers of AT & T and its interexchange competitors alike will not be able to select in advance either AT & T or one of its competitors as a transporter of intra-LATA toll calls—the so-called "presubscription" or "preselection" option. Rather, if a subscriber wishes to place an intra-LATA call through AT & T, MCI, Sprint, Microtel, or one of the other competitive services, he will have to add four digits at the time of dialing (*i.e.*, an access code of "10XX"). If an access code is not dialed, the intra-LATA call will automatically be carried by the Operating Company.

What that means, of course, is that, with respect to intra-LATA traffic, there will be inequalities between all interexchange carriers, on the one hand, and the Operating Companies, on the other. Telephone users will be able to access an Operating Company as they do now, simply by dialing a seven or ten-digit number (depending upon whether an area code is used).[222] To access an interexchange carrier, on the other hand, a telephone user would consciously have to select that carrier and dial the appropriate four-digit access code. Additionally, the Operating Companies (with their proliferation of direct trunks between Class 5 end offices and the concomitant ability to transport calls without the need for switching) may be able to carry their intra-LATA toll calls with higher quality and at less cost than can the competitors carry theirs.

A number of interexchange carriers attack this scheme both on account of the absence, to them, of the presubscription op-

tion, and because of the inequalities in facilities between the Operating Companies and their potential intra-LATA toll competitors.

The Court has concluded that, in light of all the circumstances and competing considerations, the position of the Operating Companies is not unreasonable. In approving the consent decree as in the public interest, and in directing the Operating Companies to provide intra-LATA access, it was not the Court's intention to require the decimation of the local telephone networks or to deprive customers of the conveniences and cost benefits which the Operating Companies have succeeded in making available to them.

It would cost approximately $1 billion and take several years to modify the 3,000 Bell end offices so as to permit a telephone user to presubscribe for one carrier for intra-LATA toll calls and another carrier for inter-LATA calls.[223] In the absence of such an expenditure—which the Court will not require—what will be available to the customer in the near future is the option to preselect one telephone company, and one only. If such a customer could select in advance either an interexchange carrier or an Operating Company for intra-LATA calls, many, if not most, telephone users would preselect the former rather than the latter. This is so because of the overriding fact that, under the decree and the plan of reorganization, the interexchange carriers are allowed to carry all toll calls (both inter-LATA and intra-LATA) while the Operating Companies may carry only intra-LATA calls—a significant drawback with respect to convenience. Thus, to require the Operating Companies to provide the presubscription option to the interexchange carriers would place the local companies at an almost insuperable disadvantage. This the Court will not do.

---

**221.** The intra-LATA equal access requirement does not apply to non-toll calls.

**222.** The latter would also have to be accompanied by a prefix "1" in those areas where an area code must be distinguished from a local exchange code.

**223.** This is because the end office would require revised computer software that could determine when a call was designated for a termination point within its LATA and when it was destined for a point in another LATA.

Even if a subscriber cannot or does not presubscribe, he may still designate a particular carrier at the time he makes the actual call (by dialing a specified access code). What if a customer does not do so—which carrier will get that business? Some suggest that all intra-LATA toll calls should be required to be designated.[224] That, too, will not be required.

To require all callers to use a four-digit access code, in addition to the number to be called, for all intra-LATA toll calls—including those carried by the local Operating Company—would have the perverse consequence of making intra-LATA, or local toll calls more cumbersome to dial than inter-LATA, or long distance toll calls.[225] This is totally inappropriate. The alternative—which the Court will allow—is to route all undesignated intra-LATA toll calls to the Operating Company.

This conclusion is buttressed by the consideration that affirmatively to forbid such an arrangement would inappropriately override state regulators' authority to decide what intrastate calling arrangements are best suited to the public interest within their states. In a state such as Florida, where the Public Utilities Commission has sanctioned intrastate competition by granting Microtel a license,[226] the Commission might well decide that intra-LATA competition should be further encouraged by requiring access codes alike for the Operating Company and its competitors, but the Court should not force this outcome. With respect to a state where the future of intra-LATA competition is more uncertain than in Florida, the Court would be even less justified in ordering the Operating Company to make intra-LATA telephone calling inconvenient for everyone—by adding four more digits to every intra-LATA toll call—for only speculative offsetting gains. Such a decision ought to be reserved for the state regulators, as several of them have urged.[227]

The unevenness resulting from the Court's decision between the Operating Companies and their competitors does not offend the competitive principles of the decree. The decree mandates that the Operating Companies have primary responsibility for exchange services, and it is appropri-

---

**224.** Microtel, Inc. argues that
> with equal access should come a more uniform starting point for intra-LATA competition. We have no illusion that the BOCs will not continue to enjoy significant competitive advantages arising from their historical relationship with customers and their dominant position in the ... market. But those advantages should not be solidified by an additional head start arising from carriage of undesignated intra-LATA traffic.

Opposition dated May 16, 1983, at 14. There is some merit to that argument, particularly in states where the Court approved large LATAs on the expectation that there would not be significant barriers to intra-LATA competition. Microtel's primary state of operation, Florida, is a case in point. The Court allowed the consolidation of three SMSAs to form the *Southeast LATA (Miami, West Palm Beach, and Ft. Pierce)* with the understanding that there would be intra-LATA competition for calls between these cities.

**225.** Due to the availability of presubscription in inter-LATA calls, someone who had preselected an interexchange carrier would not have to dial an access code and he therefore could dial across the country with fewer digits than within his own LATA.

**226.** The Commission has under review whether also to license MCI for intrastate telecommunications traffic.

**227.** See, *e.g.,* Comments of Maine. The situation may well be different with respect to undesignated inter-LATA calls. It would seem to be inconsistent with the decree for AT & T automatically to receive inter-LATA calls dialed either mistakenly or ignorantly without an access code (for those calls not dialed pursuant to a presubscription). The Operating Companies in that event would have two options: they could prevent an undesignated inter-LATA call from being completed (by obliging the caller to dial again using a proper access code) or they could allocate undesignated calls among all interexchange carriers on the basis of some formula. This subject is not dealt with at all in the plan of reorganization; moreover, the Operating Companies have not yet formulated their own policies, and they have not advised the Court as to the practical implications of various options. The Court will therefore defer a decision on this subject. If the Operating Companies should improperly discriminate among carriers with respect to undesignated calls, remedies will be available through the Department of Justice and the Court.

ate therefore that they should enjoy the non-access code arrangements with their exchange customers. The competitors are merely secondary suppliers of intra-LATA service, and while they may operate in that market on that basis, they should hardly be given what, in view of the considerations discussed above, would amount to a preferred position. However, if they should truly offer a better price or a better service than the Operating Companies, they should be able to educate their potential customers that it is worth the extra four numbers to take advantage of their offering.

Second. The reverse is true with respect to the so-called corridors.[228] These corridors traverse not only LATA boundaries but also state boundaries, and they thus represent dual exceptions to the decree. They were permitted by the Court in heavily populated metropolitan areas not out of a desire to "[maintain] the position of the Operating Companies in the corridor," as New Jersey Bell and the Bell Telephone Company of Pennsylvania assert, but to maintain for consumers the benefits of what were represented to the Court to be particularly efficient network arrangements.

The decree presumes that the interexchange carriers—not the Operating Companies—will be the primary transporters of interstate, inter-LATA telecommunications.

One of the reasons underlying the Court's tentative approval of the corridors—which would allow the Operating Companies, too, to operate in the markets the corridors represent—was that these routes would be fully open to competition. To implement that purpose, the Operating Companies will have to offer complete inter-LATA access to competitors which carry inter-LATA traffic within the corridors,[229] with all that this implies, including the option of presubscription,[230] and the requirement that all calls be designated. The Operating Companies may choose whether they will develop the software that will allow presubscription of more than one carrier, or whether they will offer presubscription of one carrier only.

### C. Bell-Independent Traffic

On February 17, 1983, the Operating Companies [231] submitted their proposed classifications of traffic between areas they serve and those served by independent telephone companies (Independents) [232] as either inter-LATA or intra-LATA.

The need for such a process came about because of the proximity of many Bell and Independent areas, and the consequent joint Operating Company/Independent service arrangements which are currently in effect around the country (that is, the Operating Company typically switches traffic

---

**228.** The corridors, as indicated at p. 1107 *supra,* run from the five boroughs of New York City into five northern New Jersey counties, and between five Eastern Pennsylvania counties into three southern New Jersey counties.

**229.** As evident from the filings, the Operating Companies intend to charge competitors inter-LATA access tariffs even though they would not be receiving inter-LATA-type access.

**230.** In the case of the corridors, it is appropriate that the Operating Companies undertake the responsibility for advertising what they claim to be their less expensive, exceptional service and instructing business and residential users on how to take advantage of it. Since many of the users of these routes are businesses, which may be expected to be very cost conscious, the Operating Companies should presumably have little trouble in inducing them to dial four additional numbers (in the event

that, as many assume, that Operating Company will not be the one preselected by the user) if that would save them money.

**231.** AT & T states that the Operating Companies alone classified the traffic between their respective LATAs and adjacent independent territories, without interference from AT & T. AT & T Response to Comments, March 25, 1983, at 5 n. **.

**232.** There are some 1425 independent telephone companies which provide local phone service in 11,000 of the 18,000 local exchanges in the United States. Objections of the United States Independent Telephone Assoc., March 15, 1983, at 2. The geographic areas where the Independents provide service are, in total, larger than those where the Bell Operating Companies provide local service; although the Independent territories are generally more sparsely populated, encompassing only 20 percent of the telephones in the nation.

between its end offices and the offices of the Independent, which then routes that traffic to its final destination). If all that traffic were considered to be inter-LATA under the decree, the Operating Companies would be prohibited from participating in such arrangements, and significant, costly network rearrangement would have to be undertaken in order to have all Bell-Independent traffic carried by an interexchange carrier.[233] To avoid such disruptive effects, the Operating Companies were asked to identify those areas where, consistent with the decree's purpose of limiting Operating Company participation in the long distance competitive markets, they should nevertheless be permitted to continue to provide joint service offerings with adjacent independent companies.[234] In addition to determining whether the particular Operating Company may carry such traffic or whether it should be precluded from doing so, the classifications will also be the basis for deciding whether Bell System facilities and assets connecting Bell and Independent territory should be assigned to AT & T or to an Operating Company.

On February 23, 1983, the Court issued an order establishing procedures for the review of the classifications prepared by the Operating Companies. Subsequently, a number of interested parties submitted comments, and AT & T and the Department of Justice filed their own responses.

The classifications, although made by the Operating Companies, are based upon principles and criteria furnished to these companies by the Department of Justice. The fundamental governing principle used by the Department and hence by the Operating Companies was that, for the purpose of determining whether the traffic between an Operating Company and adjacent Independent territory is to be regarded as inter-LATA or intra-LATA, Independent territory was treated as if it were Bell territory. Traffic is thus classified as intra-LATA if it would have been included within a LATA had it been exclusively Bell territory; it is classified as inter-LATA if it would have required the establishment of a separate LATA.

On November 17, 1982, the Department of Justice set forth the criteria by which it would judge the Operating Company determinations.[235] The following types of Bell-Independent traffic were designated as clearly intra-LATA:

(1) traffic within local calling areas and non-optional extended area service (EAS) areas;

(2) intrastate traffic for states with a single LATA;

(3) traffic within a single statistical area; and

(4) traffic between a LATA and Independent exchanges serving non-statistical areas.

The following types of Bell-Independent traffic were designated by the Department as "possibly" intra-LATA:

(1) traffic between a LATA and Independent territory in an adjacent SMSA which includes fewer than 100,000 main or equivalent main stations, or the distance between the core cities of the two areas is less than 25 miles;

(2) traffic between a LATA and Independent territory without a Class 4 switch (or other network considerations); and

(3) traffic between isolated Bell exchanges and an Independent dominated SMSA, provided that the Indepen-

---

**233.** This would be so even where highly integrated communities are involved.

**234.** Under the terminology used by the parties, if a particular Independent territory is considered to be "associated" with the adjacent Operating Company LATA, then telecommunications traffic between these two areas is regarded as intra-LATA and may be handled by the Operating Company. If, on the other hand,

a particular Independent territory is considered to be "not associated" with an Operating Company LATA, then the Operating Company would be prohibited under section II(D) of the decree from carrying traffic between the two areas, as this would be regarded as an inter-LATA service.

**235.** Letter from James P. Denvir to Jim G. Kilpatric, November 17, 1982, at 3–7.

dent makes a commitment to provide equal access.

The remaining traffic is regarded under the criteria as inter-LATA.

Reliance upon these criteria by the Department, and hence the Operating Companies, would have the following impact in the two factual circumstances which are predominant with respect to Bell-Independent traffic: (1) an Operating Company LATA may not be associated with an Independent area if the latter constitutes a market of sufficient size and distance from other markets to attract multiple interexchange carrier entry; (2) if, to the contrary, the Independent area has relatively few access lines or if the distance between the Bell and Independent core communities is insubstantial, an association between the Operating Company LATA and the Independent area will be permitted. In a few instances, particularly in Oregon and Washington, traffic was classified as inter-LATA by the particular Operating Company because it elected not to serve the relatively

small Independent area in question.[236] In a number of other instances, where the Operating Companies and the Independents agreed that there will be no Operating Company service despite an absence of a prohibition in the decree, the traffic was also classified as inter-LATA for purposes of the division of Bell System facilities.[237]

The two principal objections[238] which have been advanced with respect to the Bell-Independent traffic classifications are first, that in certain instances either too many or too few Independent areas have been associated with Operating Company LATAs; and second, that the classifications unduly curtail the business freedom of the Independents.

First. The Court has considered the various Bell-Independent traffic classifications on the same basis as its earlier consideration of the LATAs.[239] Although it is possible to disagree with particular decisions that were made by AT & T and the Department of Justice in this process, the Court has concluded that in no instance have the

**236.** The Department of Justice as well as the states involved oppose these classifications on the ground that even though the decree cannot impose a requirement that an Operating Company actually provide service to an area which it is permitted to serve, the purpose of the classifications is to define areas which the Operating Companies *may* serve. In that view, the particular traffic should be classified as intra-LATA and it would then be left to the state and federal regulators to determine whether the Operating Companies or any other carriers should be *obligated* to serve particular areas. See Department of Justice Response to Comments, April 4, 1983, at 8; State of Oregon Comments, March 15, 1983, at 3–5. The Court finds the position taken by the Department of Justice in this regard to be correct, since it will best ensure that the decree does not unnecessarily intrude upon the jurisdiction of the regulatory commissions to determine service responsibilities within their jurisdictions. Accordingly, the Operating Company classifications are hereby required to be modified to conform to the Department's position.

**237.** However, for the purpose of determining whether the Operating Company may serve these areas, the traffic between the two areas will be classified as intra-LATA. Thus, if in the future an Operating Company wishes to provide service to such Independent areas, it will be free to do so. This minor category of classi-

fications is, in essence, simply a request by the particular Operating Company for an exception to the general rule that it be assigned Bell System facilities devoted to intra-LATA service. Instead, AT & T will be assigned these facilities which the Operating Companies do not intend to use. See Department of Justice Response to Comments, April 4, 1983, at 9–10. No objections have been raised with respect to this exception to the general rule for the division of Bell System assets, and it is, therefore, approved.

**238.** It has also been argued that the Court should require that an opportunity be afforded the intervenors to seek reclassification of Bell-Independent traffic after divestiture. There is no basis for such a request, and it will be denied along with all other demands for systematic post-divestiture proceedings. See Part IX *infra*. However, the Bell Operating Companies may, under the decree, subsequently petition the Court for reclassification or for exceptions in regard to service between their own areas and Independent territory.

**239.** It is questionable whether, in view of the relatively limited impact of these classifications upon the intervenors (see *infra*), a level of scrutiny comparable to that employed with respect to the LATA classifications themselves was required.

intervenors made a case sufficiently compelling that it calls for a rejection of the classification.[240] The Department's guidelines are reasonable and consistent with the principles of the decree, and these guidelines were properly applied by the Operating Companies.[241]

Second. The "business freedom" claim is largely based upon a misunderstanding concerning the substantive scope of the classification decisions. Contrary to the assumption of some intervenors, the classification of particular traffic as intra-LATA does not have as its consequence that interexchange carriers may not offer service with respect thereto or that the Independents may not directly provide access arrangements to these carriers.[242] The intra-LATA or inter-LATA classifications—in this context as in the context of service within the Bell territories—bind only the Operating Companies and affect only their ability to provide service; they do not bind the interexchange carriers or the Independents and they will not in any way affect their ability to provide service.

**240.** No objections were raised to the vast majority of Independent exchanges that have been classified as "associated." It is to be noted that only 940 out of the 11,000 Independent exchanges are classified as "not associated" to any Bell Operating Company LATA. Objections of the United States Independent Telephone Assoc., March 15, 1983, at 4 n. *.

**241.** In the few instances, such as those discussed in note 236 *supra,* where the Department of Justice and the Operating Companies took different positions with respect to whether particular traffic should be classified as intra-LATA or inter-LATA, the Court agrees with the position of the Department, and the classifications should, accordingly, be modified to conform to that position.

**242.** Several intervenors argue that, although the associations being decided now have limited purposes under the decree, they will be "frozen in time" for state and federal regulatory bodies, common carriers, Independents, and ratepayers. See GTE Comments of March 15, 1983, at 3. There is nothing in the plan of reorganization which the Court is approving which has such wide consequences. If others decide to accept the decisions made herein, that would be their decision; it can hardly be a basis upon which the Court would be justified

To be sure, where traffic has been classified as inter-LATA, an Operating Company may not be "associated" with the adjacent Independent territory, and to that extent it may be said that the business freedom of the Independents is being restricted.[243] That, however, is an inevitable consequence of the decree which limits the Bell Operating Companies to intra-LATA service; it cannot be regarded as a defect in the classifications made by the Operating Companies and approved by the Department of Justice. The objections to these classifications, as well as to the classification process, will accordingly be rejected.[244]

The proposed Bell-Independent classifications will be approved.

## VIII

### Central Staff Organization

Section I(B) of the decree requires the creation of a central organization jointly funded and utilized by the Regional Companies (1) for the purpose of meeting national security and emergency preparedness requirements and (2) for administering such

in rejecting the plan. Nothing in the Court's approval of the Bell-Independent classifications is intended in any way to restrict the regulatory bodies in the exercise of their legitimate authority.

**243.** Moreover, regardless whether traffic is classified as intra-LATA or inter-LATA, Independents will have the option of establishing a relationship with an Operating Company whereby the Independent would be the carrier of traffic between its territory and the Operating Company LATA. See 569 F.Supp. 990. If the Independent does not wish to carry such traffic itself, it will alternatively be able to enter into a service arrangement with AT & T (in which case it could continue to interconnect with the same Bell System facilities as are presently used for its interexchange of traffic with Bell territory) or any other interexchange carrier. AT & T Response to Comments, March 25, 1983, at 12.

**244.** Similarly, GTE's complaints regarding splintering of trunk groups, duplication of facilities, and stranding of existing facilities are basically inevitable consequences of the decree insofar as it does not permit the Bell Operating Companies to carry interexchange traffic.

functions and services as can most efficiently be performed on a centralized basis.[245] Pursuant to these provisions, AT & T has proposed, and the Department of Justice has approved, the creation of an 8,800-person Central Staff Organization (CSO) which would engage in a number of technical and nontechnical functions [246] to replace support which the Operating Companies have until now received from the AT & T General Departments, Bell Laboratories, and Western Electric.[247]

### A. CSO Responsibilities

Under the plan of reorganization, the CSO will perform technical services to support the Operating Companies in the "construction, operation, and maintenance of their local exchange networks." [248] AT & T has listed five such technical functions: (1) network planning, which is described as "a long-range function concerned with recommending to the BOCs the optimal direction in which the local networks should evolve";[249] (2) systems engineering, that is, the development of "generic requirements for new systems" which will enable the Operating Companies to "inform vendors of the features and functions that the BOCs want or need in the equipment they pur-

chase"; (3) applied engineering, that is, the testing and evaluation of the products of potential suppliers to determine whether they meet the generic requirements developed by the systems engineers; (4) applied research, involving "state-of-the-art research in switching, signaling, materials and other elements which provide the underpinning for exchange telecommunications"; and (5) information systems support, which will involve "maintaining and enhancing a number of computerbased operations and administrative systems integral to the exchange business." [250]

Among the non-technical functions will be the provision to the Operating Companies of procurement support services,[251] and such other assistance as legal services,[252] regulatory support services, marketing (including billing and sales support) services, financial services, human resources development, and employee relations.

■ The criticisms leveled at the CSO proposal fall essentially into two categories.[253] First, intervenors representing regulatory and consumer interests contend that AT & T has presented inadequate justification for what is contended to be an overly large and costly organization. Second, po-

**245.** Section I(A)(1) permits AT & T to transfer resources to such an entity.

**246.** Of the total 8,800, approximately 6,600 staff members would perform technical functions. Plan of Reorganization at 239.

**247.** The employees would be transferred from AT & T and its affiliates, transferred from the Operating Companies, or newly hired.

**248.** AT & T Response to Objections at 505.

**249.** The network planning group within the CSO will also recommend internal network requirements and technical interface standards.

**250.** AT & T Response to Objections at 506–12.

**251.** There would be 700 procurement support personnel. Plan of Reorganization at 339. The Court expects that this staff will not make substantive procurement decisions.

**252.** The Court has some concern that the centralized provision of legal advice on potential antitrust liability might be of questionable pro-

priety and wisdom. William Weiss, designated chief executive of the Midwest Region, testified at the June 2, 1983 hearing that: "I cannot conceive of a corporation the size of mine in the future not wanting to be self-sufficient in areas of liability like antitrust ...." Transcript at 25497. Although this is not a complete answer, the likelihood of antitrust violations through the central legal staff is not sufficiently substantial that elimination of these functions will be required.

**253.** The delegation of national security and emergency responsibilities to the CSO is largely unchallenged. The Court has always insisted that legitimate Department of Defense interests be fully protected (552 F.Supp. at 208–209), and the CSO provisions of the plan carry out that objective. The security and emergency responsibilities will be executed by a specialized group within the CSO which will set and enforce technical standards to the extent that security and emergency needs demand that telephone equipment be "capable of being interconnected nationwide." Plan of Reorganization at 418–19.

tential equipment suppliers of the Operating Companies claim that the CSO may, in effect, exercise control over many procurement decisions, discriminate in favor of Western Electric products, and, over time, become a second-generation AT & T. After careful consideration, the Court has concluded that these objections are not sufficiently weighty to warrant either the rejection or the modification of the CSO provisions of the plan of reorganization.

### B. *CSO Size*

There is substantial evidence that the CSO is neither too large nor too costly a burden on the Operating Companies. Since these companies will be controlling the CSO—not the other way around—and since most of the costs of the CSO will not be capable of capitalization, the local companies will have strong incentives to avoid wastefulness in the CSO's operation.[254] In fact, it appears that the total cost of the CSO to the Operating Companies will be considerably less than what they now pay to AT & T for centralized support.[255]

Moreover, and significantly, the chief executives of the Regional Companies, who played an active part in molding the CSO,[256] have given an exceptionally strong endorsement to the size of the organization, its cost, and the responsibilities vested in it by the plan of reorganization.[257] In short, the concern of some of the intervenors that the CSO is an AT & T tool designed to hamper Operating Company progress rather than to assist these companies is not shared by those most directly involved.[258] On this issue, at least, the opinions of the Regional Company managers are entitled to more weight than those of regulators[259] and consumer groups.

Some of the intervenors also question the assignment to the CSO of functions other than those strictly related to national security and emergency preparedness. The decree permits the CSO to perform such functions as "can most efficiently be provided on a centralized basis." Section I(B). It appears obvious that, with respect to the responsibilities which are vested in the CSO

**254.** Several intervenors complain that the plan makes insufficient provision for an Operating Company's withdrawal from the CSO. Complete withdrawal may only take place with five years' advance notice, and an Operating Company may withdraw from a particular function on one year's notice. The chief executives of the Regional Companies support this approach as necessary to ensure the continuing viability of the CSO, and the Court sees no reason to interfere with their judgment.

**255.** William Weiss stated that the amount will be three-quarters of the sums previously expended (transcript at 25,500), while AT & T claims that the 8,800 CSO employees should be compared to the 23,000 AT & T employees allegedly now supporting the Operating Companies. Response to Objections at 496 note **.

**256.** A task force of Operating Company presidents initially recommended the structure of the CSO. Each regional planner on the task force then conferred with his respective chief executive officer, and a "CSO package" was adopted by these officials in October 1982. Since that time, some functions have been added and others eliminated, and negotiations over the CSO's final form are continuing, without the participation of AT & T. Response to the Operating Companies in the Mountain-Northwest Region, May 31, 1983, at 5; Southeast

Region's Response, May 31, 1983, at 3. According to William Weiss, "the presidents . . . elected to do only certain things in the central staff, those things that they felt could be done to achieve economies of scale. They excluded from the role of that central staff things that they felt either we could do ourselves with our present organizations and the Operating Companies or that didn't need to be done in the longer term future." Transcript at 25500.

**257.** See, *e.g.,* Response of Operating Companies in the Mountain-Northwest Region, May 31, 1983; Response of the Northeast Region, May 31, 1983; Response of the Mid-Atlantic Bell Telephone Companies, May 31, 1983; Southwest Region's Response, May 31, 1983.

**258.** The Court has no question that on this subject the chief executives of the Regional Companies communicated to the Court their genuine convictions.

**259.** Some of the state regulatory commissions complain that they will be unable to exercise effective control over the costs of the CSO, but this was refuted by testimony at the June 2, 1983, hearing to the effect that the Operating Companies will present their respective shares of the cost of the CSO to the state regulators, so that "[i]t will not escape [their] attention." Transcript at 25,501.

by the plan of reorganization, substantial economies will be realized from centralization. To be sure, AT & T has not provided a quantification of efficiencies and economies, but that is not especially surprising since it is unlikely that detailed cost-benefit comparisons could now be made: the seven Regional Companies are at present only planning to operate in this respect, and the territory is somewhat unchartered. It does not require an army of efficiency experts, however, to conclude that it will be more economical for certain support functions to be performed once rather than seven times over. As the Department of Justice has aptly observed, "it is neither necessary nor useful to engage in extensive second-guessing of the [Operating Companies'] decisions as to what activities can efficiently be centralized." [260]

The Court concludes that the objections regarding size, scope, and cost of the CSO do not warrant disturbing the CSO proposal.

### C. *Procurement Functions*

The objections relating to the CSO's possible involvement in procurement activities have somewhat more substance. The intervenors complain in this respect primarily that standards may be set by the CSO which will favor Western Electric products over those of competitors, and that the testing of products may be biased against Western's competitors.

It seems beyond debate that uniform standards are necessary to ensure high quality in the telephone system, indeed its very survival as a nationwide network.[261] Nor are such standards incompatible with competition. Not all characteristics of products to be purchased by the Operating Companies will be specified in advance; there will be ample room for competitors to meet the generic requirements established by the CSO and still produce products drawing upon their special skills, distinctive styles, and other competitive advantages.

Similar conclusions apply to the testing function to be performed by CSO personnel. AT & T has advised the Court that such personnel will not make product recommendations to individual Operating Companies but will limit themselves to "a scientific and objective testing function." Test results will be made available to both the Operating Companies and the manufacturers, and the latter will be allowed an opportunity to demonstrate the incorrectness of any adverse findings. And it will be up to the Operating Companies, not the CSO, to determine the weight and significance to be accorded to the test results in the making of final procurement decisions.[262] The Court believes that these assurances adequately protect potential vendors.[263]

Some intervenors question more broadly whether objective conclusions are at all possible with respect to such activities as standard-setting, testing, and the like,[264] and that in practice it may not be possible to distinguish sharply between these functions and procurement decision-making. Another intervenor asks who at the Operating Company level would "undertake an independent and intelligent analysis of the technical and other evaluations sent to [these companies] by the CSO" if, as AT & T asserts, there are not enough qualified technical personnel in the Bell System to staff both the Operating Companies and the CSO.[265]

Although these objections are not without some force—particularly those related

**260.** Department of Justice Response to Comments at 162.

**261.** There are some features, *e.g.,* network signaling protocols, which will be of no use unless they are agreed to by all the Operating Companies. AT & T Response to Objections at 523.

**262.** AT & T Response to Objections at 525–26.

**263.** Should it ultimately appear that the CSO deviates from these standards, there will be time enough for the Department of Justice, the Court, or both to take corrective action.

**264.** See, *e.g.,* Reply of U.S. Telecommunications Suppliers Association at 7; ITT Reply at 15.

**265.** See GTE Reply at 8.

to the somewhat shadowy line between standard-setting and procurement—the Court has decided that, on balance, the advantages to be achieved from the centralization of these various responsibilities outweigh the dangers visualized by the opponents of such a step. The issue reduces itself to an inquiry whether the desirable ends of economy and uniform quality can be achieved without serious risk that the CSO will become an instrument of anticompetitive conduct. In the Court's view, that risk, i.e., the risk of bad faith, is relatively small,[266] for a very basic reason.

There will be no continuing relationship between AT & T and the CSO,[267] and therefore no economic incentive for CSO personnel to favor Western Electric products over those of any other supplier. CSO personnel will, at least indirectly, be working for the Operating Companies; their success in their new employment will be bound up with the success of the local companies;[268] and the Operating Companies are far more likely to flourish by purchasing the best equipment at the best price than by favoring Western Electric products regardless of quality or price. The employees' economic incentives therefore all run in favor of the Operating Companies and against improper favoritism toward Western Electric. Moreover, the testimony of the regional chief executives and their various filings with the Court establish that they intend to make their own procurement decisions, and that they are acutely aware of the spectre of an enforcement action brought by the United States should the CSO act anticompetitively.[269]

In the absence of an economic incentive, much is made of the emotional attachment of CSO personnel to AT & T—the former employer of many of them. Such an attachment cannot be entirely discounted, at least with respect to some employees and at least in the short run. But it defies all experience with a mobile work force in the United States to assume that, for any length of time, former AT & T personnel will make decisions which will assist their former employer, but now sometime competitor, simply because they used to work there.[270] Certainly the Court would not be justified in vetoing an arrangement agreed to by AT & T, the Operating Companies, and the Department of Justice which is otherwise perfectly sensible and reasonable upon the basis of so speculative an objection.[271]

**266.** Since the representations made by AT & T in its Response to Objections regarding the limited role of the CSO in setting standards and testing products were critical in persuading the Department of Justice and the Court to approve the CSO as proposed, it is of course essential that the CSO abide by those representations. The Court has considered adopting the suggestion of some (e.g., U.S. Telephone Suppliers Association) that these representations be reduced to a separate contract, but in the interest of avoiding the imposition of yet another set of rules on the Operating Companies, it will not insist on this measure. However, the Court does expect the Operating Companies to use the CSO to further only their own competitive interests, not those of AT & T, and it also expects the Department of Justice to be vigilant in its oversight of the CSO's role in the setting of standards and testing of products.

The plan of reorganization does not limit the CSO to the responsibilities initially entrusted to it. The Court is persuaded that some flexibility is necessary in this regard as well. However, here, too, it expects that the CSO will respect the boundaries between standards and testing, on the one hand, and procurement, on the oth-er. It is in this area particularly that the Court will not hesitate to exercise the powers vested in it by section VIII(I) of the decree should this appear to be warranted.

**267.** Whatever sharing contracts that will be in effect will be between the Operating Companies and AT & T, not the CSO and AT & T.

**268.** The CSO will not, on its own, manufacture or market any product or service.

**269.** See, e.g., Transcript at 25,502.

**270.** This conclusion would seem to hold notwithstanding the strong feelings of loyalty which have been fostered and have traditionally existed within the Bell System.

**271.** As for the claim that the very establishment of a CSO might give rise to antitrust problems it is well established that a joint technical organization with responsibility for setting standards does not in and of itself violate the Sherman Act. See American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982).

The Central Staff Organization is designed to carry out extremely important responsibilities. Not only will it perform the coordination for national defense and other emergency purposes that is vital to the nation's security, but it will also set the standards which will permit telecommunications to continue to operate in an engineering sense as one national network.[272] These responsibilities were in the past performed exceedingly well by AT & T. In the Court's view, it is essential that the break-up of the Bell System and the economic competition which will result from that break-up will not lead to a departure from that high standard or to the development of balkanized regional networks which poorly interconnect with each other to the detriment of all users. The Central Staff Organization will be an important check against deterioration and fragmentation of the existing telephone system.

For these reasons, the Court is strongly committed to the success of the CSO, and it will not weaken that organization, whether in size or in authorized responsibilities, without good cause. The arguments proffered by the intervenors, while they do not, here and there, lack some plausibility, are far from being sufficiently persuasive to provide such a cause. The Court accordingly will approve the Central Staff Organization as it is proposed in the plan of reorganization.

## IX

### Further Court Proceedings

Several intervenors suggest additional judicial or other proceedings of various kinds beyond those that are expressly provided for in the decree. For example, the State of New Mexico asks that the intervention status of all third parties be continued to permit them to participate in the true-up process following divestiture.[273] The State of California asserts [274] more specifically that a true-up procedure is necessary to ensure the achievement of target debt ratios, pointing out that the plan already contemplates such a procedure with respect to a number of other subjects.[275] American Satellite Company asks for the submission to the Court of detailed information concerning the day-to-day progress in the implementation of the plan of reorganization and requests public disclosure as well as judicial review of all divestiture-related contracts.[276] And the State of Maine urges that the state and local public utilities commissions be allowed to participate in the division of assets between AT & T and the Operating Companies by a court-imposed requirement of the distribution to them of the same kinds of information and monitoring rights possessed by the Department of Justice. The Court will deny all of these and similar requests.[277]

There now is some provision in the decree, albeit on a carefully limited basis, for the retention of jurisdiction by the Court.

Section VII specifies that, upon application of a party or an Operating Company, the Court may issue orders to construe the decree, carry it out, modify it, or enforce it, or to punish violations.[278] At the request of

**272.** The testimony at the trial demonstrated that the application of nationwide standards has contributed substantially to the overall quality of telephone service enjoyed in this country. See, *e.g.*, testimony of Casimir Skrypczak, Transcript at 23854–55.

**273.** Reply Comments of the State of New Mexico, April 13, 1983, at 18–19.

**274.** Further Comments of the People of the State of California, Feb. 14, 1983, at 65–67.

**275.** These include a true-up of certain Operating Company accounts (1) to correct faulty estimates of depreciation reserves, of the as-

signment of assets and liabilities and of personnel assignments, (2) to correct mistaken personnel assignments and inadvertent work force imbalances, and (3) to accommodate personal hardships. Plan of reorganization at 160–62, 233–34, 277–78. See Part V(B) *supra.*

**276.** Reply Comments of American Satellite Co., April 4, 1983, at 2–4.

**277.** See note 283 *infra.*

**278.** The Court subsequently required the adoption of section VIII(I) which permits the Court to undertake the various section VII responsibilities (except that of modifying the de-

a number of intervenors, the Court announced the adoption of a procedure which would permit an interested nonparty to initiate enforcement proceedings on its own. But that opportunity was deliberately kept very narrow [279] because, as the Court stated on August 11, 1982, so restricted it strikes a proper balance between the need for some enforcement mechanism not under the direct control of the parties and the necessity of avoiding "constant, unnecessary interference by AT & T's competitors and others with implementation of the reorganization and with the normal operations of AT & T and the divested Operating Companies . . . [as well as the necessity not to burden the Court] with innumerable requests for clarification or modification, and with charges of violations." 552 F.Supp. at 219–20.

The Court will not expand these provisions. The difference between the procedures described above and those presently suggested by the intervenors is that the former are designed to be invoked only sporadically, upon the occurrence of some specific incident regarding the decree, while the latter would involve the Court, the intervenors, or both, on a more or less continuing basis in the divestiture process. The Court has no wish to be engaged on a long-range basis in oversight either of the divestiture or of the operations of the various components of the Bell System; such

an oversight role would not be consistent with the principle of proper judicial restraint; and the kind of interference which it implies would not be fair to those who will manage AT & T and the Operating Companies.

The Tunney Act requires a court to determine whether certain consent decrees are in the public interest and, in view of the unusual circumstances of this case,[280] this responsibility also required the Court to pass upon the validity of the plan of reorganization under the decree and to allow third party intervenors to participate extensively in the review process. But for the reasons outlined above, this direct oversight should end with the approval of the plan of reorganization.

To be sure, the reorganization process is not complete: the division of assets, the transfer of employees and stock, and the upgrading of the Operating Companies to the status of truly equal access providers have yet to occur. Also, as several intervenors point out, it is possible that those within the Bell complex who will actually implement the reorganization will attempt to depart from the spirit if not the letter of the decree. However, notwithstanding some failures,[281] the parties have not given evidence of bad faith sufficient to impose upon them the rather draconian requirements requested by the intervenors.[282]

---

cree) *sua sponte,* rather than merely upon request.

**279.** Such a party may serve upon the Department of Justice a request for enforcement. If the Department refuses to take action in response thereto, an application may be made to the Court for the initiation of "further appropriate proceedings." The process was carefully restricted to complaints accompanied by affidavits alleging facts with particularity which, if true, would demonstrate a bad faith refusal by the Department to enforce the judgment. 552 F.Supp. at 220. The Court will in due course issue an implementing order, and it will not entertain enforcement requests which do not follow this route.

**280.** *E.g.,* the size of the divestiture, the sketchy nature of the decree itself, and, ultimately, the broad implications of the divestiture upon the entire telecommunications industry.

**281.** *E.g.,* the attempts of the Department of Justice, of AT & T, or both, to disavow commitments previously made with respect to patent and trademark rights to be granted to the Operating Companies (see Parts III and IV *supra*) and the continuing reluctance of the Department to accept as final the decision regarding the marketing of CPE by the Operating Companies. See pp. 73–74 *supra*. That reluctance gives rise to some concern regarding the Department's willingness and ability to enforce fairly the CPE provisions of the decree (rather than to seek, once again, to pursue its own notions in that regard) and this, of course, casts some doubt upon the Department's overall attitude with respect to the implementation of the decree. However, in these respects, too, the various judicial powers enumerated above are adequate to deal with any recalcitrance, whatever form it may take.

**282.** It should also be noted that independent auditors and actuaries will verify compliance

There comes a time, once the basic documents have been approved, when the Court, rather than to superintend on an intensive basis the actual implementation of the reorganization, should, in the interest of keeping judicial involvement to a necessary minimum, leave compliance to the managers of the business interests directly involved, with such oversight as is vested in the Department of Justice by the decree. See, e.g., section VI.[283]

■ Should the Court's expectations with respect to the good faith and the fidelity of the parties to the letter and the spirit of the decree be disappointed with regard to any particular matter, there will be time enough under section VII, section VIII(I), and the Court's general equity powers, to take appropriate action. Except for such an eventuality, however, the Court's direct oversight role will come to an end with its approval of the plan of reorganization.

## X

### Conclusion

#### A. Summary

The Tunney Act imposed upon the Court the responsibility for determining whether the consent decree submitted to it by the parties was "in the public interest." In August of 1982, the Court approved the heart of the decree—divestiture—as satisfying that standard. At the same time, it determined that its public interest responsibilities required it to pass also on the plan of reorganization, since that plan was to fill in the decree's many interstices and to describe the precise method by which divestiture was to be accomplished.[284] The plan was submitted by the parties, and the Court has since subjected it to thorough scrutiny, on its own and with the assistance of the parties and over one hundred intervenors.[285]

To the extent that it has been free to do so,[286] the Court, in exercising its Tunney Act responsibilities, has sought to achieve three principal objectives: (1) promotion of true and fair competition in the telecommunications long distance and equipment markets, (2) preservation of AT & T as a dynamic force, capable of research, manufacturing, and marketing in technologically advanced fields, and (3) protection of the principle of universal telephone service, accessible to all segments of the population regardless of income.

by AT & T and the Operating Companies with the requirements of the plan of reorganization regarding the assignment of assets and liabilities. AT & T Response to Objections at 355–60.

**283.** For similar reasons, the Court rejects the request of the State of California that the prices charged by Western Electric be controlled for a period following divestiture (Further Comments of the People of the State of California, Feb. 4, 1983, at 41); the request of the State of Missouri to provide special representation for the Operating Companies in the form of an independent attorney (Motion of the State of Missouri for a Hold Separate Order, April 13, 1983); and the request of New York City for the appointment of a Special Master pursuant to Rule 53 (Comments of the City of New York, Feb. 14, 1983, at p. 4). Suggestions similar to these were considered and rejected by the Court prior to the entry of the decree (552 F.Supp. at 166, 220–22). No new grounds have been adduced; indeed, the Operating Companies have not been reticent in recent months to advance their views to the Court, often contradicting those of AT & T. As the Operating Companies progress further on the road to independence, they may be expected to

be increasingly strong-willed in protecting their rights vis-a-vis AT & T.

**284.** The 471-page plan is a blueprint for the largest corporate reorganization in United States history. The decree itself describes the reorganization process only in the most general terms.

**285.** Many of the submissions of the parties and the intervenors (e.g., states, AT & T's competitors, consumer groups) were detailed and voluminous. For example, one intervenor—MCI—filed a total of over 850 pages of memoranda, exhibits, and other documents, and AT & T's March 1983 Response alone was 617 pages in length. For the first time in the Bell System reorganization process, the Operating Companies participated in the judicial proceedings in their own right. A hearing was held on June 2, 1983, at which the parties, several intervenors, and the chief executives of the Regional Companies gave their views on several particularly controversial issues. See notes 3 and 4 supra.

**286.** The Court's powers under the Tunney Act are, of course, limited (see 552 F.Supp. at 151) and in passing upon the plan of reorganization, the Court likewise does not write on a clean slate but must conform to the provisions and principles of the decree itself.

In its consideration of the decree, the Court was able to advance all of these objectives—in part by approving various provisions of the proposal submitted by the parties over vigorous objection from others, and in part by requiring the substantial modification of a number of other provisions.[287] When it considered the plan of reorganization, the Court again had all three objectives in mind. However, it became apparent in the course of that consideration that the bulk of the actions which the Court had to take to achieve consistency of the plan with the decree tended primarily to promote the vitality of the Operating Companies[288] and the principle of universal service.[289]

These actions, which are described in detail in the body of the Opinion, include the assignment of the "Bell" name and logo to the Operating Companies (Part III(C) of the Opinion); imposition of the requirement that the Operating Companies be granted licenses to all patents acquired by the Bell System (Part IV(A)), along with appropriate sublicensing rights (Part IV(B)); the grant of authority to the Operating Companies to perform their own Official Services functions rather than to have to lease the necessary facilities from AT & T or other interexchange carriers (Part VI(A)); approval of the establishment of a Central Staff Organization which will give effective logistical support to the Operating Companies (Part VIII); imposition of the requirement that AT & T stand as the ultimate guarantor of the costs of equal access and network reconfiguration (Part I); and the approval of local access and transport areas (LATAs) which avoid substantial, costly network rearrangements (Part VII(A)).

The fundamental purpose of the decree under the antitrust laws is to create conditions which will reduce the cost of telecommunications service t · the public—individual consumers, busir · s, and government.[290]

287. Among the actions which tended to further the cause of competition were the approval of the divestiture from AT & T of the twenty-two "bottleneck" local companies, the prohibition on the entry of these companies into business ventures where their monopoly status might have given them an improper advantage, and the requirement that these companies must provide equal access to all of AT & T's interexchange competitors. The Court also prohibited AT & T for a period of seven years from entering the electronic publishing market.

Actions designed to preserve AT & T's effectiveness included the rejection of proposals which would have required that company to divest itself of Western Electric and Bell Laboratories, prohibited it from utilizing sophisticated "bypass" technologies, and otherwise limited the scope of its operations. The Court also approved the removal of the restrictions imposed upon AT & T by the 1956 consent decree. The vitality of the Operating Companies and the goal of universal telephone service were promoted, *inter alia,* by modifications which permitted the entry of the local companies into the printed advertising directory market and customer premises equipment market.

288. These actions will, of course, to some degree affect existing and potential competitors of AT & T, suppliers of products, and others within and without the telecommunications industry. But in passing upon the plan of reorganization, the Court was principally called upon to decide "internal" matters between AT & T and the Operating Companies, and for that reason it is not particularly surprising that the primary impact of the decision is on the local companies and their financial well-being.

289. This is not to say that other objectives were not advanced. Thus, the Court approved much of the AT & T plan, and it rejected proposals which would have improperly saddled AT & T with substantial costs, *e.g.,* the direct costs of providing equal access and reconfiguring the network (Part I(C) of this Opinion) and the sole financial responsibility for the Bell System's contingent antitrust liabilities (Part II). In order further to promote competition in telecommunications services, the Court, *inter alia,* rejected joint use by AT & T and the Operating Companies of the name "Bell" (Part III(A)), required the access the Operating Companies provide to AT & T's competitors to be of sufficiently high quality so that voice and data customers will be unable to detect any difference (Part I(A)), and required the provision of equal access in the intra-LATA field and the densely populated "corridors" in the New York-New Jersey-Philadelphia areas (Part VII(B)). In the interest of protecting the rights of AT & T employees, the Court made explicit that with respect to various subjects (*e.g.,* pension benefits) the decree does not relieve AT & T of its obligation to bargain collectively. (Part V(A)).

290. Cost reductions need not, and in the Court's view will not, be achieved at the expense of quality and reliability. See Part VIII

Competition in the long distance and telephone equipment markets is already bearing fruit in the form of lower prices and wider choices.[291] In the view of this Court, it is not necessary that these favorable developments be accompanied by the imposition of higher rates for local service.

One of the Court's principal aims throughout the public interest process has been to ensure that divestiture would not bring about or contribute to local telephone rate increases. While the parties to this proceeding have acknowledged that this effort was successful and that neither the decree nor the divestiture has caused or will cause local rates to rise,[292] these rates will nevertheless be going up, albeit for reasons unrelated to the reorganization of the Bell System.

As the Court has previously noted, and as it elaborates at p. 1091 *supra,* decisions taken by federal regulators regarding access charges will have the effect of increasing the cost of local service to residential subscribers. The Court has no authority to countermand those decisions.[293] It does, however, have the authority to take them into account—not conclusively, certainly, but as support for determinations which are indicated in any event. That is what it has done here. The modifications it

is requiring to be made in the proposed plan of reorganization should assist in moderating the pressure for local rate increases, whatever their source.[294]

The telecommunications industry as a whole has a bright future for, as the Court previously observed,[295] we live in an age in which information and its transmission are central to the commonwealth and a flourishing economy. No one can predict which company or group of companies will be able best to take advantage of the opportunities which lie ahead. To a large extent this will depend upon their own efforts and performance,[296] and to a lesser degree upon the wisdom of those who will exercise regulatory authority over various segments of the industry at the federal and local levels. As indicated above (Part IX), the Court's own oversight over the Bell System divestiture process will end with the approval of the plan of reorganization.[297]

AT & T (including Western Electric and Bell Laboratories) as well as the Operating Companies appear to be led by talented managers, scientists, and engineers; moreover, these entities will continue to command immense personal and material resources. There is no reason to believe that the separate parts of the reorganized Bell System will not prosper in the new environ-

of the Opinion where the Court approved the setting of uniform standards so as to maintain the quality of the telephone network.

**291.** A number of interexchange carriers and telephone equipment manufacturers and dealers have entered these fields or have vastly expanded their operations. The result has been that the prices of long distance service and customer premises equipment are falling and that telephone and related apparatus are becoming available in unprecedented varieties. These trends may be expected to continue and, indeed, to accelerate.

**292.** See, *e.g.,* Department of Justice Supplemental Memorandum, June 10, 1983, at 8 (decree will not, and has not, caused adverse effects on local rates); AT & T Response of May 5, 1983, at 10–21 (local rates are going up but not because of divestiture); see also, Response of the Federal Communications Commission, June 13, 1983, at 4 n. 5 (FCC decision not a product of divestiture since Commission had

proposed customer access charges well before Court accepted decree).

**293.** See 47 U.S.C. § 402.

**294.** Requests for rate increases by local telephone companies are apparently sought to be justified in some instances by references to the divestiture. Such reliance is unjustified. See note 292 *supra.*

**295.** 552 F.Supp. at 164–65.

**296.** See, *e.g.,* Fortune, *Breaking Up The Phone Company,* June 27, 1983.

**297.** The Court assumed control of this case in the summer of 1978. Pretrial proceedings were designed and announced in September of that year (461 F.Supp. 1314), and they took a little over two years to complete. Trial began in January 1981, and it was within weeks of completion when, in January 1982, the parties settled the case by the consent decree referred to above.

ment or that they will fail to contribute significantly to the American economy.

## B. *Action on the Motions*

Motions of AT & T and of the Department of Justice seeking approval of the plan of reorganization are pending.[298] These motions will favorably be acted upon after the Court is advised that the following modifications [299] are agreed to by the parties:[300]

1. If by January 1, 1994, the Operating Companies in the aggregate have not recovered the costs of providing equal access and network reconfiguration (as defined in AT & T's Consolidated Application filed with the Federal Communications Commission on March 1, 1983), plus financing expenses, through their collection of access charges from the interexchange carriers, AT & T will reimburse the Operating Companies in the amount of any remaining deficit. For purposes of this provision, "costs" shall mean the actual costs incurred by the Operating Companies, as distinguished from the estimates in the Consolidated Application. A preliminary accounting will be provided to the Court at the close of the Operating Companies' equal access and network reconfiguration program or by January 1, 1989, whichever is earlier, and a final accounting not later than January 1, 1994.

2. Beginning on the date of divestiture, AT & T will cease to use the word "Bell" in its corporate name and in the names of its subsidiaries or affiliates, other than Bell Laboratories and AT & T's foreign subsidiaries or affiliates; and beginning on the same date, AT & T will cease to use the "Bell" name and the Bell trademarks, or either, on any equipment sold by it in the

United States after that date, except for equipment manufactured or purchased by AT & T prior to that date. In the event that substantial efforts have been made by AT & T by November 1, 1983, to acquaint the public with a new name to replace the name "American Bell," and for good cause shown, the Court will extend the use of that name by AT & T for an additional six months following divestiture in connection with the sale, but not the manufacture or purchase, of equipment.

The divested Operating Companies, the Regional Companies, or either, may use the "Bell" name and the Bell trademarks in connection with the services they perform and on equipment they use or sell, and they may use the word "Bell" in their corporate names, provided that the "Bell" name is modified so as to identify the particular company, and provided further that on equipment sold any Bell trademark is accompanied by the corporate name of the respective Operating Company or Regional Company.

3. AT & T will grant to each Operating Company nonexclusive and personal royalty-free licenses to use telecommunications equipment and operational methods covered by all existing patents owned or controlled by AT & T and all other patents issued to AT & T on or before five years after the date of divestiture.

AT & T will grant to each Operating Company the right to sublicense all AT & T patents to manufacturers for use only in providing the Operating Companies with goods and services embodying the inventions of the patents.

---

**298.** Issues relating to the LATAs are not a part of the plan of reorganization as such. However, the Court expects compliance with the decisions made with respect to such issues in the Opinion of April 20, 1983, and the present Opinion. It also expects the parties to comply with the other directions contained in these two documents.

**299.** All such modifications will supersede the existing provisions of the plan of reorganization to the extent of any inconsistency.

**300.** Section VIII(J) of the decree provides that the plan of reorganization "shall not be implemented until approved by the Court as being consistent with the provisions and principles of the decree." The Court considers that the plan will not be consistent with the decree until modified as required herein.

4. In determining whether the use made by an Operating Company of facilities or other assets predominates over that made by AT & T within the meaning of section VIII(G) of the decree, the capacity of a facility or other asset devoted to Operating Company Official Service functions will be included as part of the Operating Company's use. Nothing in the decree precludes an Operating Company from constructing or maintaining facilities or other assets devoted to Operating Company Official Service functions.

5. The Operating Companies will not provide inter-LATA order writing, order typing, or other provisioning exclusively for AT & T.

6. The decree does not relieve AT & T and the Operating Companies from bargaining in good faith with any labor union, except with respect to the division of the Bell System Pension Plan into nine separate plans; the actuarial methodology specified in the plan of reorganization; and the elimination, one year following the date of divestiture, of unlimited portability of service credit.

## ON MOTION FOR PARTIAL RECONSIDERATION

### I

AT & T has asked for partial reconsideration of the Court's ruling of July 8, 1983, requesting that the Court delete Modification 1 [1] which requires that AT & T guarantee the costs of providing equal access and of reconfiguring the network to conform to the LATAs (hereinafter generally referred to collectively as access costs or access expenses). The principal contention supporting the request for an outright elimination of the guarantee provision [2] is that this provision would improperly add to AT & T's obligations under the decree. [3]

As the Court previously pointed out (Opinion of July 8, 1983, 569 F.Supp. 1057 at 1066–68), there are two bases under the decree for requiring AT & T to bear at least part of the cost of access, whether in the form of a guarantee or otherwise. First, although section requires AT & T to transfer to the Operating Companies adequate facilities to enable the local companies to meet the equal access requirements, the transfers of equipment provided for under the plan of reorganization will clearly not be sufficient to achieve that purpose. Second, AT & T consistently represented to the Court that, even though the company would not pay the access expenses directly, it would do so indirectly through the carrier access charges. [4] It now appears, however, that for several reasons discussed in the July 8, 1983 Opinion, the carrier access charges may not be adequate to reimburse

1. This Modification reads as follows:
 If by January 1, 1994, the Operating Companies in the aggregate have not recovered the costs of providing equal access and network reconfiguration (as defined in AT & T's Consolidated Application filed with the Federal Communications Commission on March 1, 1983), plus financing expenses, through their collection of access charges from the interexchange carriers, AT & T will reimburse the Operating Companies in the amount of any remaining deficit. For purposes of this provision, "costs" shall mean the actual costs incurred by the Operating Companies, as distinguished from the estimates in the Consolidated Application. A preliminary accounting will be provided to the Court at the close of the Operating Companies' equal access and network reconfiguration program or by January 1, 1989, whichever is earlier, and a final accounting not later than January 1, 1994.

2. Other points made by AT & T essentially relate to the request for a proviso to the Modification and are considered under II *infra*.

3. AT & T also claims that the issue was not briefed or otherwise considered prior to the Court's decision on July 8, 1983, but this claim is difficult to understand. Dozens of memoranda with supporting materials were submitted to the Court on the question whether the access costs should more appropriately fall on AT & T or on the Operating Companies, and this was also one of the subjects on which argument and testimony were adduced at the June 2, 1983 hearing.

4. While all interexchange carriers will pay such access charges, AT & T, as the largest carrier, will contribute the lion's share.

the Operating Companies for these costs. Hence the guarantee required as a prerequisite to the Court's approval of the plan of reorganization.

The argument made by AT & T, and supported by the Department of Justice, that the guarantee would impose an obligation on the company that would be inconsistent with what the parties call the decree's "basic premise"—that the access costs be recovered through access charges paid by all interexchange carriers, not merely AT & T [5]—thus misses the point, for it fails to consider those features which embody a special AT & T obligation not shared by other carriers: the provisions of section I(A)(1) and the representations made to the Court by AT & T.[6]

All of these subjects were fully explored by the parties and considered by the Court prior to the issuance of the July 8, 1983 Opinion; AT & T's motion adds nothing new on any of the underlying issues; and the Court will therefore deny that motion to the extent that it requests the deletion of Modification 1.

## II

The essence of AT & T's argument in support of the attachment of a proviso to the Modification lies in the claim that the Operating Companies and the local regulators would have and might exercise the opportunity to establish access charges that would be insufficient for full cost recovery. The result of such actions would be that the

costs would ultimately be recovered from AT & T pursuant to the guarantee. This, according to AT & T, is not the purpose for which the Modification was designed. That understanding is correct.

The Operating Companies, assured under the guarantee provision of reimbursement from AT & T at the end of the ten-year period specified in the Modification, would have a significant incentive consistently to under-recover access costs prior to that time;[7] the regulators would have a similar incentive to deny full recovery of such costs;[8] and AT & T's competitors would have an incentive to encourage these trends.[9] In the judgment of the Court it is quite likely that, absent some countervailing mechanism, these entities will act on these incentives.

The Court was not unmindful of this contingency when it issued the July 8, 1983 Opinion. Indeed, it was for that reason that it required AT & T and the Operating Companies to file prior to divestiture a description of the accounting methods which would be used for identifying the access costs and for determining whether and when they had been recovered. Opinion at 1068 note 37. The Court had in mind that, if AT & T and the Operating Companies agreed on the procedure and substance with respect to such recovery, there would be no need for further judicial intervention; if these parties did not agree (essentially because of a dispute similar to that generated

**5.** AT & T Memorandum at 3–4; Department of Justice Response at 2.

**6.** Moreover, as the National Association of Regulatory Utility Commissioners (NARUC) points out,
> [i]t would be fundamentally unfair if AT & T, whose interstate toll operations were sheltered by the refusal to provide equal access, should be allowed to unload the massive costs of complying with the decree upon the BOCs.

Response at 2. On this basis, the Court also rejects AT & T's demand that it strike the reference in the July 8, 1983, Opinion to AT & T's prior obligation to provide equal or substantially equal access. Motion at 6–7 note *. If this issue should arise in other, private litigation, the tribunals having jurisdiction will, of

course, draw their own conclusions based on their understanding of court and FCC precedents.

**7.** This would lower rates and thus stimulate usage, and it would also tend to divert the equal access obligation from the local companies to AT & T.

**8.** The resulting lower intra-LATA ·toll rates would obviously be popular with the public the regulators serve.

**9.** To the extent that AT & T, as a result of the guarantee, ultimately paid for the costs of providing equal access, its competitors would be relieved of the obligation of paying for that access through interexchange access charges.

by AT & T's present motion) the Court could take steps before divestiture to guard against the contingencies feared by AT & T. By its motion AT & T has brought the issue to a head now, and there is no reason for delaying consideration of this subject.

The July 8, 1983 ruling represents the Court's determination that the somewhat conflicting requirements of the decree [10] can best be harmonized by requiring the Operating Companies to incur the access expenses while requiring AT & T to provide the guarantee embodied in Modification 1. Implicit in that Modification is the principle that AT & T shall guarantee all access costs legitimately incurred and legitimately unrecovered. Equally implicit is the corollary: that AT & T need not provide a guarantee with respect to costs which remain unrecovered as a consequence of actions by Operating Companies or regulators designed improperly to divert such costs to AT & T. The proviso proposed by AT & T would make the latter objective explicit,[11] and it would do so—as will now be seen—without in any way weakening the guarantee itself.

Several of the intervenors [12] argue that the proviso would have the practical effect of nullifying the guarantee obligations. The theory underlying these arguments is that, if due to market forces or substantial bypass by AT & T, there is a shortfall in any one year in the recovery of carrier access charges to pay for the access costs, the Operating Companies will under the proviso be compelled to file, and the regulators will be compelled to approve, a higher tariff the following year, and so on every year until the end of the guarantee period.

This process, it is said, would automatically and inevitably relieve AT & T of all obligations on the following basis. If the tariffs were designed so as to recover all necessary costs, there would never be a shortfall; on the other hand, if the tariffs were not designed to recover all necessary costs, they would violate the proviso and AT & T would be discharged of its obligation on that basis.

That analysis misconceives the breadth of the guarantee and the relatively narrow focus of the proviso. As AT & T has pointed out (Reply at 8–9):

> The obligation would still require AT & T to stand as the ultimate guarantor of whatever equal access and network reconfiguration costs are allowed in the BOCs' tariffs in the ten years following divestiture. If market conditions ultimately prevent the BOCs from recovering those costs by January 1, 1994—despite their inclusion in tariffs intended to produce full recovery—AT & T pays the balance, even as the guarantee would be conditioned by the proviso.

Properly construed, then, the effect of the Modification in combination with the proviso will be to protect AT & T from manipulation by the Operating Companies or the regulators; at the same time, these provisions will not excuse AT & T from the guarantee obligation in the event that there is a shortfall in the recovery of carrier access charges for access cost purposes as a result of market forces or bypass by AT & T.[13] Under the decree and in equity, that is as it should be.[14]

10. Compare, *e.g.,* section I(A)(1) with Appendix B.

11. Essentially, the protection of AT & T is accomplished in the proviso by the clauses relieving AT & T of its obligation if the Operating Companies fail to file access charge tariffs designed to recover all costs included within the guarantee, or if the regulators refuse to allow such tariffs to take effect.

12. *E.g.,* Maine, p. 2; NARUC, pp. 4–7; GTE, p. 7; SBS, p. 2.

13. In the event that at the conclusion of the guarantee period, there is a dispute as to the cause of any shortfall, the Court will resolve that dispute as provided for on p. 1068 of the Opinion of July 8, 1983.

14. The proviso proposed by AT & T includes a footnote which reads as follows:

> To the extent that network reconfiguration costs relate to the BOCs' provision of other services (such as intra-LATA toll), rather than to carrier access services, the BOCs will be required to include such costs in tariffs for those other services which are filed and allowed to become effective in accordance with this proviso, and any amounts thus recovered shall count toward reimbursement of the BOCs' costs of network reconfiguration.

Questions have been raised by some (*e.g.,* SBS Memorandum at 3) regarding the duration of the guarantee period. Modification 1 envisages the recovery by the Operating Companies of the costs of access within ten years. AT & T and others (*e.g.,* the Department of Justice) have pointed out that under current regulatory directives, many major capital investments must be depreciated over extended periods of time, some in twenty-five years. The Court is thus presented with the choice of either substantially extending the guarantee period or retaining the ten-year period notwithstanding the various existing or proposed depreciation schedules.

After giving the subject careful consideration, the Court has decided to retain the ten-year deadline.[15] Any change in that regard would create unnecessary and inappropriate entanglements between AT & T and the Operating Companies well into the next century.[16] Moreover, depreciation schedules vary, depending not only upon the

equipment involved but also upon the practices of the several state and federal regulators, and it would be difficult, if not impossible, to tailor the guarantee to meet all these contingencies. Finally, the various depreciation schedules are not immutably fixed in the law but are subject to change by the regulators.

The choice thus rests with the various regulatory bodies.[17] They may either so adjust the depreciation schedules for equipment used to provide equal access or network reconfiguration as to accommodate the requirements of Modification 1, or they may decline to do so, recognizing that if they elect this course not all the costs may be recovered within a ten-year period and AT & T will be relieved of its obligation to that extent to make up the difference.

The Court denies AT & T's motion for partial reconsideration insofar as it requests that the Court strike Modification 1, but it grants that motion insofar as it requests the addition to the Modification of a proviso.[18]

Network facilities to be constructed will, of course, be used in part for services other than interexchange access (*e.g.,* for intra-LATA access or intra-LATA toll services), and accordingly a portion of the investment in these facilities will normally be recovered from services other than such access. On this basis, it is appropriate, therefore, that any funds received by the Operating Companies from these other sources be counted toward AT & T's reimbursement obligation. It was for this reason that the Court required in its July 8, 1983 Opinion that the Operating Companies keep records to isolate access expenses from expenses they would have incurred in any event (Opinion at 1068 note 37), and it is on the same basis that it approves the inclusion of this footnote.

It should be noted that this provision will not compel regulators to determine that any portion of network reconfiguration costs relates to services other than carrier access services; it simply provides that *if* the regulators make such determinations, AT & T will be protected from having to pay under the guarantee even though, in reality, there was no deficit.

15. The Court recognizes that one consideration cuts the other way: a ten-year schedule, as California points out (Opposition at 7), may inflate the Operating Companies' annual access costs in the near term. However, that increase in costs must be kept in perspective. Even if $3 billion will have to be recovered in the ten-year period, the total amount would still

only be two percent of the over $150 billion that is estimated to be collected by the Operating Companies in access charges. See Department of Justice Response, Attachment B at 6. Thus, the effect on rates of a ten-year recovery period vs. some longer period would not be substantial, and even that effect could further be mitigated by the regulators.

16. For the same reason, the Court rejects the suggestion of the United Church of Christ (Opposition at 8) that AT & T be relieved of the guarantee only to the extent that the Operating Companies may be able to recover costs after 1994.

17. This solution also appropriately meets concerns expressed by the Federal Communications Commission (Comments at 2) and by NARUC (Response at 5) that the Court's decision might improperly interfere with the authority of the regulators.

18. Several of the intervenors propose various measures in other areas of the plan of reorganization in order to counterbalance what they regard as the effects of the proviso. Thus, California proposes (Opposition at 9–10) that the Court assign the so-called "Account 232" to AT & T, and MCI suggests (Opposition at 3) that the Court's modification with respect to patent licensing will have a beneficial impact on the recovery of the access costs. The plan of reorganization, as it was required to be mod-

Accordingly, Modification 1 is hereby amended by the addition of the following language:

Provided, however, that with respect to any Operating Company, AT & T's obligation shall be discharged to the extent that: (a) the Operating Company fails annually to file carrier access tariffs designed to recoup any then-unrecovered equal access and network reconfiguration * costs by January 1, 1994; or (b) any regulatory commission refuses to permit such tariffs to take effect; or (c) regulatory requirements for the depreciation or amortization of equal access and network configuration investment cause any portion of the investment not to be recognized as a cost of ratemaking in periods prior to January 1, 1994.

* To the extent that network reconfiguration costs relate to the BOCs' provision of other services (such as intra-LATA toll), rather than to carrier access services, the BOCs will be required to include such costs in tariffs for those other services which are filed and allowed to become effective in accordance with this proviso, and any amounts thus recovered shall count toward reimbursement of the BOCs' costs of network reconfiguration.

It is the Modification as so amended which AT & T and the Department of Justice will be required to incorporate in the plan of reorganization as a prerequisite to the Court's final consideration and approval of that plan.

### ON MOTIONS FOR RECONSIDERATION AND CLARIFICATION

Several motions for reconsideration or clarification of the Court's July 8, 1983,

ified in the July 8, 1983 Opinion, is carefully balanced to achieve the decree's purposes and objectives. The proviso is not sufficiently significant to call that balance into question and thus to provoke reconsideration of other aspects of the plan.

California also suggests (Opposition at 5–6) that

[t]hroughout the nation, BOCs are presenting regulatory authorities with rate increase proposals . requesting not only substantial increases in total revenue but also drastically restructured rate designs, featuring 100 to 300 percent increases in basic monthly rates ..., occasional reductions in toll rates [and] substantial customer access line charges . . . .

opinion have been filed. This Memorandum disposes of all such motions.[1]

1. MCI Communications Corporation has moved for clarification of Modification 3, which modifies the provisions of the plan of reorganization with respect to patents. MCI argues that computer software is subject to this modification, and that AT & T must grant to the Operating Companies royalty-free licenses thereto as well as the right to sublicense where the provision of goods and services to these companies is involved.

The Court stated in its July 8, 1983 Opinion that, for purposes of the plan of reorganization, "patents" includes nonpatented technical information. Opinion at 1082 note 100. However, as the Court indicated in the very next sentence of that footnote, it was referring in the technical information context to such information as was funded by the license contract between AT & T and the Operating Companies. Computer software has not been so funded.

More broadly, as the discussion in Part IV of the July 8, 1983 Opinion demonstrates, insofar as technical information (as distinguished from patents) is concerned, the Court was concerned in Modification 3 with the issues raised in the "Patents" section of the plan of reorganization, in particular note 399 at p. 411 of the plan. That footnote flatly states that "[t]he BOCs will not be granted any licenses relating to patents

To the extent that these requests are claimed to be based on the divestiture as presently structured, they have no justification.

1. To the extent that motions or individual arguments made in motions are not addressed herein, they either raise issues which were previously fully considered or are deemed to lack merit for other reasons. However, the Operating Companies' proposed provision of cellular radio services across LATA boundaries, which is not part of the plan of reorganization but constitutes a request for an exception under Section VIII(C) of the decree, will be considered at a later time.

or any other technical information that relate solely to provision of CPE, inter-LATA service or any BOC services now prohibited by the Decree." The July 8 Opinion made it clear that this restriction was unacceptable under the purposes and principles of the decree and the representations that had been made to the Court. This, in turn, led to the requirement of Modification 3.

Other portions of the plan of reorganization deal with non-patented technical information in completely different contexts. For example, Part II(A)(1) (pp. 341–369 of the plan) discusses in considerable detail the assignment of various types of computer software. It was not the Court's intention to disapprove these portions of the plan *sub silentio*.[2] Indeed, the two reasons given in the July 8 Opinion for granting to the Operating Companies more extensive patent rights than originally provided for by the plan of reorganization—(1) recognition of past contributions to research they had made through the licensing contracts, and (2) the reasonableness of the removal of the mandatory patent licensing provisions of the 1956 decree[3]—are not applicable to the type of non-patented, computer software which is the subject of MCI's motion.[4] These parts of the plan were not affected by Modification 3, and they remain in effect.

To the extent that clarification is required to resolve any seeming inconsistency between the Court's reference to technical information in note 100, on the one hand, and its implicit approval of the plan's treatment of non-patented technical information which AT & T did propose to share with the

Operating Companies, on the other,[5] it is hereby resolved as described above. MCI's motion will accordingly be denied.

2. Several intervenors ask the Court to reconsider its approval of the assignment of the so-called Account 232 to the Operating Companies and to assign the Account instead to AT & T.[6] That request will likewise be denied. In-place wiring, which is a principal item in Account 232, is as much a "bottle-neck" as are the subscriber access lines.[7] To assign such wiring to AT & T would be to insert AT & T-controlled facilities between the Operating Companies and the subscribers, and such an assignment would thus be entirely inconsistent with the basic purposes of the decree.[8]

Account 232 also includes the capitalized labor costs associated with the installation and testing of customer premises equipment, and a theoretical case could be made that, since under the plan embedded CPE is being assigned to AT & T, so should be this portion of Account 232. However, the Court was and is persuaded by AT & T's argument, for the reasons stated in AT & T's Response to Objections at 154–55, that there is no practical way to separate out the various handling costs.[9] The provision made in the plan of reorganization regarding Account 232 is consistent with the decree and otherwise reasonable, and there is no basis for reconsidering the Court's approval of the plan in this regard.

3. GTE Corporation has petitioned the Court for limited reconsideration of that part of the Court's July 8, 1983 Opinion which approved the Operating Companies' classifications (as either intra-LATA or in-

---

2. The provisions in the plan regarding computer software represent complex arrangements some of which were substantially modified by AT & T following Department of Justice objections. See, *e.g.*, Response of Department of Justice to Comments at 144–52.

3. Opinion of July 8, 1983 at 1084–85.

4. See AT & T Response to Objections at 426–29.

5. *I.e.*, technical information not related to CPE, inter-LATA service, or other Operating Company services prohibited by the decree.

6. The Court did not discuss this issue in the July 8, 1983, Opinion, but it was considered. Opinion at 1061 note 2, and at 3.

7. Much inside wiring is wire that is embedded in conduits, and it is not replaceable by, nor often even accessible to, the customer.

8. See *Litton Systems, Inc. v. Am. Tel. & Tel.*, 700 F.2d 785 (2d Cir.1983).

9. See also, the FCC's treatment of this issue, *Amendment of Part 31 (Uniform System of Accounts)*, CC Docket No. 79–105, 85 F.C.C.2d 818, 823–30 (1981).

ter-LATA) of traffic between their territories and Independent telephone company territories. Opinion of July 8, 1983 at 1110–13. The basis for this request for the reconsideration of nineteen out of hundreds of such classifications is that new information regarding homing and network arrangements was revealed for the first time during the development of the exchange areas under the proposed consent decree in *United States v. GTE Corp.,* Civil Action No. 83–1298, (filed May 4, 1983), which is pending before this Court. See GTE Petition at 2.

Of the nineteen classifications at issue, in eleven instances the relevant Operating Company does not oppose GTE's reclassification proposal.[10] These proposals are reasonable and consistent with the decree, and they will accordingly be deemed incorporated in the plan of reorganization.

Of the remaining eight GTE proposals, in two instances the Operating Company does not oppose a temporary reclassification pending the completion of certain modernization programs (which was the basis for the Operating Company's original proposal).[11] Such a temporary reclassification makes sense in view of current network arrangements, and the Court will approve it for these two areas on such a basis. In another case, permission is hereby granted for the reclassification which GTE proposes, upon completion of the rehoming project.[12]

In two instances, the Operating Company and GTE are in agreement, but the Department of Justice has correctly pointed out that the Operating Company should be permitted, but not required, to service the adjacent area.[13] With respect to the three remaining proposals, the relevant Operating Company opposes the reclassification—at least at this time—and GTE has not demonstrated that the classification as originally proposed by that Operating Company, and approved by the Department of Justice and the Court, is unreasonable or inconsistent with the decree.[14] Accordingly, that part of GTE's motion which relates to these five areas is denied.

4. The Public Service Commission of Kentucky has moved for reconsideration of the Court's decision to deny consolidation of the Winchester and Louisville LATAs. The Commission argues that the incremental loss of intrastate toll revenue that will be occasioned by three LATAs rather than two will require increases in local rates. However, the Commission has failed to note that access charges to be collected from the interexchange carriers can, if set properly, make up for any loss of revenue to South Central Bell. In any event, significant competitive advantages would flow from three LATAs. The Department of Justice has previously argued in favor of three LATAs on this basis; and the Public Service Commission has not demonstrated that

---

10. These proposals relate to the following areas: Indiana-Lafayette; Oklahoma-Guymon; South Carolina-Florence; Illinois-Olney; Illinois-Macomb; Pennsylvania-Erie; Texas-Texarkana; Kentucky-Winchester; Michigan; Oregon; and Washington. With respect to the last three areas, the respective Operating Company has indicated that the classifications in these states are already being revised as required by the Court's July 8, 1983 Opinion, and that they will therefore be consistent with the GTE proposals. Response of the Operating Companies to GTE Petition at 6–7.

11. The proposals in this category relate to the areas of Illinois-Bloomington and Illinois-Kewanee. Response of the Operating Companies to GTE Petition at 4, 7.

12. This will enable the association of the Chesapeake exchange with the Columbus LATA when the exchange is rehomed in 1984.

13. These two proposals relate to Indiana-Terre-Haute and West Virginia-Bluefield.

14. These proposals relate to the following areas: Illinois-Chicago; Ohio-Medina; and California-Oxnard. With respect to the last of these areas, Pacific Telephone has indicated that it is presently discussing the resolution of this matter with the Department of Justice. Response of the Operating Companies to GTE Petition at 3. As the Court indicated in the Opinion of July 8, 1983, the Bell Operating Companies may, under the decree, subsequently petition the Court for reclassification or for exceptions in regard to service between their own areas and Independent territory. Opinion of July 8, 1983 at 1112 n. 238.

the Court ought to disturb its prior decision that three LATAs are appropriate in Kentucky.[15] The motion is denied.

5. New York Telephone Company has expressed concern that the July 8, 1983 Opinion may have placed territorial restrictions on the Operating Companies' provision of directory advertising services. That concern is unwarranted. As the company correctly surmised, when the Court made mention of activities outside an Operating Company's territory,[16] it was referring to the Bell logo standing alone and the Bell name without a modifier. The decree and the plan do not limit the provision of directory advertising or of customer premises equipment to prescribed geographical territories.

6. The American Council of the Blind, the Paralyzed Veterans of America, and others are concerned about the transfer to AT & T of embedded specialized equipment for the disabled, such as teletypewriters and large button telephones, the price of which may conceivably no longer be subsidized after the transfer. The Court's approval of the decree's provisions regarding embedded CPE is, of course, without prejudice to whatever equitable arrangements may be made among AT & T, the Operating Companies, and the representatives of the disabled regarding continued subsidization of such equipment. See also, The Telecommunications for the Disabled Act, P.L. 97–410 (1982).

7. The Communications Workers of America yesterday for the first time requested that the Court clarify or reconsider language in the July 8, 1983 Opinion which may prohibit portability of pension benefits not only between AT & T and the divested entities but also among the Regional Companies and between them and the Central Staff Organization. See Opinion at 1094. In view of the fact that AT & T and the Union are apparently at the present time engaged in collective bargaining, the Court inquired of AT & T whether it was prepared, on an informal and expedited basis, to express its agreement with the Union's interpretation, but AT & T responded that it

could not do so. Accordingly, the issue will be resolved on the basis of briefing in accordance with the usual procedure.

### ORDER

Upon consideration of the motion filed by AT & T on April 7, 1983 to approve the Plan of Reorganization, the proposed plan of reorganization as amended, the testimony given, and the oppositions, affidavits, comments, responses, and briefs filed with respect thereto;

It appearing that AT & T on August 3, 1983, agreed to the modifications required by the Court on July 8, 1983, as qualified on July 28, 1983, and it appearing that the Department of Justice has likewise given its assent to such modifications, it is this 5th day of August, 1983,

ORDERED That the motion be and it is hereby granted, and it is further

ORDERED That AT & T's proposed plan of reorganization, dated December 16, 1982, as amended March 14, 1983, March 25, 1983, April 7, 1983, and August 3, 1983, be and it is hereby approved as consistent with the provisions and principles of the decree entered on August 24, 1982.

---

**15.** South Central Bell is neutral on this issue.

**16.** July 8, 1983 Opinion at 1081.